Louis R. Strubeck, Jr. (SBT 19425600)
William R. Greendyke (SBT 08390450)
Elizabeth N. Boydston  (SBT 24053684)
**FULBRIGHT & JAWORSKI L.L.P.**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Tel:  (214) 855-8000
Fax:  (214) 855-8200
lstrubeck@fulbright.com
wgreendyke@fulbright.com
lboydston@fulbright.com

**ATTORNEYS FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 11-32600 |
| | § | |
| VITRO ASSET CORP., et al., | § | Jointly Administered |
| | § | Chapter 11 |
| In re: Vitro America, LLC | § | Case No. 11-32602 |
| In re: Super Sky Products, Inc. | § | Case No. 11-32604 |
| In re: Super Sky International, Inc. | § | Case No. 11-32605 |
| In re: VVP Finance Corporation | § | Case No. 11-32611 |
| Debtors.[1] | § | (Jointly Administered under Case No. 11-32600) |
| In re: VVP Funding Corporation, | § | Case No. 11-33161 |
| Debtor. | § | Joint Administration Requested |

**DEBTORS' MOTION, PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND RULES 2002, 6004, 6006, 9007 AND 9014 OF
THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR ENTRY OF AN
ORDER (I) APPROVING THE PURCHASE-SALE AGREEMENT BY AND
BETWEEN THE DEBTORS AND MARK S. AND ANN M. BLACKBURN,
(II) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND
<u>OTHER INTERESTS, AND (III) GRANTING RELATED RELIEF</u>**

TO THE HONORABLE HARLIN D. HALE, UNITED STATES BANKRUPTCY JUDGE:

---

[1]     The Debtors are: Vitro America, LLC ("*Vitro America*") (Case No. 10-47473), Super Sky Products, Inc. ("*Super Sky Products*") (Case No. 10-47475), Super Sky International, Inc. ("*Super Sky International*") (Case No. 10-47476), and VVP Finance Corporation ("*VVP Finance*") (Case No. 10-47482).

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby file this *Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure for Entry of an Order (I) Approving the Purchase-Sale Agreement by and Between the Debtors and Mark S. and Ann M. Blackburn, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests, and (III) Granting Related Relief* (the "Motion"). In support of this Motion, the Debtors respectfully represent the following:

## PRELIMINARY STATEMENT

1.  By this Motion, the Debtors seek the approval of the expedited sale of certain non-essential assets, consisting of two (2) cranes and two (2) concrete tilt-up buildings measuring 40,755 square feet and located on approximately 89,278 square feet of land, located at 9010 S. Norwalk Boulevard, Santa Fe Springs, California 90670 (the "Acquired Assets"), to Mark S. Blackburn and Ann M. Blackburn (collectively, the "Buyers"), for $2,350,000.00 (the "Purchase Price"). As more comprehensively described below, and in the Debtors' Motion for Expedited Consideration of this Motion, which was filed contemporaneously herewith, the Debtors seek expedited consideration of the Motion because: (i) in the absence of immediate court approval of the Sale (defined below), the Debtors risk losing the Sale to the Buyers, the only prospective purchasers of the Acquired Assets; (ii) the value of the Acquired Assets continues to decline on a daily basis; and (iii) the Debtors' ongoing obligation to provide security for the Acquired Assets constitutes an unnecessary burden on the Debtors' scarce liquid resources.

2.  From the Debtors' perspective, the Purchase-Sale Agreement (defined below) represents a reasonable exercise of the Debtors' business judgment, and an expedited sale is in the best interests of the Debtors' estate, and all creditors, interest holders and parties in interest.

The terms of the contemplated Sale are fair and reasonable and represent the highest and best offer the Debtors are likely to receive for the Acquired Assets.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference of the United States District Court for the Northern District of Texas.  This is a core proceeding pursuant to 28 U.S.C. §157(b).

4.    Venue of these chapter 11 cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.    The statutory predicates for the relief requested herein are (i) sections 105(a) and 363(b), (f), (k) and (m) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"); (ii) Rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (iii) the Local Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules").

## BACKGROUND

**A.    Introduction**

6.    On November 17, 2010 (the "Petition Date"), Knighthead Master Fund, L.P., Brookville Horizons Fund, L.P., Davidson Kempner Distressed Opportunities Fund, LP, and Lord Abbett Bond-Debenture Fund, Inc. (collectively, the "Petitioning Creditors"), filed an involuntary petition against each Debtor under chapter 11 of the Bankruptcy Code (collectively, the "Involuntary Petitions").

7.    On December 9, 2010, the then Alleged Debtors filed their Answer to the Involuntary Petitions, denying a number of allegations made in the Involuntary Petitions and asserting a number of affirmative defenses to the relief sought by the Petitioning Creditors.

8.     On April 6, 2011 (the "Order for Relief Date"), orders for relief were entered with respect to Vitro America, Super Sky Products, Super Sky International, and VVP Finance. Since that date, the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On April 15, 2011, the United States Trustee for the Northern District of Texas (Fort Worth Division) (the "U.S. Trustee") appointed the Official Unsecured Creditors' Committee (the "Committee") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

9.     On May 9, 2011, VVP Funding Corporation ("VVP Funding") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

10.     Information regarding the Debtors' business and capital structure and the circumstances and events leading to these chapter 11 cases is contained in the *Affidavit by Ricardo Maiz Rodriguez in Support of Various Applications and Motions* (the "Maiz Declaration"), which is incorporated herein by reference for all purposes. *See* Dkt. No. 228.

**B.     9010 S. Norwalk Boulevard**

11.     The Acquired Assets are comprised of 89,278 square feet of land, which contain two (2) concrete tilt-up buildings and two (2) cranes. The Buyers are Mark S. Blackburn and Ann M. Blackburn, the owners of the land adjacent to the Acquired Assets. The land component of the Acquired Assets is subject to an easement which is beneficially owned by the Buyers.[2] Prior to the Petition Date, the Debtors used the Acquired Assets as a fabrication and distribution center, where they, *inter alia*, tempered, cut and insulated glass products. However, the Debtors have not used the Acquired Assets since the first quarter of 2009, at which time they closed

---

[2]     The City of Santa Fe Springs required the Debtors to provide the easement to the Buyers.

various facilities to consolidate their operations into a plant located in the City of Industry, California. Accordingly, the Acquired Assets have remained idle since early 2009. On July 9, 2008, the Debtors engaged Laird Perkins, of CB Richard Ellis, as a broker to market the Acquired Assets.

12. Although several prospects have examined the Acquired Assets, the Debtors believe that the existence of the easement, which is beneficially owned by the Buyers, makes the Acquired Assets particularly unattractive to potential purchasers. The easement runs between the two tilt-up buildings, and subdivision of the land is not a feasible alternative. Accordingly, the existence of the easement has made the Acquired Assets all but impossible to sell and has otherwise depressed their purchase price.

13. Further in early 2011, the Acquired Assets were vandalized and now require security services to protect the property from further vandalism. Specifically, trespassers have damaged doors and windows of both buildings, and have stripped one of the tilt-up buildings of its copper and other wiring. The cost of the security services that the Debtors must provide to protect the Acquired Assets constitutes a burden on the estates' scarce liquid resources and, to the extent the Debtors would ever seek to use the Acquired Assets in the future, the Debtors estimate that the costs of repairing the Acquired Assets would exceed $300,000.00.

## C. The Debtors' Debt Structure

### (i). Pre-Petition Loan Facility and BALC Equipment Leases

14. Vitro America and VVP Finance (together, the "Pre-Petition Borrowers") are parties to that certain Loan and Security Agreement, dated as of June 27, 2003 (as modified from time to time, the "Pre-Petition Loan Agreement"), pursuant to which Bank of America, N.A. (the

"Pre-Petition Lender") provided them with a revolving loan facility of up to $35 million (the "Pre-Petition Loan Facility"), with an $18 million letter of credit sub-facility.

15. As of the Petition Date, there was outstanding under the Pre-Petition Loan Facility or was otherwise owed to the Pre-Petition Lender (a) revolving credit loans in the approximate principal amount of $8,610,575 (the "Pre-Petition Revolver Loans"), (b) reimbursement obligations for any draws made upon letters of credit issued by the Pre-Petition Lender for the account of the Pre-Petition Borrowers in the aggregate face amount of approximately $14,180,106 (collectively, the "Pre-Petition LCs"), and (c) corporate credit card debt of approximately $501,000 (the "Pre-Petition Credit Card Debt" and together with the Pre-Petition Revolver Loans, Pre-Petition LCs and all other obligations of any Pre-Petition Obligor (defined below) to the Pre-Petition Lender on the Petition Date, including, without limitation, all indebtedness associated with cash management system services or products and all interest, fees, legal expenses and other amounts heretofore or hereafter accruing on any of the foregoing or at any time chargeable to any of the Pre-Petition Obligors in connection therewith, referred to as the "Pre-Petition Obligations").

16. As of the Order for Relief Date, the total principal amount of the Obligations under (and as defined in) the Pre-Petition Loan Agreement (exclusive of interest, fees, and other charges (including legal fees) payable in connection therewith and indebtedness associated with the cash management system services) totaled approximately $24,673,975 (including reimbursement obligations under the Pre-Petition LCs), consisting, in part, of Gap Credit Extensions (defined below) in the approximate principal amount of $1,401,763 and corporate credit card obligations in the approximate principal amount of $501,000 (collectively, together with all other obligations of the Pre-Petition Obligors to the Pre-Petition Lender on the Order for

Relief Date (but excluding the Pre-Petition Obligations), including all indebtedness associated with cash management system services or products and all interest, loan fees, legal fees and expenses and other amounts accruing on any of the foregoing or at any time chargeable to any of the Pre-Petition Obligors in connection therewith, referred to as the "Gap Period Obligations").

17. Pursuant to those certain Continuing Guaranty Agreements, dated June 27, 2003, and that certain Continuing Guaranty Agreement, dated November 16, 2009, VVP Holdings, LLC, VVP Auto Glass, Inc., Super Sky International, and Super Sky Products (together with the Pre-Petition Borrowers, the "Pre-Petition Obligors") guaranteed the Pre-Petition Obligations and the Gap Period Obligations (collectively, the "Pre-Petition Secured Obligations").

18. The Pre-Petition Secured Obligations are secured by first priority security interests in and liens (the "Pre-Petition Liens") upon (a) all or substantially all of the Pre-Petition Obligors' (other than Super Sky Products) personal property, including, without limitation, all accounts, inventory, contract rights, chattel paper, documents, instruments, supporting obligations, general intangibles, equipment, money, securities, deposit accounts, and books and records, and (b) certain parcels of real property, and improvements thereto, of certain Pre-Petition Obligors, which parcels are located in Los Angeles County, California, Denver County, Colorado, Grenada County, Mississippi, Guilford County, North Carolina, Oklahoma County, Oklahoma, Tulsa County, Oklahoma, Dallas County, Texas, Harris County, Texas, and Henrico County, Virginia (all such real and personal property, as the same existed on the Petition Date, together with all cash and non-cash proceeds thereof, being collectively called the "Pre-Petition Collateral").

19. The Gap Period Obligations are also secured by first priority security interests in and liens upon (the "Gap Credit Extension Liens") the Pre-Petition Collateral and all of the same

types of property at any time created or acquired by any Pre-Petition Obligor during the Gap Period (the "Gap Period Collateral" and together with the Pre-Petition Collateral, the "Lender Collateral").

20.     In addition, pursuant to this Court's orders,[3] the Pre-Petition Lender was granted, as adequate protection for any diminution in the value of its interests in the Pre-Petition Collateral resulting from the use, sale, consumption, collection, or other disposition of any Pre-Petition Collateral, adequate protection replacement liens (the "Gap Adequate Protection Liens" and together with the Pre-Petition Liens and the Gap Credit Extension Liens, the "Lender Liens") upon the Post-Petition Collateral (as defined in the Gap Period Financing Orders).

21.     The Acquired Assets constitute Lender Collateral subject to the Lender Liens as security for the Pre-Petition Secured Obligations.

## RELIEF REQUESTED

22.     The Debtors request the entry of an order in substantially the form attached hereto as **Exhibit A** (the "Sale Order"): (i) approving the Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate (the "Original Sale Agreement," and with any and all amendments, collectively, the "Purchase-Sale Agreement"), dated March 3, 2011, and subsequently amended on April 1, 2011, and April 27, 2011, between the Debtor Vitro America and the Buyers, and the execution thereof, substantially in the form attached hereto as **Exhibit B**, pursuant to which the Buyers, or their assignee(s) or designee(s) (the Buyers and any assignee(s)

---

[3]     See *Interim Order Pursuant to 11 U.S.C. §§ 105, 303, 361, 363 and 364 (I) Authorizing Certain Borrowers (A) to Continue to Obtain Secured Financing, (B) to Continue to Utilize Their Existing Cash Management System and (C) to Use Cash Collateral, (II) Approving Post-Petition Financing, (III) Granting Adequate Protection and (IV) Scheduling a Final Hearing* [Docket No. 60] (the "Interim Gap Period Financing Order"), and *Final Order Pursuant to 11 U.S.C. §§ 105, 303, 361, 363 and 364 (I) Authorizing Certain Borrowers (A) to Continue to Obtain Secured Financing, (B) to Continue to Utilize Their Existing Cash Management System and (C) to Use Cash Collateral, (II) Approving Post-Petition Financing, and (III) Granting Adequate Protection* [Docket No. 137] (the "Final Gap Period Financing Order" and, together with the Interim Gap Period Financing Order, the "Gap Period Financing Orders").

or designee(s) shall be collectively referred to as the "Buyers"), will acquire the Debtors' assets identified in further detail in the Purchase-Sale Agreement (the "Acquired Assets"); (ii) authorizing at closing, the sale (the "Sale") of the Acquired Assets to the Buyers, free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Liens"), with such Liens, including, without limitation, the Lender Liens, to attach to the proceeds of the Sale, and with the proceeds of the Sale to be paid to the Pre-Petition Lender for application to the Pre-Petition Secured Obligations in such order as the Pre-Petition Lender may elect in its discretion; and (iii) granting other related relief.

**THE NEED FOR AN EXPEDITED SALE**

23.     The Debtors seek emergency consideration of this Motion, which is essential because the Debtors currently seek to sell the Acquired Assets on or before May 27, 2011. If the Acquired Assets are not sold before May 27, 2011, the Debtors may lose their only opportunity to sell these assets, as further discussed herein. Moreover, as described above, the Acquired Assets have been vandalized and now require ongoing security services to protect the property from further vandalism. Such costs represent a significant burden to the Debtors' scare liquid resources, and the elimination of these expenses would benefit the estate. Further, the value of the Acquired Assets is believed to be declining rapidly. The Buyers, the only viable purchasers of the Acquired Assets and the Debtors seek to close the sale within the next several weeks. Upon information and belief, the Creditors' Committee and the Pre-Petition Lender have no objection to the relief sought herein. Accordingly, an expedited sale is essential to maximize the value of the Acquired Assets for the benefit of the Debtors' estates and a prompt sale pursuant to this contract represents the best and most viable option available to the Debtors. From the Debtors' perspective, the Purchase-Sale Agreement represents a reasonable exercise of the Debtors' business judgment, and an expedited sale is in the best interests of the Debtors and all

of their economic claim and interest holders. The Debtors have expended substantial time and resources soliciting potential purchasers of the Acquired Assets pre-petition and accordingly are of the opinion that the Purchase-Sale Agreement with the Buyers represents the best terms the Debtors can reasonably anticipate to obtain and that the process they have implemented is comprehensive, fulsome and appropriate in every respect.

## LEGAL AUTHORITIES IN SUPPORT OF RELIEF REQUESTED

### A.   Approval of the Sale of Substantially All of the Debtors' Assets.

24.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

25.    Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, in applying this section, courts have required that it be based upon the debtor's business judgment. *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) (stating that a debtor must demonstrate "some articulated business justification for using, selling, or leasing property outside of the ordinary course of business"); *Comm. Of Equity Security Holders v. Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (indicating that a sale of a substantial part of a chapter 11 estate other than in the ordinary course of business may be conducted if a good business reason exists to support it.). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigation v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that "'in making a

business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A. 2d 858, 872 (Del. 1985)).

26.     Moreover, section 105(a) of the Bankruptcy Code grants this Court broad authority under its equitable powers to fashion any order or decree that would preserve or protect the value of a debtor's assets.  *See* 11 U.S.C. § 105(a); *see also*, *Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Crop.)*, No. 02 Civ.8495, 2003 WL 21297258, at *4 (S.D.N.Y. June 4, 2003) ("Section 105 of Title 11 provides the bankruptcy courts with a broad range of equitable powers over cases within its jurisdiction.").

27.     Courts look to various factors to determine whether to approve a motion under section 363(b) of the Bankruptcy Code, such as: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided.  *See In re Condere*, 228 B.R. 615, 626 (Bankr. S.D. Miss. 1998); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).  The Debtors respectfully submit that the proposed sale of the Acquired Assets fits squarely within the parameters of the sound business judgment test articulated above.

      **1.**    **A Sound Business Reason Exists For The Sale Of The Purchased Assets**

28.     The Debtors' decision to sell property out of the ordinary course of business enjoys a strong presumption "that in making a business decision the Debtors acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656.  Therefore, parties objecting to the

Debtors' proposed sale must make a showing of "bad faith, self-interest, or gross negligence." *Integrated Res.*, 147 B.R. at 656.

29.     The Debtors have determined, in their business judgment, that the sale of the Acquired Assets pursuant to the Purchase-Sale Agreement is appropriate and in the best interest of, and represents the best means of preserving and maximizing value for, the Debtors' estates.

30.     The Debtors have not used the Acquired Assets since early 2009.    After approximately two years, during which time a representative of CB Richard Ellis led a comprehensive marketing process, the Buyers have emerged as the only prospective purchasers of the Acquired Assets.    As discussed above, the Acquired Assets are subject to an easement which is beneficially owned by the Buyers.    The easement not only substantially impairs the Debtors' ability to sell or lease the Acquired Assets, but it also detrimentally affects the value of the Acquired Assets.    Moreover, the Acquired Assets have been vandalized and now require security services to protect the property from further vandalism.    Such costs represent a burden to the Debtors' estates, and therefore must be eliminated to maximize value for all of the Debtors' stakeholders.    In addition, the value of the Acquired Assets continues to decline rapidly. Therefore, sounds business reasons support the Sale of the Acquired Assets to the Buyers.

   **2.     The Purchaser Is Paying Fair And Reasonable Consideration For The Purchased Assets**

31.     The aggregate consideration for the Acquired Assets is approximately $2,350,000.00.    Although the purchase price of the Acquired Assets was reduced from $2,475,000.00, such reduction was caused by, *inter alia*, the vandalism sustained by the Acquired Assets.    Given the difficulty the Debtors have faced trying to sell the Acquired Assets, the Debtors believe that the purchase price is fair and reasonable consideration for the Acquired Assets and is the result of extensive arm's length negotiations between the respective

representatives of the Debtors and the Buyers. The purchase price offered by the Buyers represents the highest and best offer to purchase the Acquired Assets received to date. The Debtors have expended substantial time and resources soliciting potential purchasers of the Acquired Assets pre-petition and accordingly are of the opinion that the Purchase-Sale Agreement with the Buyers represents the best terms the Debtors can reasonably anticipate to obtain.

### 3. The Sale Of The Purchased Assets Has Been Proposed And Negotiated In Good Faith

32. The Buyer should be afforded all protections under section 363(m) of the Bankruptcy Code as a good faith purchaser. Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith." 11 U.S.C. § 363(m). Courts generally determine that parties have acted in good faith with respect to a proposed sale if the purchase price is adequate and reasonable and the terms of the sale are disclosed fully. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986).

33. The Debtors submit that the Purchase-Sale Agreement is not tainted by self-dealing, collusion or manipulation as it was proposed and negotiated in good faith and executed by the Debtors and the Buyers in an arm's length transaction, and the Debtors and the Buyer have fully disclosed all material information. Similarly, the Buyers' proposed consideration for the Purchased Assets was made in good faith. Moreover, the Buyers were not preferred and did not receive special treatment. Accordingly, the Debtors assert that it is appropriate that the Buyers receive the protection of a good faith finding by the Court in accordance with section 363(m).

4.      **The Court Should Authorize The Sale Of The Purchased Assets To The Purchaser Free And Clear Of All Liens, Claims, Encumbrances, And Interests**

34.      The Debtors request that the sale and transfer of the Acquired Assets be approved free and clear of all interests, liens, claims, encumbrances and other interests, other than those specifically assumed by the Purchaser.  Such relief is consistent with the provisions of section 363(f) of the Bankruptcy Code.

35.      The Court may, pursuant to section 363(f) of the Bankruptcy Code, authorize a debtor-in-possession to sell property free and clear of any interest, lien, claim or interest of another entity in such property if any of the following circumstances pertain:

(i)      applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(ii)     such entity consents;

(iii)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(iv)     such interest is in bona fide dispute; or

(v)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

36.      As indicated by the use of the disjunctive term "or," satisfaction of any of the five requirements listed in section 363(f) is sufficient to permit the sale of assets free and clear of all interests, liens, claims, encumbrances, pledges, mortgages, security interests, charges, options and other interests, including any right of setoff.  *See, e.g.*, *In re C-Power Prods., Inc.*, 230 B.R. 800 (Bankr. N.D. Tex. 1998); *In re Elliott*, 94 B.R. 343, 345 (E.D. Pa. 1988) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; the court may approve a sale "free and clear" provided that at least one of the subsections is met).

37.     Here, the Debtors believe that the only entity asserting liens in the Acquired Assets as of the Petition Date is the Pre-Petition Lender.[4]  The Pre-Petition Lender has consented to the Sale subject to the Pre-Petition Lender's review and approval of any amounts to be deducted from the Purchase Price and the requirements that the Lender Liens shall attach to the proceeds of the Sale and that such proceeds shall be paid to the Pre-Petition Lender for application to the Pre-Petition Secured Obligations in such order as the Pre-Petition Lender may elect in its discretion.  Accordingly,  the Sale is permissible under section 363(f)(ii) of the Bankruptcy Code.

### 5.     Approval Of The Purchase-Sale Agreement

38.     Courts routinely approve asset purchase agreements and purchase-sale agreements in connection with the sale of a debtor's assets.  *See In re Arlco, Inc.*, 239 B.R. 261, 265 (Bankr. S.D.N.Y. 1999).  In this case, the Purchase-Sale Agreement was the subject of arm's length negotiations between representatives of the Debtors and the Buyers, and the Debtors submit that the terms and conditions of the Purchase-Sale Agreement are the best that could be obtained under the circumstances, and that entry into the Purchase-Sale Agreement is a sound exercise of the Debtors' business judgment.

### BANKRUPTCY RULES 6004(H) AND 6006(D) SHOULD BE WAIVED

Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  FED. R .BANK. P. 6004(h).  The Debtors request that any order entered pursuant to this Motion authorizing the consummation of a transaction that is deemed a

---

[4]     That certain Deed of Trust, Assignment of Rents Security Agreement and Fixture Filing, dated January 8, 2007, as amended by that certain First Amendment to Deed of Trust, Assignment of Rents Security Agreement and Fixture Filing, dated January 5, 2009, as amended  by that certain Second Amendment to Deed of Trust, Assignment of Rents Security Agreement and Fixture Filing, dated February 19, 2009, is attached hereto as **Exhibit C** and incorporated herein for all purposes.

sale of assets be effective immediately by providing that the 14-day stay under Rule 6004 is inapplicable, so that they may proceed to close on the Sale as expeditiously as possible and within the time frames contemplated by the Debtors and the Buyers.

## NOTICE OF THE SALE MOTION

In accordance with applicable rules, notice of this Motion has been provided by overnight delivery and/or e-mail or facsimile to:  (a) the Pre-Petition Lender; (b) the 30 largest unsecured creditors of the Debtors on a consolidated basis; (c) the Buyers; (d) the U.S. Trustee's Office; and (e) the United States Attorney's Office.  The Debtors believe that the notice provided for herein is fair and adequate and no other or further notice is necessary.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Debtors respectfully request the entry of an order or orders granting the relief requested in the Motion and for such other and further relief as may be just and proper.

Dated:  May 10, 2011                     Respectfully Submitted,

FULBRIGHT & JAWORSKI L.L.P.

*/s/ William R. Greendyke*
   Louis R. Strubeck, Jr. (SBT 19425600)
   William R. Greendyke (SBT 08390450)
   Elizabeth N. Boydston (SBT 20453684)
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Tel:  (214) 855-8000
Fax:  (214) 855-8200
lstrubeck@fulbright.com
wgreendyke@fulbright.com

*ATTORNEYS FOR THE DEBTORS AND DEBTORS-IN-POSSESSION*