**EXECUTION COPY**

**ASSET PURCHASE AGREEMENT**

**Dated as of June 8, 2011**

**Among**

**VITRO AMERICA, LLC,**

**Certain of its Affiliates named herein,**

**And**

**AMERICAN GLASS ENTERPRISES, LLC**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...........................................................................................2
    1.1    Definitions.................................................................................................2
    1.2    Other Definitional and Interpretive Matters .........................................14

ARTICLE II PURCHASE AND SALE ......................................................................15
    2.1    Purchased Assets....................................................................................15
    2.2    Excluded Assets.....................................................................................17
    2.3    Assumed Liabilities ...............................................................................19
    2.4    Excluded Liabilities ...............................................................................20
    2.5    Assignments; Cure Amounts .................................................................22
    2.6    Further Assurances.................................................................................22
    2.7    Designated Remaining Contracts...........................................................23

ARTICLE III PURCHASE PRICE ............................................................................24
    3.1    Purchase Price; Purchase Price Adjustment .........................................24
    3.2    Estimated Purchase Price Adjustment ...................................................25
    3.3    Final Purchase Price Adjustment ...........................................................25
    3.4    Cure Costs ..............................................................................................26
    3.5    Withholding ...........................................................................................27
    3.6    Payment of Deposit...............................................................................27
    3.7    Allocation of Purchase Price..................................................................27

ARTICLE IV CLOSING ............................................................................................27
    4.1    Closing Date...........................................................................................27
    4.2    Payment on the Closing Date.................................................................28
    4.3    Buyer's Additional Deliveries ..............................................................28
    4.4    Sellers' Deliveries .................................................................................28

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS................29
    5.1    Organization of Sellers .........................................................................29
    5.2    Subsidiaries and Investments.................................................................29
    5.3    Authority of Sellers...............................................................................29
    5.4    Real Property .........................................................................................30
    5.5    Title to Purchased Assets; Good Condition...........................................32
    5.6    Taxes .....................................................................................................33
    5.7    Absence of Certain Developments.........................................................33
    5.8    Sellers' Intellectual Property.................................................................33
    5.9    Employment Matters..............................................................................34
    5.10   Sufficiency of Assets .............................................................................37
    5.11   Compliance with Laws; Permits ...........................................................37
    5.12   Contracts ................................................................................................37

5.13 Customers and Suppliers.................................................................37
5.14 Financial Statements ....................................................................38
5.15 Litigation .................................................................................38
5.16 Accounts Receivable.....................................................................39
5.17 Inventory .................................................................................39
5.18 Insurance .................................................................................39
5.19 Product Returns..........................................................................40
5.20 Customer Warranties ....................................................................40
5.21 Affiliate Transactions....................................................................40
5.22 No Broker.................................................................................40
5.23 Assets of Other Entities .................................................................40
5.24 Disclaimer ...............................................................................41

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER ...................41
6.1 Organization of Buyer...................................................................41
6.2 Authority of Buyer.......................................................................41
6.3 No Finder ................................................................................42
6.4 Availability of Funds ...................................................................42

ARTICLE VII ACTION PRIOR TO THE CLOSING DATE ...............................42
7.1 Investigation of the Business by Buyer ...............................................42
7.2 Preserve Accuracy of Representations and Warranties ..............................43
7.3 Third Party Consents; Permits .........................................................43
7.4 Governmental Approvals ...............................................................44
7.5 Operations Prior to the Closing Date ..................................................45
7.6 Notification of Breach; Disclosure ....................................................48
7.7 Insurance; Damage; Destruction .......................................................49
7.8 Confidentiality ..........................................................................49
7.9 Bankruptcy Court Matters...............................................................49
7.10 Bankruptcy Filings......................................................................50
7.11 Information Technology.................................................................50
7.12 Non-Assignable Material Contracts....................................................50
7.13 Other Entities Assets....................................................................50
7.14 Customer Liens/Bonds..................................................................50
7.15 Renegotiation of Collective Bargaining Agreements ...............................51

ARTICLE VIII ADDITIONAL AGREEMENTS ...........................................51
8.1 Taxes .....................................................................................51
8.2 Employees and Employee Benefit Plans ..............................................52
8.3 Collection of Receivables ..............................................................53
8.4 Name Change............................................................................54
8.5 Real Property Prorations ...............................................................54
8.6 Post-Closing Books and Records and Personnel .....................................54
8.7 Insurance .................................................................................54

ARTICLE IX CONDITIONS TO CLOSING ...............................................55
9.1 Conditions to Obligations of Each Party ..............................................55
9.2 Conditions to Obligations of Buyer ...................................................55

9.3     Conditions to Obligations of Sellers ...................................................................56

ARTICLE X TERMINATION .....................................................................................56
10.1    Termination..................................................................................................56
10.2    Effect of Termination...................................................................................58
10.3    Specific Performance ..................................................................................58

ARTICLE XI GENERAL PROVISIONS ....................................................................58
11.1    Survival of Obligations................................................................................58
11.2    No Public Announcement ............................................................................58
11.3    Notices .........................................................................................................59
11.4    Successors and Assigns................................................................................60
11.5    Entire Agreement; Amendments..................................................................60
11.6    Waivers ........................................................................................................60
11.7    Expenses ......................................................................................................61
11.8    Partial Invalidity..........................................................................................61
11.9    Execution in Counterparts............................................................................61
11.10   Further Assurances.......................................................................................61
11.11   Governing Law ............................................................................................62
11.12   No Third Party Beneficiaries .......................................................................62

**SCHEDULES**

| Section | Schedule |
|---|---|
| 1.1(a) | Significant Suppliers |
| 1.1(b) | Third Party Consents |
| 2.1(e) | Assumed Contracts |
| 2.1(g) | Transferred Employee Plans |
| 2.2(l) | Retained Third Party Actions |
| 2.3(e) | Certain Trade Obligations |
| 2.3(f) | Certain Additional Trade Obligations |
| 2.3(g) | Cure Costs |
| 2.7(a) | Designated Remaining Contracts |
| 5.2 | Subsidiaries and Investments |
| 5.4(a) | Owned Real Property |
| 5.4(b) | Leased Real Property |
| 5.4(d) | Environmental |
| 5.5(a) | Title to Property |
| 5.5(b) | Condition of Assets |
| 5.6 | Taxes |
| 5.7 | Certain Developments |
| 5.8(a) | Intellectual Property |
| 5.8(b) | Intellectual Property Licenses and Agreements |
| 5.8(f) | Intellectual Property Violations, Claims and Actions |
| 5.9(c) | Unfair Labor Practices, Charges or Other Employee Related Complaints or Claims |
| 5.9(d) | Labor and Collective Bargaining Agreements |
| 5.9(h) | Benefit Plans |
| 5.9(i) | Post Termination Employee Benefits |
| 5.9(k) | Title IV Plan Funding |
| 5.9(l) | Multiemployer Pension Plans |
| 5.9(m) | Benefits Triggered by Transaction |
| 5.10 | Sufficiency of Assets |
| 5.11(a) | Notice of Violation of Legal Requirement |
| 5.12(a) | Material Contracts |
| 5.12(b) | Validity of Assumed Contracts |
| 5.13 | Customers and Suppliers |
| 5.14(a) | Financial Statements |
| 5.14(c) | Letters of Credit |
| 5.15 | Litigation |
| 5.16 | Accounts Receivable (Contests, Claims, Counterclaims or Setoffs) |
| 5.17 | Inventory |
| 5.18 | Insurance |
| 5.20 | Customer Warranty Claims |
| 5.21 | Affiliate Transactions |
| 5.23 | Assets of Other Entities |
| 7.5(b)(v) | Certain Real Estate That May Be Sold |
| 7.14 | Customer Liens/Bonds |
| 8.2(c) | Employee Transition Coverage |

## EXHIBITS

| | | |
|---|---|---|
| EXHIBIT A | - | ASSUMPTION AGREEMENT |
| EXHIBIT B | - | BIDDING PROCEDURES |
| EXHIBIT C | - | BIDDING PROCEDURES ORDER |
| EXHIBIT D | - | SALE ORDER |
| EXHIBIT E | - | ASSIGNMENT AND BILL OF SALE |
| EXHIBIT F | - | ASSIGNMENT OF PATENTS |
| EXHIBIT G | - | ASSIGNMENT OF TRADEMARKS |
| EXHIBIT H | - | ASSIGNMENT OF COPYRIGHTS |
| EXHIBIT I | - | ASSIGNMENT OF DOMAIN NAMES |
| EXHIBIT J | - | PRICE ADJUSTMENT ESCROW AGREEMENT |
| EXHIBIT K | - | GENERAL RELEASE |
| EXHIBIT L | - | DEPOSIT ESCROW AGREEMENT |

## ASSET PURCHASE AGREEMENT

This **Asset Purchase Agreement** ("Agreement") is made as of June 8, 2011, by and among VVP Holdings, LLC, a Delaware limited liability company ("Holdings"), Vitro America, LLC, a Delaware limited liability company, Super Sky International, Inc., a Wisconsin corporation, Super Sky Products, Inc., a Wisconsin corporation, VVP Funding Corporation, a Delaware corporation, and VVP Finance Corporation, a Delaware corporation (Holdings, together with each of the other entities listed, collectively, "Sellers"), and American Glass Enterprises, LLC, a Delaware corporation ("Buyer").

**Whereas**, Sellers engage in the specialty design, fabrication, distribution and installation of glass and glass-related products including doors, walls, skylights and mirrors (the "Business");

**Whereas**, on November 17, 2010 (the "Involuntary Petition Date"), Knighthead Master Fund, L.P., Brookville Horizons Fund, L.P., Davidson Kempner Distressed Opportunities Fund, L.P., and Lord Abbett Bond-Debenture Fund, Inc., each filed involuntary petitions (against each of the Sellers (other than VVP Funding, Corporation) commencing involuntary cases under Section 303(a) of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court");

**Whereas**, Sellers desire to sell to Buyer substantially all of Sellers' assets and Buyer desires to purchase from Sellers substantially all of Sellers' assets and assume certain specified liabilities of Sellers, upon the terms and conditions hereinafter set forth;

**Whereas**, on April 6, 2011 (the "Voluntary Petition Date"), an order for relief under chapter 11 of title 11 of the United States Code was entered with respect to Vitro America, LLC, Super Sky Products, Inc., Super Sky International, Inc. and VVP Finance Corporation;

**Whereas**, on May 9, 2011, an order for relief under chapter 11 of title 11 of the United States Code was entered into with respect to VVP Funding Corporation;

**Whereas**, on June 2, 2011, an order for relief under chapter 11 of title 11 of the United States Code was entered into with respect to Holdings (the involuntary petition and the subsequent voluntary orders for relief each, a "Filing" and together, the "Filings");

**Whereas**, the Parties are bound by their respective obligations under the Bidding Procedures Order and the Bidding Procedures;

**Whereas**, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of substantially all of Sellers' assets pursuant to Section 363 of the Bankruptcy Code; and

**Whereas,** the execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of an Order of the Bankruptcy Court under, *inter alia*, sections 363 and 365 of the Bankruptcy Code.

**Now, Therefore,** in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows.

<h1 align="center">ARTICLE I</h1>

<h2 align="center">DEFINITIONS</h2>

  **1.1** **Definitions**.  In this Agreement, the following terms have the meanings specified or referred to in this <u>Section 1.1</u> and shall be equally applicable to both the singular and plural forms. Any agreement referred to below shall mean such agreement as amended, supplemented and modified from time to time to the extent permitted by the applicable provisions thereof and by this Agreement.

  "<u>Accountants</u>" means the accountants from the Independent Accounting Firm.

  "<u>Accounts Receivable</u>" means, with respect to a Seller, all accounts receivable and other rights to payment from customers of such Seller and the full benefit of all security for such accounts, debts or rights to payment, including those consisting of all accounts receivable in respect of goods shipped or Products sold or services rendered to customers, any other miscellaneous accounts receivable, and any claim, remedy or other right related to any of the foregoing.

  "<u>Action</u>" means any legal action, suit or arbitration, or any inquiry, proceeding or investigation, by or before any Governmental Authority.

  "<u>Adjustment Liabilities</u>" means the sum of the amount of the Assumed Liabilities assumed pursuant to <u>Section 2.3</u>, including all liabilities assumed by Buyer pursuant to <u>Section 2.3(e)</u>, except for the following Assumed Liabilities: (i) <u>Section 2.3(a)</u> (Assumed Contract obligations arising after the Closing Date), (ii) <u>Section 2.3(b)</u> (obligations arising from the operation of the Purchased Assets and Business after the Closing Date), (iii) <u>Section 2.3(c)</u> (capitalized lease obligations arising after the Closing Date), (iv) <u>Section 2.3(f)</u> (assumption of up to an additional $500,000 in trade obligations), (v) <u>Section 2.3(l)</u> (any WARN Act liabilities), (vi) <u>Section 2.3(n)</u> (Buyer Additional Cure Costs), (vi) <u>Section 2.3(o)</u> (bonded customer contract warranties), and (vii) <u>Section 2.3(p)</u> (Bankruptcy Related Claims); calculated in accordance with GAAP consistently applied; <u>provided</u>, (a) with respect to accrued vacation only that are Assumed Liabilities pursuant to <u>Section 2.3(i)</u>, such accrued vacation shall be included in Adjustment Liabilities at one-half of the aggregate amount of the accrued vacation amount that is an Assumed Liability, and (b) with respect to IBNR Claims that are Assumed Liabilities pursuant to <u>Section 2.3(m)</u>, such assumed IBNR Claims shall be included in Adjustment Liabilities only to the extent they exceed an amount equal to the CIGNA Deposit.

  "<u>Affected Assets</u>" has the meaning specified in <u>Section 7.7</u>.

  "<u>Affiliate</u>" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended.

  "<u>Agreement</u>" has the meaning specified in the preamble.

"Allocation Schedule" has the meaning specified in Section 3.7.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction, including a plan of reorganization or plan of arrangement approved by the Bankruptcy Court, of any material portion of Sellers' assets, in a transaction or a series of transactions with one or more Persons other than Buyer; provided, however, that an "Alternative Transaction" shall not include: (i) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business or Sellers' assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of Sellers; (ii) an arrangement sponsored by Buyer or any of its Affiliates, (iii) the sale, dividend, distribution, transfer or other disposition of VVP Auto Glass, Inc., to Vitro, S.A.B. de C.V. or any of its Affiliates or (iv) the approval of (but no other action relating to) the Back-Up Bid pursuant to the Sale Order.

"Ancillary Documents" means the Assignment and Bill of Sale, Deeds, Assumption Agreement, Assignment of Patents, Assignment of Trademarks, Assignment of Copyrights, Assignment of Domain Names and the General Release.

"Asserted Cure Costs" means, in the aggregate, all Cure Costs asserted by any counterparty to an Assumed Contract that, as of the Closing Date, are not Determined Cure Costs.

"Assignment and Bill of Sale" means the Assignment and Bill of Sale substantially in the form of Exhibit E.

"Assignment of Copyrights" has the meaning specified in Section 4.4(b).

"Assignment of Domain Names" has the meaning specified in Section 4.4(b).

"Assignment of Patents" has the meaning specified in Section 4.4(b).

"Assignment of Trademarks" has the meaning specified in Section 4.4(b).

"Assumed Contracts" has the meaning specified in Section 2.1(e).

"Assumed Liabilities" has the meaning specified in Section 2.3.

"Assumption Agreement" means the Assumption Agreement in substantially the form of Exhibit A.

"Avoidance Actions" means any and all claims for relief of Sellers under chapter 5 of the Bankruptcy Code.

"Audited Financial Statements" has the meaning specified in Section 5.14(a).

"Bankruptcy Case" means the cases under chapter 11 of the Bankruptcy Code, styled *In re Vitro Asset Corp., et al.*, jointly administered under Case No. 10-47470 and pending before the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, Sections 101 *et seq*.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Related Claims" means, with respect to the Sellers, (i) Cure Costs, but excluding any Buyer Additional Cure Costs, (ii) Claims payable to trade vendors that are accorded administrative priority under Section 503 of the Bankruptcy Code, and (ii) other Claims that are accorded administrative priority under Section 503 of the Bankruptcy Code, but excluding costs, fees and expenses of the Sellers' estates, any official committee appointed in the Sellers' chapter 11 cases, and similar administrative claims to be paid in cash by the Sellers' estate, including professional fees and expenses and payments under any management incentive plan.

"Benefit Plan" has the meaning specified in Section 5.9(h).

"Bidding Procedures" means the bid procedures attached hereto as Exhibit B, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"Bidding Procedures Order" means the Order of the Bankruptcy Court attached hereto as Exhibit C.

"Business" has the meaning specified in the recitals.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Business Intellectual Property" means all Intellectual Property owned or licensed (as licensor or licensee) by a Seller.

"Buyer" has the meaning specified in the preamble.

"Buyer Additional Cure Costs" has the meaning specified in Section 2.7(e).

"Buyer's Contract Designations" has the meaning specified in Section 2.7(a).

"Cash" means all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits.

"Cash Target" means $4,866,000, increased by proceeds, other than the Santa Fe Cash, obtained after the Involuntary Petition Date and prior to the Closing relating or allocable to (i) the sale of any Owned Real Property or other Purchased Asset (other than sales of Inventory in the ordinary course of the Business consistent with past practice), (ii) insurance claims for losses relating to Purchased Assets, (iii) Preference Actions; (iv) tax refunds, and (v) any rights, claims or causes of action described in Section 2.1(s).

"CIGNA Deposit" has the meaning specified in Section 2.1(o).

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

- 4 -

"<u>Closing</u>" has the meaning specified in <u>Section 4.1</u>.

"<u>Closing Date</u>" has the meaning specified in <u>Section 4.1</u>.

"<u>Closing Date Payment</u>" means the Purchase Price as initially set forth in <u>Section 3.1</u>, <u>minus</u> (i) the Estimated Purchase Price Adjustment, <u>minus</u> (ii) the Price Adjustment Deposit, <u>minus</u> (iii) the Deposit.

"<u>COBRA</u>" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Collective Bargaining Agreement</u>" means any contract or other binding agreement or arrangement (written or oral) with any labor union or organization, collective bargaining agent or other similar employee representative.

"<u>Computers</u>" means all computer equipment and hardware, including, without limitation, all central processing units, terminals, disk drives, tape drives, electronic memory units, printers, keyboards, screens, peripherals (and other input/output devices), modems and other communication controllers, and any and all parts and appurtenances thereto, together with all Intellectual Property used in connection with the operation of such computer equipment, including, without limitation, all software and rights under any licenses related to such use.

"<u>Confidentiality Agreement</u>" has the meaning specified in <u>Section 11.5</u>.

"<u>Contract</u>" means any agreement, contract, obligation, promise, instrument, undertaking or other arrangements (whether written or oral) that is legally binding, including any insurance policy, License or capitalized lease, other than a Lease, to which any Seller is party.

"<u>Copyrights</u>" means all United States and foreign copyrights and copyrightable subject matter, whether registered or unregistered, including all United States copyright registrations and applications for registration and all foreign equivalents, all moral rights and rights of attribution and integrity, all common-law copyright rights, and all rights to register and obtain renewals and extensions of copyright registrations, together with all other copyright interests accruing by reason of any international copyright convention.

"<u>Cure Costs</u>" has the meaning specified in <u>Section 2.5</u>.

"<u>Cure Costs Cap</u>" means $250,000.

"<u>Current Assets</u>" means Accounts Receivable, Inventory, Purchased Deposits and prepaid expenses.

"<u>Current Assets Target</u>" is $59,725,950.

"<u>Deeds</u>" means, with respect to each parcel of Owned Real Property, the instrument of conveyance customary to the applicable jurisdiction in registrable or recordable form, in order to

convey to Buyer and Sellers' right, title and interest in and to Owned Real Property, to be delivered pursuant to Section 4.4(a).

"Deposit" has the meaning set forth in Section 3.6.

"Deposit Escrow Agreement" means the Deposit Escrow Agreement in substantially the form of Exhibit L, as amended pursuant to the terms hereof.

"Designated Remaining Contract" means each Contract or Lease designated on Schedule 2.7(a).

"Determined Cure Costs" means, in the aggregate, all Cure Costs that have been determined pursuant to a Final Order or pursuant to an agreement between one or more of the Sellers and the counterparty to the applicable Assumed Contract.

"DIP Credit Agreement" means that certain Post-Petition Loan and Security Agreement to be entered into by and among Bank of America, N.A., as the lender, and certain of the Sellers, as the borrowers.

"Disclosure Schedules" means the written information that Sellers have prepared and delivered to Buyer pursuant to the terms of this Agreement setting forth information regarding the Business, the Purchased Assets, the Assumed Liabilities and other matters with respect to Sellers as set forth therein.

"Documents" means all books, records, files, invoices, Inventory records, product specifications, advertising materials, customer lists, cost and pricing information, supplier lists, business plans, catalogs, customer literature, quality control records and manuals, research and development files, data (including master files and three years of transaction data), records and laboratory books and credit records of customers (including all data and other information stored on discs, tapes or other media) to the extent used in or to the extent relating to the assets, properties, including the Intellectual Property, business or operations of the Business.

"Domain Names" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet. A Domain Name may or may not also be a Trademark.

"Eligible Employee" has the meaning set forth in Section 8.2(c).

"Encumbrance" means any interest, charge, lien, claim, mortgage, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, title retention agreement, encroachment, encumbrance, or other similar restriction of any kind.

"Environment" means all air, water vapor, surface water, groundwater, drinking water supply or land, including land surface or subsurface, and includes all fish, wildlife, biota and all other natural resources.

"Environmental Laws" means all foreign, federal, state or local environmental, land use, health, chemical use, safety and sanitation laws, statutes, ordinances, regulations or rule of common law (including with respect to the Business, specific Environmental Permits and Orders) relating to the protection of human health and the environment, including laws relating to the presence of, exposure to, or Releases or threatened Releases of, Hazardous Substances or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, transport or handling of Hazardous Substances and all laws and regulations with regard to recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Substances.

"Environmental Permits" means all permits, licenses, certificates, approvals, authorizations, consents or registrations issued by a Governmental Authority pursuant to an Environmental Law.

"Equipment" means all furniture, fixtures, equipment, Computers, machinery, apparatus, appliances, implements, spare parts, signage, supplies, vehicles, forklifts, any information technology equipment (including hardware) and all other tangible personal property of every kind and description.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" has the meaning specified in Section 5.9(h).

"Escrow Agent" has the meaning given to it in the Price Adjustment Escrow Agreement and the Deposit Escrow Agreement, as applicable.

"Estimated Purchase Price Adjustment" has the meaning specified in Section 3.2(a).

"Excess Cure Costs" has the meaning specified in Section 3.4.

"Excluded Assets" has the meaning specified in Section 2.2.

"Excluded Contracts" has the meaning specified in Section 2.2(c).

"Excluded Liabilities" has the meaning specified in Section 2.4.

"Filing" has the meaning specified in the recitals.

"Final Claims List" has the meaning specified in Section 2.3(p).

"Final Order" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it has passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest has passed; (iii) the Governmental Authority does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial

review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Final Purchase Price Adjustment" means an amount equal to the sum of: (i) if positive, Current Assets Target minus the Current Assets; plus (ii) if positive, the Cash Target minus Cash; plus (iii) Adjustment Liabilities; provided, such amount will not be less than zero.

"Financial Statements" means the Audited Financial Statements and the Unaudited Financial Statements and the Interim Unaudited Financial Statements.

"GAAP" means generally accepted accounting principles in the United States.

"General Release" means the General Release in substantially the form of Exhibit K.

"Governmental Authority" means any United States federal, state or local governmental authority, regulatory or administrative authority or any court, tribunal or judicial body having jurisdiction.

"Hazardous Substance" means (a) any "pollutant", "contaminant", "hazardous waste", "hazardous material", "restricted hazardous material", "extremely hazardous substance", "toxic substance", "hazardous substance" or words of similar meaning and regulatory effect, as defined under any Environmental Law; (b) petroleum in any form, including any petrochemical or petroleum products; (c) radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing polychlorinated biphenyls, and radon gas or (d) any other chemical, material or substance, exposure to which is prohibited, limited, or regulated by any applicable Environmental Law.

"Holdings" has the meaning specified in the preamble.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the relevant rules and regulations thereunder.

"H&W Transition Date" has the meaning set forth in Section 8.2(c).

"IBNR Claims" has the meaning specified in Section 2.3(m).

"Independent Accounting Firm" means an independent accounting or valuation firm of national or regional reputation that is mutually appointed by Sellers and Buyer.

"Independent Accounting Firm Report" has the meaning specified in Section 3.3(a).

"Initial Deposit" has the meaning set forth in Section 3.6.

"Insurance Policies" has the meaning specified in Section 5.18.

"Intellectual Property" means all intellectual property rights of any kind, throughout the world, including all Software, Copyrights, Patents, Trademarks, Trade Secrets and Domain Names, all rights of privacy and rights to personal information, all telephone numbers and Internet protocol addresses, all documentation and media constituting, describing or relating to the above, including memoranda, manuals, technical specifications and other records wherever created throughout the world, all rights in the foregoing and in other similar intangible assets, and all rights and remedies (including the right to sue for and recover damages, profits and any other remedy for past, present, or future infringement, misappropriation or other violation relating to any of the foregoing.

"Interim Unaudited Financial Statements" has the meaning specified in Section 5.14(a).

"Inventions" means inventions, novel devices, processes, compositions of matter, methods, techniques, improvements, observations, discoveries, apparatuses, machines, designs, expressions, theories and ideas, whether or not patentable.

"Inventory" has the meaning specified in Section 2.1(c).

"Involuntary Petition Date" has the meaning set forth in the recitals.

"IRS" means the Internal Revenue Service.

"Know-How" means scientific, engineering, mechanical, electrical, financial, marketing, practical and other specific knowledge or experience or other know-how.

"Knowledge" means with respect to any matter in question, in the case of Sellers, the actual knowledge or knowledge that could be obtained after reasonable inquiry and investigation of the matter in question, of Arturo Carrilo or Ricardo Maiz Rodriguez, with respect to such matter (but without imposing any requirement or obligation on Arturo Carrilo or Ricardo Maiz Rodriguez to question any Person, including any customer, supplier or sales representative, that is not a director, officer or management level employee of any Seller).

"Leased Real Property" has the meaning specified in Section 5.4(b).

"Leases" has the meaning specified in Section 5.4(b).

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"Liability" means any debt, losses, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"License" has the meaning specified in Section 5.8(b).

"Loss" has the meaning specified in Section 7.7.

"Material Adverse Effect" means any fact, condition, change, violation, inaccuracy, circumstance or event, individually or in the aggregate, that (i) has, or is reasonably likely to have, a material adverse effect on or materially impairs the Purchased Assets or the Business, taken as a whole, or (ii) materially impedes or delays, or is reasonably likely to materially impede or delay, the consummation of the transactions contemplated by this Agreement, in each case except to the extent that any such fact, condition, change, violation, inaccuracy, circumstance or event results from or arises out of (i) the Filings, (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the transactions contemplated hereby, (iii) changes in (or proposals to change) Legal Requirements or accounting regulations or principles, (iv) any action contemplated by this Agreement or taken at the request of Buyer, or (v) changes in general economic conditions or political conditions or the securities or financial markets in any country or region or changes affecting the industry in which the Business operates generally (except to the extent that such developments have a disproportionate effect on the Purchased Assets or the Business); provided, however, that with respect to any supplier listed on Schedule 1.1(a), if there is a material change, which is adverse to the Business, in price of a material portion of the materials supplied, the terms and conditions of sale for such materials supplied, or the volume of such materials supplied, then such adverse change shall constitute a Material Adverse Effect hereunder.

"Material Contract" means any Contract to which any Seller is a party or by which any of the Purchased Assets are bound and (i) which is outside of the ordinary course of business; (ii) to which any significant customer is a party; (iii) to which any significant supplier is a party; (iv) pursuant to which Sellers would be required to make payments in excess of $250,000 from and after April 5, 2011; (v) which relates to the generation, transportation or disposal of Hazardous Substances; (vii) which is an employment agreement or severance agreement or is a collective bargaining agreement with any labor union; (viii) which creates a joint venture or partnership or which otherwise involves the sharing of profits, losses, costs or liabilities with any other Person; (ix) which is a License; (x) which is an Assumed Contract; or (xi) to which any officer or director of any Seller, or any Affiliate of any such officer or director, is a party.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

"Other Encumbrances" means liens for taxes not yet due and payable that are being contested in good faith.

"Other Entities" means Binswanger Glass Company, Troper Services, Inc., Holdings, and VVP Funding Corporation.

"Owned Real Property" has the meaning specified in Section 5.4(a).

"Party" or "Parties" means, individually or collectively, Buyer and each Seller.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Patents" means United States and foreign patents (including certificates of invention and other patent equivalents), patent applications, provisional applications and patents issuing therefrom, as well as any continuations, continuations-in-part, divisions, substitutions,

extensions, reexaminations, reissues, renewals, patent disclosures, Inventions (whether or not patentable or reduced to practice) and any improvements thereto.

"Periodic Taxes" has the meaning specified in Section 8.1(a).

"Permits" means all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances and orders of any Governmental Authority which are necessary for Sellers to own, lease and operate their properties and assets or to carry on the Business as it is now being conducted.

"Permitted Encumbrances" means (i) statutory liens for current property Taxes and assessments not yet due and payable, including, without limitation, liens for *ad valorem* Taxes and statutory liens not yet due and payable arising other than by reason of any default by Sellers, and that are subject to pro-ration pursuant to Section 8.1 and for which Sellers have paid their pro-ration amount, (ii) easements, covenants, conditions, restrictions, leases, reservations or other rights of others in or minor defects and irregularities of title that do not, individually or in the aggregate, materially impair the use of the encumbered property or assets for the purposes for which they are held or the value thereof, (iii) to the extent related to any Assumed Contract which is a Lease, any Encumbrance or privilege vested in any lessor, licensor or permit securing the payables of rent or other obligations solely related to the period after the Closing, (iv) to the extent related to any Assumed Contract, and grants of rights to use intellectual property in the ordinary course of the Business and not incurred in connection with the borrowing of money, (v) standard printed general title exceptions customarily contained in title policies issued in the state where the real property is located which do not, individually or in the aggregate, materially impair the occupancy, value or current use of the real property which they encumber, excluding those with respect to parties in possession, and (vi) statutory liens and rights of set-off of landlords, carriers, warehousemen, mechanics, repairmen, workmen, suppliers and materialmen, and other similar Encumbrances imposed by law incurred in the ordinary course of business for amounts not yet overdue that are not material individually or in the aggregate, all of which are included as Adjustment Liabilities.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or Governmental Authority.

"Post-Closing Tax Period" has the meaning specified in Section 8.1(a).

"Pre-Closing Tax Period" has the meaning specified in Section 8.1(a).

"Preference Actions" means actions arising pursuant to 11 U.S.C. section 547 against or otherwise involving (a) trade vendors; (b) counterparties to all Assumed Contracts (including counterparties to any Designated Remaining Contracts that become Assumed Contracts); (c) current employees of any Seller; and (d) any party with which the Buyer does business or is associated with the Business after the Closing Date; provided, however, that in no event shall Preference Actions include actions against Vitro S.A. de C.V. or its Affiliates other than Sellers, or any Insiders (as such term is defined in 11 U.S.C. section 101(31)) of the Sellers or of Vitro S.A. de C.V. or its Affiliates, provided further, that no Transferred Employees or any directors or

officers of any Seller who continue to be employed by Buyer or its Affiliates in connection with the Business or provide services to the Business following the Closing Date shall be considered Insiders for such purposes.

"Price Adjustment Deposit" is an amount equal to 20% of the Estimated Purchase Price Adjustment.

"Price Adjustment Escrow Agreement" has the meaning specified in Section 3.2(b).

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Products" means any and all products developed, manufactured, marketed or sold by Sellers.

"Purchase Price" has the meaning specified in Section 3.1.

"Purchased Assets" has the meaning specified in Section 2.1.

"Purchased Deposits" means all deposits (including customer deposits and security deposits for rent, electricity and otherwise) and prepaid charges and expenses of Sellers, other than any deposits or prepaid charges and expenses paid in connection with or relating exclusively to any Excluded Assets.

"Realized Utility Deposits" means an amount equal to the value of any Utility Deposit or any portions thereof that are converted to cash and paid to Buyer within thirty (30) Business Days after the Closing Date.

"Reference Date" means December 31, 2010.

"Reference Date Balance Sheet" means the unaudited balance sheet of the Business as of the Reference Date which has been delivered to Buyer.

"Release" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the Environment (including the abandonment or discharging of barrels, containers and other closed receptacles containing any Hazardous Substance).

"Renegotiated Collective Bargaining Agreements" has the meaning specified in Section 7.15.

"Representative" means with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement and the Back-Up Bid (as defined in the Bidding Procedures).

"Sale Motion" means the motion or motions, in form and substance reasonably acceptable to Buyer, filed by Sellers pursuant to, *inter alia*, sections 363 and 365 of the Bankruptcy Code to obtain the Bidding Procedures Order and the Sale Order and to approve the transactions contemplated by this Agreement.

"Sale Order" means an Order of the Bankruptcy Court in substantially the form attached hereto as Exhibit D.

"Santa Fe Cash" means the $2,300,000 paid to Sellers by Mark S. Blackburn and Ann M. Blackburn in consideration for the two cranes and two concrete tilt-up buildings measuring 40,755 square feet and approximately 89,278 square feet of land, located at 9010 S. Norwalk Boulevard, Santa Fe Springs, California 90670.

"Second Deposit" has the meaning set forth in Section 3.6.

"Sellers" has the meaning specified in the preamble.

"Seller Additional Cure Costs" has the meaning specified in Section 2.7(e).

"Software" means all Computer software programs and software systems (whether in source code, object code, or other form), including all websites, algorithms, databases, compilations and data, tool sets, compilers, higher level or "proprietary" languages, related documentation, technical manuals and materials, and any licenses or rights (including rights to use and modify) relating to the foregoing.

"Straddle Period" has the meaning specified in Section 8.1(a).

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, *ad valorem*, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any liability as a transferee, successor by contract or otherwise in respect of any items described in clause (i) above.

"Tax Return" means any return, report or similar statement filed or required to be filed with respect to any Taxes (including any attached schedules), including any information return, claim for refund, amended return or declaration of estimated Tax.

"Termination Notice" has the meaning set forth in Section 10.1(e).

"Title IV Plan" has the meaning set forth in Section 5.9(i).

"Third Party Consents" means the consents, approvals and waivers set forth on Schedule 1.1(b).

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress, corporate names and trade names (including all assumed or fictitious names under which the Business has been conducted), and any other indicia of source or sponsorship of goods and services, designs and logotypes related to the above, in any and all forms, whether registered or unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), and all goodwill related to or symbolized by the foregoing.

"Trade Secrets" means confidential or proprietary ideas, trade secrets, Know-How, concepts, methods, models, methodologies, processes, formulae, algorithms, reports, data, customer lists, mailing lists, business plans, market surveys, market research studies, information contained on drawings and other documents, information relating to research, development or testing, and all other proprietary or confidential information.

"Transfer Taxes" has the meaning specified in Section 8.1(b).

"Transferred Employee Plans" means the Benefit Plans expressly assumed (in whole or in part) in writing by Buyer in accordance with Section 2.1(g).

"Transferred Employees" has the meaning specified in Section 8.2(b).

"Treasury Regulations" means the regulations promulgated by the U.S. Treasury Department pursuant to the Code.

"Unaudited Financial Statements" has the meaning specified in Section 5.14(a).

"Undisclosed Contract" has the meaning specified in Section 2.7(e).

"Unrealized Utility Deposits" means an amount equal to the value of any Utility Deposit or any portions thereof that are not converted to cash and paid to Buyer within thirty (30) Business Days after the Closing Date.

"Utility Deposit" means any rights to deposits or prepaid charges paid to providers of public utility services as electricity, natural gas and water.

"Voluntary Petition Date" has the meaning specified in the recitals.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, and any similar state or local law relating to plant closings and layoffs.

**1.2    Other Definitional and Interpretive Matters**.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)     No Strict Construction. The Parties participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE II

## PURCHASE AND SALE

2.1     **Purchased Assets**. Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase,

free and clear of all Encumbrances (other than Permitted Encumbrances, except for those Permitted Encumbrances that are to be expunged and discharged pursuant to the Sale Order), all right, title and interest of Sellers in, to or under all of the properties and assets of Sellers (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business (herein collectively called the "Purchased Assets"), including, but not limited to, all right, title and interest of each Seller in, to or under the following such properties and assets of Sellers, save and except any that is an Excluded Asset:

      (a)    subject to Section 2.2(m), all Cash;

      (b)    all Accounts Receivable;

      (c)    all inventory, merchandise, residual by-products, raw materials, work-in-process, finished goods, shipping materials, packaging materials, samples and other consumables relating to the Business and maintained, held or stored by or for any of Sellers in connection with the Business (the "Inventory");

      (d)    all Equipment;

      (e)    all Contracts and Leases listed or described in Schedule 2.1(e), other than those excluded pursuant to (but including those that may be added pursuant to, as applicable) the provisions governing Designated Remaining Contracts (the "Assumed Contracts") (notwithstanding any provision in this Agreement to the contrary, Buyer shall have the right, in its sole discretion, to include on Schedule 2.1(e), as Assumed Contracts any one or more schedules, appendices, annexes or other attachments to any Contract irrespective of whether such Contract or any other schedules, appendices, annexes or other attachments to such Contract are included on Schedule 2.1(e));

      (f)    all Owned Real Property;

      (g)    all rights and assets under any Transferred Employee Plan to the extent listed in Schedule 2.1(g); provided that the Transferred Employee Plans shall include only those Benefit Plans as Buyer notifies Sellers in writing at least five (5) Business Days prior to Closing;

      (h)    [Intentionally omitted.];

      (i)    all Permits and pending applications therefor, in each case to the extent assignable;

      (j)    all Business Intellectual Property (including all goodwill associated therewith or symbolized thereby);

      (k)    all Products (and all Intellectual Property contained therein, embodied thereby or related thereto) in development by Sellers;

      (l)    all Documents except those specifically excluded under Section 2.2(k) (provided that any Seller may retain copies of such Documents it is required by law to retain);

(m) all telephone, telex and telephone facsimile numbers and other directory listings used in connection with the Business;

(n) all Purchased Deposits;

(o) all rights to proceeds or proceeds of insurance policies, relating or allocable to any Purchased Asset or Assumed Liability, and any cash deposits or return premiums related thereto, including all rights to proceeds or proceeds allocable to the approximately $500,000 deposit supporting the CIGNA self-insurance policy (the "CIGNA Deposit");

(p) all Preference Actions (including the proceeds thereof);

(q) any Realized Utility Deposits;

(r) tax refunds;

(s) any rights, claims or causes of action of Sellers against third parties arising out of events occurring prior to the Closing Date, including and, for the avoidance of doubt, arising out of events occurring prior to the Involuntary Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers;

(t) all goodwill associated with the Business or the Purchased Assets; and

(u) all other or additional privileges, rights, and interests, associated with the Purchased Assets of every kind and description and wherever located that are used or intended for use in connection with, or that are necessary to the continued operation of, the Business as presently being operated.

Upon Buyer's reasonable request, Sellers shall provide additional detailed information as to the Liabilities under the Contracts and Leases sufficient for Buyer to make an informed assessment whether to accept an assignment and assumption of such Contracts or Leases hereunder. Notwithstanding the foregoing, Buyer may not exclude any Contracts or Leases entered into after the date of this Agreement at the request of Buyer.

At any time prior to three (3) Business Days prior to the Closing Date, Buyer may, in its discretion by written notice to Sellers, designate any of the Purchased Assets (other than Contracts that have been designated as Assumed Contracts as of the date of this Agreement or following the date of this Agreement) as additional Excluded Assets, which notice shall set forth in reasonable detail the Purchased Assets so designated. Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Purchased Assets as Excluded Assets. Notwithstanding any other provision hereof, the Liabilities of Sellers under or related to any Purchased Asset excluded under this paragraph will constitute Excluded Liabilities.

2.2 **Excluded Assets**. Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest

to, in and under the Excluded Assets. For all purposes of and under this Agreement, the term "<u>Excluded Assets</u>" shall mean:

        (a)     any shares of capital stock or other equity interest of any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller;

        (b)     all minute books, stock ledgers, corporate seals and stock certificates of Sellers;

        (c)     subject to <u>Section 2.7(b)</u>, all Contracts and Leases not constituting Assumed Contracts (the "<u>Excluded Contracts</u>");

        (d)     [Intentionally omitted.];

        (e)     the Purchase Price;

        (f)     Benefit Plans to the extent not Transferred Employee Plans;

        (g)     all claims or causes of action related exclusively to any Excluded Asset;

        (h)     all rights under insurance policies relating to claims for losses related exclusively to any Excluded Asset or to the period before Closing;

        (i)     any deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets, if not a Purchased Asset pursuant to <u>Section 2.1(n)</u>, <u>Section 2.1(o)</u>, <u>Section 2.1(q)</u> or a Transferred Employee Plan pursuant to <u>Section 2.1(g)</u>;

        (j)     all Avoidance Actions (including the proceeds thereof) other than Preference Actions;

        (k)     all Documents relating exclusively to an Excluded Asset;

        (l)     any rights, claims or causes of action of Sellers against third parties arising out of events occurring prior to the Closing Date set forth on <u>Schedule 2.2(l)</u>;

        (m)     Cash in excess of the Cash Target, if any;

        (n)     any residual rights under that certain Letter of Credit No. 3024674 per application by Vitro America, LLC, issued by Bank of America, N.A., for the benefit of The Travelers Indemnity Company;

        (o)     any rights to that certain deposit with PHH Arval for approximately $900,000;

        (p)     any Unrealized Utility Deposits;

        (q)     all insurance policies other than any Assumed Contracts; and

(r)     any rights, claims or causes of action of Sellers under this Agreement or any Ancillary Document.

2.3    **Assumed Liabilities**.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer shall execute and deliver to Sellers the Assumption Agreement pursuant to which Buyer shall assume only the following Liabilities (without duplication) existing as of immediately prior to the Closing (collectively the "Assumed Liabilities") and no others:

(a)     all obligations and liabilities of any Seller under the Assumed Contracts that arise on or after the Closing Date;

(b)     all obligations or liabilities with respect to events or circumstances first occurring after the Closing Date arising out of or resulting from the ownership, lease, license, operation or disposition of the Purchased Assets by Buyer;

(c)     all obligations and liabilities of any Seller under all capitalized leases assumed pursuant to Section 2.1(e) that arise on or after the Closing Date;

(d)     all trade obligations arising in the ordinary course of the Business on or after the Voluntary Petition Date and existing as of immediately prior to the Closing that do not constitute Excluded Liabilities and would be included in the line item "Accounts Payable" in a consolidated balance sheet of the Business as of immediately prior to the Closing prepared in accordance with GAAP and using the same accounting policies, principles and practices as were used to prepare the Reference Date Balance Sheet; provided, however, that Buyer's aggregate liability under this Section 2.3(d) shall not exceed $500,000 and, if expenses from such obligations under this Section 2.3(d) exceed $500,000, then Buyer shall select such obligations to be assumed under this Section 2.3(d) up to $500,000 or additional amounts if agreed by Buyer in its sole discretion;

(e)     those certain trade obligations, including Cure Costs, arising prior to or after the Involuntary Petition Date in the ordinary course of the business listed on Schedule 2.3(e); provided, however, that (i) the aggregate liability to be assumed by Buyer for any such trade obligations shall not exceed $3,500,000 and (ii) notwithstanding any other provision in this Agreement to the contrary, Buyer shall be able to first assume any additional trade obligations, including Cure Costs, payable to the vendors listed on Schedule 2.3(e) arising prior to or after the Involuntary Petition Date in the ordinary course of business pursuant to this Section 2.3(e);

(f)     if $3,500,000 of aggregate liability is assumed by Buyer pursuant to Section 2.3(e), those certain trade obligations, including Cure Costs, arising prior to or after the Involuntary Petition Date in the ordinary course of the business listed on Schedule 2.3(f); provided, however, that the aggregate liability to be assumed by Buyer for any such trade obligations shall not exceed $500,000;

(g)     the Determined Cure Costs set forth on Schedule 2.3(g) in an amount not to exceed the Cure Costs Cap;

(h)     all Liabilities arising under the Transferred Employee Plans, it being understood that all assets of such Transferred Employee Plans shall also have been transferred and are assumed by Buyer;

(i)     all Liabilities of Sellers with respect to accrued payroll (other than accrued payroll Taxes), bonus, commission pay, vacation pay and holiday pay of Sellers' employees as of the Closing Date who become Transferred Employees; provided, however, that Buyer's aggregate liability under this Section 2.3(i) shall not exceed $4,250,000, as reflected in the Financial Statements and, if expenses from obligations under this Section 2.3(i) exceed $4,250,000, then Buyer shall select such obligations to be assumed under this Section 2.3(i) up to $4,250,000;

(j)     Liabilities referenced in clause (vi) of the definition of Permitted Encumbrances;

(k)     all obligations and liabilities of any Seller with respect to warranties that are in the ordinary course of the Business consistent with past practice as described to Buyer prior to the date hereof, relating to Products or services provided by a Seller to a customer on or after the date hereof;

(l)     Liabilities of Sellers under the WARN Act, 29 U.S.C. § 2101 et seq.;

(m)     all claims incurred-but-not-reported ("IBNR Claims") under the Sellers' self-insured health plans (including medical, prescription drugs and dental claims) incurred as of or prior to the Closing Date.  For purposes of this provision, an IBNR Claims shall be determined to have been incurred as of the date the service or treatment with respect to such claim was rendered regardless of when the claim is submitted for reimburse or payment;

(n)     the Buyer Additional Cure Costs, if any;

(o)     all obligations and liabilities with respect to warranties arising under the bonded customer Contracts described in Section 7.14; and

(p)     Bankruptcy Related Claims selected by Buyer in its sole discretion in the aggregate amount of $6,150,000 less any Unrealized Utility Deposits.  The final amounts of certain Bankruptcy Related Claims may not be determined until after the Closing and such $6,150,000 less any Unrealized Utility Deposits assumption amount shall apply to such Claims determined as of the Closing and after the Closing, with Sellers realizing the full benefit of such assumption amount; provided, however, that (i) Sellers shall deliver to Buyer no later than September 15, 2011 a final list of all Bankruptcy Related Claims (the "Final Claims List"), (ii) any Excess Cure Costs shall be paid by Seller pursuant to Section 3.4 and in no event shall Buyer pay or assume any Excess Cure Costs, and (iii) any Bankruptcy Related Claims selected by Buyer shall be reduced by the amount of any related Realized Utility Deposits, thereby applying net amounts.  All Bankruptcy Related Claims assumed by Buyer shall be paid by Buyer in the ordinary course of business, unless otherwise agreed to by the holder of such Claim.

2.4     **Excluded Liabilities**.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay,

perform or otherwise discharge any Liability of any Seller, and Sellers shall be solely and exclusively liable with respect to all Liabilities of Sellers, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively the "Excluded Liabilities"). For the avoidance of doubt, subject to the assumption of Bankruptcy Related Claims as determined by Buyer in its sole discretion pursuant to Section 2.3(p), the Excluded Liabilities include the following:

(a)     any Liability of Sellers or their directors, officers, stockholders or agents (acting in such capacities), arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses and any and all fees and expenses of any Representatives of Sellers;

(b)     other than as specifically set forth in Section 2.3, any Liability relating to events or conditions occurring or existing in connection with or arising out of, the Business as operated prior to the Closing Date, or the ownership, lease, license, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(c)     other than as specifically set forth herein, any Liability to any Persons at any time employed by Sellers or their predecessors-in-interest at any time or to any such Person's spouses, children, other dependents or beneficiaries, with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such person's employment by Sellers or their predecessors-in-interest, whenever such claims mature or are asserted, including without limitation, all Liabilities arising (i) under the Benefit Plans, (ii) under any employment, wage and hour restriction, equal opportunity, discrimination, plant closing or immigration and naturalization laws, (iii) under any collective bargaining laws, agreements or arrangements or (iv) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(d)     any Liability relating to the Purchased Assets based on events or conditions occurring or existing prior to the Closing Date and connected with, arising out of or relating to: (i) Hazardous Substances or Environmental Laws, (ii) claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Person or (iii) compliance with any Legal Requirement relating to any of the foregoing;

(e)     any Liability of Sellers or any ERISA Affiliate under Title IV of ERISA, including with respect to any single employer plan, multiemployer plan or multiple employer plan;

(f)     any Liability of Sellers under COBRA or similar state law;

(g)     any Seller Additional Cure Costs and any Excess Cure Costs;

(h)     any Liability of Sellers under the Benefit Plans including any pension, retirement or retiree health and welfare Liability to Sellers' current or former employees except

with respect to any Liability under any Transferred Employee Plans and with respect to any Liability for IBNR Claims assumed pursuant to <u>Section 2.3(m)</u>;

(i) any Liability, known or unknown, fixed, contingent or otherwise, the existence of which is a breach of any representation, warranty, covenant, obligation or agreement of Sellers set forth in this Agreement or in any of the other Ancillary Documents;

(j) any Liability of Sellers or their Affiliates for Taxes, including, without limitation, Taxes attributable to, resulting from, or otherwise arising from the transactions contemplated by, this Agreement (except as otherwise specifically provided for in <u>Section 8.1</u>);

(k) any Liability to any Person or Seller on account of any Action or Proceeding;

(l) any Liability relating to or arising out of (i) that certain warranty issued by the Sellers to Morcon Construction with respect to the Minneapolis / St. Paul Airport HHH Terminal located at 3060 East 72nd Street, Minneapolis, MN 55450 (Project No. 19994236) and (ii) that certain warranty issued by the Sellers to Perini - Suitt Joint Venture with respect to the Opryland Hotel and Convention Center located at 3200 International Drive, Kissimmee, FL 34746 (Project No. 19991211); and

(m) any Liability relating to or arising out of the ownership, lease or operation of an Excluded Asset.

**2.5** **Assignments; Cure Amounts**. Sellers shall transfer and assign all Assumed Contracts to Buyer, and Buyer shall assume all Assumed Contracts from Sellers, as of the Closing Date pursuant to Section 365 of the Bankruptcy Code and the Sale Order. In connection with such assignment and assumption, Buyer shall cure all monetary defaults under such Assumed Contracts to the extent required by Section 365(b) of the Bankruptcy Code (such amounts, the "<u>Cure Costs</u>"), as provided in <u>Section 3.4</u> hereof.

In the case of licenses, certificates, approvals, authorizations, Leases, Contracts and other commitments included in the Purchased Assets (a) that cannot be transferred or assigned effectively without the consent of third parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Buyer in endeavoring to obtain such consent and, if any such consent is not obtained, Sellers shall, subject to any approval of the Bankruptcy Court that may be required, cooperate with Buyer in all reasonable respects to provide to Buyer the benefits thereof in some other manner, or (b) that are otherwise not transferable or assignable (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Buyer to provide to Buyer the benefits thereof in some other manner (including the exercise of the rights of Sellers thereunder).

**2.6** **Further Assurances**.

(a) At the Closing, and at all times thereafter as may be necessary, Sellers and Buyer shall execute and deliver such other instruments of transfer as shall be reasonably

necessary or appropriate to vest in Buyer title to the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances, except for those Permitted Encumbrances that are to be expunged and discharged pursuant to the Sale Order), and to comply with the purposes and intent of this Agreement and such other instruments as shall be reasonably necessary or appropriate to evidence the assignment by Sellers and assumption by Buyer or its designee of the Assumed Contracts. Sellers and Buyer shall reasonably cooperate with one another to execute and deliver such other documents and instruments as may be reasonably required to carryout the transactions contemplated hereby; provided that nothing in this Section 2.6(a) shall (i) require Sellers to make any expenditure or incur any obligation on their own or on behalf of Buyer for which funds in the full amount of such expenditure or obligation are not provided to Sellers by Buyer in advance in cash or (ii) prohibit any Seller from ceasing operations or winding up its affairs following the Closing.

(b)      Prior to the Closing, Sellers shall (at Sellers' sole cost and expense) effect the necessary change of ownership and recordals with all patent, trademark, and copyright offices and domain name registrars and other similar authorities where Business Intellectual Property owned or purported to be owned by Sellers (i) is still recorded in the name of legal predecessors of Sellers or any Person other than Sellers or (ii) where, to Sellers' Knowledge, the relevant recordals of the patent, copyright, and trademark offices, and domain name registrars, and other similar authorities are materially incorrect for any other reason, including as necessary to ensure a Seller is the record owner thereof.

**2.7      Designated Remaining Contracts**

(a)      Schedule 2.1(e) sets forth Buyer's designation of Assumed Contracts and Schedule 2.7(a) sets forth the Designated Remaining Contracts (such schedules, "Buyer's Contract Designations"). Any Contracts or Leases not listed as part of Buyer's Contract Designations are Excluded Contracts; provided, notwithstanding anything to the contrary in this Agreement, Buyer shall have until up to one (1) day prior to Closing to amend, by written notice to Sellers, Buyer's Contract Designations by (i) having any Designated Remaining Contract made an Assumed Contract or (ii) including any Contract that was not on the list of Buyer's Contract Designations as an Assumed Contract or a Designated Remaining Contract. Sellers shall make available to Buyer true and complete copies of all Contracts and Leases (including all amendments thereto and assignments thereof) prior to the hearing to approve the Sale Order.

(b)      Notwithstanding any provision in this Agreement to the contrary, from and after the date hereof through (i) the Closing Date or, with respect to any Designated Remaining Contract, ninety (90) days after the Closing Date, or (ii) earlier termination of this Agreement, Sellers will not reject, repudiate or disclaim, without the prior consent of Buyer, any Contract. Notwithstanding anything to the contrary in this Agreement, any Designated Remaining Contract shall not constitute an Assumed Contract or Excluded Contract unless and until such Designated Remaining Contract is so designated (or deemed designated) in accordance with Section 2.7(c).

(c)      Notwithstanding anything to the contrary in this Agreement, pursuant to written notice of Buyer to Sellers no later than ninety (90) days after the Closing Date, Designated Remaining Contracts may either be (i) designated as Assumed Contracts and

assumed by Sellers and assigned to Buyer so long as counterparties to such Designated Remaining Contracts are afforded 10 days to object to such assumption and assignment; provided, however, that, absent an objection, each such Designated Remaining Contract shall be deemed assumed by the Sellers and assigned to Buyer without further order or action of or notice to the Bankruptcy Court or any other party or (ii) designated as Excluded Contracts and promptly rejected by Sellers. At the end of such ninety (90) day period, any Designated Remaining Contract for which Buyer has not provided written notice of its desire to assume, shall be deemed an Excluded Contract and Sellers shall promptly reject such Contract or Lease. For the avoidance of doubt, Buyer does not have a right to designate any Contract or Lease that is an Assumed Contract (whether because it is listed on Schedule 2.1(e) as of the date of this Agreement or because it is designated as an Assumed Contract following the date of this Agreement) as an Excluded Contract.

(d)     With respect to any Designated Remaining Contract, Buyer shall compensate Sellers in full for the ordinary costs related thereto first arising after the Closing Date and actually incurred by Sellers after the Closing in performing the obligations under such Designated Remaining Contracts until the date a final determination is made (or deemed made) by Buyer with respect to the treatment of such Designated Remaining Contract (in any event, not to exceed ninety (90) days after the Closing).

(e)     Notwithstanding anything in this Agreement to the contrary, on the date any Designated Remaining Contract is assumed and assigned to Buyer, such Designated Remaining Contract shall be deemed an Assumed Contract for all purposes under this Agreement and, to the extent required herein, any applicable Determined Cure Cost shall be satisfied and paid by Buyer; provided, however, that Seller shall pay for the first $150,000 of any Determined Cure Costs for any Assumed Contract if Seller did not make available to Buyer a true and complete copy of such Assumed Contract on or prior to June 1, 2011 (each, an "Undisclosed Contract"), and such Undisclosed Contract is designated by Buyer as a Designated Remaining Contract pursuant to Section 2.7(a)(ii) and later assumed and assigned by Buyer pursuant to Section 2.7(c) (such first $150,000 of such Determined Cure Costs for which Seller shall be responsible, the "Seller Additional Cure Costs") and Buyer shall be responsible for and pay any Determined Cure Costs relating to such Undisclosed Contracts in excess of such first $150,000. With respect to any Excluded Contract which has not been rejected following the Closing Date, upon written notices from Buyer, as soon as practicable, Sellers shall take all actions reasonably necessary to assume and assign to Buyer pursuant to Section 365 of the Bankruptcy Code any Contracts or Leases set forth in Buyer's notices; provided, any applicable Determined Cure Cost shall be satisfied and paid by Buyer. All Cure Costs referenced in this Section 2.7(e) (other than the Seller Additional Cure Costs) are referred to in this Agreement as the "Buyer Additional Cure Costs" and shall be borne 100% by Buyer without any reduction to the Purchase Price or any increase to the Adjustment Liabilities.

## ARTICLE III

## PURCHASE PRICE

**3.1     Purchase Price; Purchase Price Adjustment**. The purchase price, subject to adjustment pursuant to Sections 3.2 and 3.3, for the purchase, sale, assignment and conveyance

of Sellers' right, title and interest in, to and under the Purchased Assets shall be $55,086,000 (the "Purchase Price").

**3.2    Estimated Purchase Price Adjustment**.

(a)    Not less than three (3) Business Days nor more than five (5) Business Days prior to the Closing Date, Sellers and Buyer jointly shall determine an estimate, as of the Closing Date, of the Final Purchase Price Adjustment (such estimate, the "Estimated Purchase Price Adjustment"). The Estimated Purchase Price Adjustment shall be calculated in accordance with GAAP as consistently applied by Sellers. For purposes of the calculation with respect to any Determined Cure Costs, with respect to any given Assumed Contract, the calculation shall use the Asserted Cure Cost to the extent no Determined Cure Cost has been finalized.

(b)    On the Closing Date, Buyer shall deliver to and deposit in trust with the Escrow Agent, pursuant to the terms of a Price Adjustment Escrow Agreement entered into among Sellers, Buyer, and the Escrow Agent, in substantially the form attached as Exhibit J (the "Price Adjustment Escrow Agreement"), an amount equal to the Price Adjustment Deposit. Interest earned on the Price Adjustment Deposit shall be deemed a part of the Price Adjustment Deposit for all purposes of this Agreement.  The Price Adjustment Deposit shall be released in accordance with Section 3.3(b). Sellers and Buyer shall each pay, and shall each be liable only for, one-half of the Escrow Agent's escrow fees and charges in connection with the Price Adjustment Escrow Agreement.

**3.3    Final Purchase Price Adjustment**.

(a)    Within two (2) Business Days following the Closing, (i) Representatives of Sellers and Buyer, and the Independent Accounting Firm shall conduct a physical count of the Inventory and determine the amount of the Inventory as of the Closing Date; and (ii) the Independent Accounting Firm shall conduct a calculation of the other Current Assets and Cash; and the Independent Accounting Firm shall deliver a report (the "Independent Accounting Firm Report") of the conclusions of that count and calculation of clauses (i) and (ii) of the Final Purchase Price Adjustment within thirty (30) Business Days after the Closing Date, in each case as of the Closing Date and in accordance with GAAP as consistently applied by Sellers. During such first fifteen (15) Business Days of such thirty (30) Business Days after Closing, Buyer and Sellers shall review the Adjustment Liabilities as used to calculate the Estimated Purchase Price Adjustment in order to finalize clause (iii) of the Final Purchase Price Adjustment. If Buyer and Sellers are unable to resolve any disagreement as to any amount included in or omitted from the Adjustment Liabilities calculation within the first fifteen (15) Business Days after the Closing Date, then the amounts in dispute will be referred to the Independent Accounting Firm for final arbitration within fifteen (15) Business Days thereafter, which arbitration shall be final and binding on both Buyer and Sellers. The Accountants shall act as an arbitrator to determine, based solely on presentations by Buyer and Seller, and not by independent review, only those amounts of the Adjustment Liabilities still in dispute.

(b)    On the third (3rd) Business Day following the delivery of the Independent Accounting Firm Report pursuant to Section 3.3(a) and the resolution of any dispute with respect

to the Adjustment Liabilities, the appropriate adjusting payment shall be made in accordance with this <u>Section 3.3(b)</u> as follows:

         (i)    if the Final Purchase Price Adjustment, as determined in accordance with this <u>Section 3.3(a)</u> is equal to or greater than the Estimated Purchase Price Adjustment, then: (A) an amount equal to the difference between the Final Purchase Price Adjustment and the Estimated Purchase Price Adjustment shall be released to Buyer from the Price Adjustment Deposit by the Escrow Agent and if the amount exceeds the Price Adjustment Deposit such additional amount in excess of the Price Adjustment Deposit shall be paid by Sellers to Buyer by wire transfer of immediately available funds; and (B) the balance, if any, of the Price Adjustment Deposit shall be released to Sellers by the Escrow Agent; or

         (ii)    if the Final Purchase Price Adjustment, as determined in accordance with this <u>Section 3.3(a)</u>, is less than the Estimated Purchase Price Adjustment, then: (A) the Price Adjustment Deposit shall be released to Sellers by the Escrow Agent and (B) Buyer shall remit to Sellers by wire transfer of immediately available funds such difference between the Estimated Purchase Price Adjustment and the Final Purchase Price Adjustment up to the amount of the Estimated Purchase Price Adjustment.

         (iii)    The Sellers and Buyer shall direct the Escrow Agent in writing to release the Price Adjustment Deposit in accordance with this Agreement.

         (c)    The calculation of the Final Purchase Price Adjustment shall be final, binding and conclusive on Buyer and Sellers and once payment is made in accordance with this <u>Section 3.3</u>, the Purchase Price shall not be entitled to be re-calculated or subsequently re-opened.

         (d)    Any Cash that is an Excluded Asset pursuant to <u>Section 2.2(m)</u> shall be paid to Sellers promptly after final determination thereof.

         (e)    Sellers and Buyer shall each pay, and shall each be liable only for, one-half of the Independent Accounting Firm's fees and charges.

         **3.4**    <u>**Cure Costs**</u>.  Buyer agrees to satisfy and pay, as and when due, the Determined Cure Costs (other than the Seller Additional Cure Costs and the Excess Cure Costs) in respect of the Assumed Contracts for which all necessary consents and/or Bankruptcy Court approval to transfer have been obtained and, pursuant to <u>Section 2.3(g)</u>, the liability for such Determined Cure Costs shall be an Assumed Liability.  In consultation with and at the direction of Buyer, Sellers shall file and prosecute any pleadings with the Bankruptcy Court to determine the amount of any Asserted Cure Cost.  As and when any Asserted Cure Costs becomes a Determined Cure Cost, the amount of such Determined Cure Costs shall be satisfied and paid by Buyer pursuant to the terms of this <u>Section 3.4</u>; <u>provided</u>, <u>however</u>, that (i) Seller shall pay the Seller Additional Cure Costs and (ii) Seller shall pay (as an administrative expense entitled to priority under Section 503 of the Bankruptcy Code) for any Cure Costs associated with any Contract listed on

Schedule 2.3(g) in excess of the amount set forth next to such Contract on Schedule 2.3(g) (such Cure Costs, the "Excess Cure Costs"). In no event shall Buyer pay or assume any Cure Costs associated with any Contract set forth on Schedule 2.3(g) in excess of the amount set forth on Schedule 2.3(g).

      **3.5**    **Withholding**. Buyer shall be entitled to deduct and withhold from all payments made pursuant to this Agreement such amounts (if any) as Buyer is required to deduct and withhold under the Code or any provision of state, local or foreign law. To the extent that amounts are so withheld and paid over to the appropriate Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Seller from which such deduction and withholding was made.

      **3.6**    **Payment of Deposit**. Buyer deposited $2,000,000 in good and immediately available funds on May 20, 2011 with the Escrow Agent pursuant to the terms of the Deposit Escrow Agreement (the "Initial Deposit"). On the first Business Day following the entry of the Sale Order, the Buyer shall deposit an additional $8,000,000 in good and immediately available funds with the Escrow Agent pursuant to the terms of the Deposit Escrow Agreement, as amended for such additional deposit (the "Second Deposit", and together with the Initial Deposit, the "Deposit"). Sellers shall receive the Deposit and interest accrued thereon upon the Closing. The Deposit, plus all accrued interest thereon, shall be returned to Buyer as provided in Section 10.2(c). The Sellers and Buyer shall direct the Escrow Agent in writing to release the Deposit in accordance with this Agreement.

      **3.7**    **Allocation of Purchase Price**. Within one hundred eighty (180) days after the Closing, Buyer shall deliver to Sellers for Sellers' review and approval allocation schedule(s) (the "Allocation Schedule(s)") allocating the Purchase Price and the Assumed Liabilities that are liabilities for federal income Tax purposes on a dollar basis among the Purchased Assets. The Allocation Schedule(s) shall be reasonable and shall be prepared in accordance with Section 1060 of the Code and the regulations thereunder. Sellers agree that, following their approval of the Allocation Schedule(s), such approval not to be unreasonably withheld, conditioned, or delayed, Sellers shall sign the Allocation Schedule(s) and return an executed copy thereof to Buyer within ten (10) days after receiving the Allocation Schedule(s) from Buyer. Buyer and Sellers will each file IRS Form 8594, and all Tax Returns, in accordance with the Allocation Schedule(s). Buyer, on the one hand, and Sellers, on the other hand, each agrees to provide the other promptly with any other information required to complete IRS Form 8594.

## ARTICLE IV

## CLOSING

      **4.1**    **Closing Date**. Upon the terms and subject to the satisfaction of the conditions contained in Article IX (or the waiver thereof by the Party entitled to waive the condition), the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at a mutually agreed upon location and time no later than the third Business Day following the date on which the conditions set forth in Article IX have been satisfied or waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such

other place or time as Buyer and Sellers may mutually agree. The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date."

4.2 **Payment on the Closing Date**. Subject to satisfaction or waiver (if permissible) of the conditions set forth in Article IX, at the Closing Buyer shall pay to Sellers the Closing Date Payment by wire transfer of immediately available funds to the account in the United States specified by Sellers.

4.3 **Buyer's Additional Deliveries**. At or prior to the Closing, Buyer shall deliver to Sellers:

(a) the Assumption Agreement and the Price Adjustment Escrow Agreement;

(b) the certificates required to be delivered pursuant to Sections 9.3(a) and 9.3(b); and

(c) such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request to transfer and assign the Assumed Liabilities to Buyer.

4.4 **Sellers' Deliveries**. At or prior to the Closing, Sellers shall deliver or cause to be delivered to Buyer all the following:

(a) the Assignment and Bill of Sale, Deeds, Assumption Agreement, Price Adjustment Escrow Agreement and the General Release, duly executed by Sellers and the other parties thereto, other than Buyer;

(b) instruments of assignment of the Patents (the "Assignment of Patents"), Trademarks (the "Assignment of Trademarks"), Copyrights (the "Assignment of Copyrights") and Domain Names (the "Assignment of Domain Names") that are included in the Purchased Assets, if any, duly executed by Sellers, in form for recordation with the appropriate Governmental Authorities, substantially in the form of Exhibits F, G, H, and I, respectively, and any other assignments or instruments with respect to any Intellectual Property included in the Purchased Assets for which an assignment or instrument is required to assign, transfer, convey and deliver such assets to Buyer;

(c) with respect to the Owned Real Property, the documents listed in Section 5.4(a)(i)(B);

(d) certified copy of the Sale Order;

(e) the certificates required to be delivered pursuant to Sections 9.2(a) and 9.2(b);

(f) certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code; and

(g)     such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as are necessary or otherwise customary to vest in Buyer all the right, title and interest of Sellers in, to or under any or all the Purchased Assets and other transfer tax forms, affidavits and certificates customarily delivered in connection therewith.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLERS

As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, each Seller jointly and severally represents and warrants to Buyer and agrees as follows:

**5.1     Organization of Sellers**. Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Each Seller is in good standing in each of the jurisdictions in which the ownership or leasing of its properties or the conduct of its businesses requires such qualification, except where failure to so qualify or be in good standing would not reasonably be expected to have a Material Adverse Effect. Each Seller has the requisite corporate or limited liability company power and authority to own or lease and to operate and use its Purchased Assets and to carry on the Business as is now conducted by such Seller.

**5.2     Subsidiaries and Investments**.  Except as set forth in Schedule 5.2, Sellers do not, directly or indirectly, own, of record or beneficially, any outstanding voting securities, membership interests or other equity interests in any Person.

**5.3     Authority of Sellers**.

(a)     Each Seller has the requisite corporate or limited liability company power and authority to execute, deliver and, subject to the entry of the Sale Order, perform this Agreement and each of the Ancillary Documents to which such Seller is a party. The execution, delivery and performance of this Agreement and such Ancillary Documents by each Seller have been duly authorized and approved by each applicable Seller's board of directors (or similar governing body), and, subject to the entry of the Sale Order, does not require any authorization or consent of any Seller's shareholders or members that has not been obtained. This Agreement has been duly authorized, executed and delivered by Sellers and, subject to the entry of the Sale Order, is the legal, valid and binding obligation of Sellers enforceable in accordance with its terms, and each of the Ancillary Documents to which each Seller is a party has been duly authorized by such Seller and upon execution and delivery by such Seller and subject to the entry of the Sale Order, will be a legal, valid and binding obligation of such Seller enforceable in accordance with its terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

(b)     Subject to requisite Bankruptcy Court approval, entry of the Sale Order, notice filings and consents required in connection with the Bankruptcy Case, and receipt of the

Third Party Consents, neither the execution and delivery of this Agreement or any of the Ancillary Documents or the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default or an event of default, or permit the acceleration of any Liability or obligation, under (i) any charter (or similar governing instrument) or by-laws (or similar governing document) of any Seller, (ii) any Permits, (iii) any Order to which any Seller is bound or any Purchased Asset is subject, (iv) any Legal Requirement affecting Sellers or the Purchased Assets, or (v) any Assumed Contract listed, except in the case of <u>clauses (ii)</u>, <u>(iv)</u> and <u>(v)</u>, as would not individually or in the aggregate, have a Material Adverse Effect or a material adverse effect on Sellers' ability to consummate the transactions contemplated by this Agreement.

**5.4** **<u>Real Property</u>**.

(a)     <u>Schedule 5.4(a)</u> lists, as of the date of this Agreement, all real property which is owned in fee by any Seller including all land and buildings and improvements located on the land, and all fixtures, systems, other property attached or appurtenant thereto and all interests, easements, rights of way, licenses and other rights, privileges and options related thereto (collectively, the "<u>Owned Real Property</u>").

(i)     Except as described in <u>Schedule 5.4(a)</u>: (A) each Seller that is the owner of a parcel of Owned Real Property is listed on <u>Schedule 5.4(a)</u>; (B) to the extent as are in the Sellers' possession as of the date of this Agreement, the Sellers have made available to Buyer copies of all existing deeds, surveys, maps, appraisals, legal descriptions, title commitments, reports or policies for each parcel of Owned Real Property; and (C) no Person, other than the Sellers listed in <u>Schedule 5.4(a)</u> as the owners (including all prior legal and fictitious names of such Seller) have any occupancy or use rights with respect to the Owned Real Property and no lease, license, option, right of first refusal or any other right to purchase exists, or has been granted, with respect to the Owned Real Property.

(ii)     Except as described in <u>Schedule 5.4(a)</u>, no Seller has received written notice, nor to Sellers' Knowledge is there pending or is there threatened any (A) condemnation, eminent domain, expropriation or similar proceeding affecting the Owned Real Property, (B) proceeding to change the zoning classification of any portion of the Owned Real Property or (C) imposition of any special assessments for public betterments affecting the Owned Real Property.

(iii)     The Owned Real Property and the present uses of the Owned Real Property by Sellers are in compliance with, and not in default under or in violation of (A) any building, zoning, land use, public health, public safety, sewage, water, sanitation or other Legal Requirement, and (B) the terms and provisions of any restrictive covenants, easements, or agreements affecting the Owned Real Property, except for such instances of noncompliance, default or violation that would not individually or in the aggregate have a Material Adverse Effect.

(iv)     To the Knowledge of Sellers, the Owned Real Property is assessed by local property assessors as a Tax parcel or parcels separate from all other Tax parcels.

(b)     Schedule 5.4(b) lists, as of the date of this Agreement, all leases, subleases, licenses or other use or occupancy agreements with respect to real property to which a Seller is a party as lessee, sublessee, tenant, subtenant, licensee or is in a similar capacity (collectively, "Leases" and each a "Lease") and sets forth the street address of each parcel of real property and the improvements thereon that is the subject of the applicable Lease (the "Leased Real Property"). Sellers have made available to Buyer complete and correct copies of the Leases, including any amendments, extensions or renewals thereto. Except as set forth on Schedule 5.4(b), (i) there has not been any sublease, license, use agreement or assignment entered into by any of the Sellers in respect of the Leases; and (ii) each Lease that is an Assumed Contract as of the date of this Agreement is valid, in full force and effect and enforceable against Sellers party thereto and to Sellers' Knowledge, the other parties thereto in accordance with its terms, except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, or (y) as set forth on Schedule 5.4(b). Upon entry of the Sale Order and payment of the Cure Costs, (i) no Seller will be in breach or default of its obligations under any of the Leases, (ii) no condition exists that with notice or lapse of time or both would constitute a default under any of the Leases, and (iii) to the Seller's Knowledge, no other party to any of the Leases is in breach or default thereunder.

(c)     Schedules 5.4(a) and 5.4(b) list all of the real property used by the Sellers in the operation of the Business as of the date of this Agreement.

(d)     Except as set forth in Schedule 5.4(d) or as would not, individually or in the aggregate, have a Material Adverse Effect:

(i)     Sellers have all Environmental Permits necessary for the lawful operation of the Business as presently conducted.

(ii)     The ongoing activities of the Business comply with, and are not subject to any Order with respect to, any Environmental Permits or Environmental Laws, and no Seller has received written notice of, or is aware of any facts, circumstances or conditions relating to the Business that could constitute a violation of, or give rise to any claim, Action, Proceeding or Liability under, any Environmental Laws.

(iii)     There has been no Release of any Hazardous Substances at, on or under any of the Owned Real Property or the Leased Real Property by any Seller in violation of any Environmental Laws, or that would otherwise be reasonably likely to give rise to a Liability under Environmental Laws, and there is no threatened Release at, on or under such properties by any Seller in violation of any Environmental Laws, or that would otherwise be reasonably likely to give rise to a Liability under Environmental Laws. To Sellers' Knowledge, no Person has Released, placed, stored, treated, deposited, discharged, buried, dumped or

disposed of any Hazardous Substances or non-hazardous solid wastes at, on or under any of the Owned Real Property or the Leased Real Property in violation of any Environmental Laws or in a manner that would be reasonably likely to give rise to a Liability under Environmental Laws.

(iv)    Sellers have not voluntarily assumed any environmental liabilities affecting any of the Owned Real Property with any party.

(v)    There are no claims, suits or Proceedings by any employee pending or, to Sellers' Knowledge, threatened, against any Seller that are premised on the exposure to asbestos or asbestos-containing material in any of the Owned Real Property that constitutes a Purchased Asset.

(vi)    There are no claims, suits, Actions or Proceedings arising under any Environmental Law pending against any Sellers and relating to the Business or any of the Purchased Assets or, to Seller's Knowledge, threatened against or affecting any Sellers and relating to the Business or any of the Purchased Assets.

(vii)    The storage tanks that presently exist on, at or under any of the Owned Real Property have been operated and maintained in accordance with all Environmental Laws and none of them is Releasing any Hazardous Substance and no such Release is threatened.

(viii)    To Sellers' Knowledge, no Encumbrance has been imposed or asserted on any Owned Real Property by any Governmental Authority or other Person in connection with any Environmental Law.

(ix)    Sellers have made available to Buyer copies of all material documents, records and information in Sellers' possession concerning the condition of the Environment at any of the Owned Real Property that constitutes a Purchased Asset, whether generated by Sellers or others, including environmental audits and environmental site assessments.

**5.5**    **Title to Purchased Assets; Good Condition**.

(a)    Sellers will have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.4, and subject to the terms of the Sale Order, Sellers will thereby transfer to Buyer, good and marketable title to, or, in the case of property leased or licensed by Sellers, a valid leasehold or licensed interest in, all of the Purchased Assets, free and clear of all Encumbrances, except (a) as set forth on Schedule 5.5(a), (b) for the Assumed Liabilities,   and (c) for Permitted Encumbrances (except for those Permitted Encumbrances that are to be expunged and discharged pursuant to the Sale Order).

(b)    Except as set forth on Schedule 5.5(b), all of the tangible personal property and real property (including buildings and improvements located thereon) comprising the Purchased Assets is in good operating condition and repair, free of defects and in a state of good maintenance, in each case in all material respects in the aggregate, ordinary wear and tear excepted, and is adequate and suitable for the purposes for which it is presently being used.

**5.6**     **Taxes**. Except as set forth on <u>Schedule 5.6</u>, Sellers have (i) each timely filed all Tax Returns required to be filed with the appropriate Governmental Authority in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted, or to be obtained on behalf of, Sellers), which were complete and accurate in all material respects; and (ii) all Taxes due with respect to the periods covered by such Tax Returns have been paid. Except as set forth on <u>Schedule 5.6</u>, on the date hereof, (i) no material examination of any such Tax Return of Sellers is currently in progress by any Governmental Authority and to the Knowledge of Sellers, no such examination is threatened by any Governmental Authority; (ii) no material adjustment has been proposed in writing with respect to any such Tax Returns for the last five (5) fiscal years by any Governmental Authority; (iii) there are no waivers in force extending the statutory period of limitation applicable to any such Tax Return of Sellers; (iv) no material claim has been made in writing within the last five (5) years by any Governmental Authority in a jurisdiction where Sellers do not file Tax Returns that it is or may be subject to Taxes by that jurisdiction; and (v) there are no liens for Taxes against any of the Purchased Assets (other than liens for current Taxes not yet due and payable).

**5.7**     **Absence of Certain Developments**. Other than as a result of the Filings and as set forth on <u>Schedule 5.7</u>, since the Reference Date:

    (a)     Sellers have conducted the Business in the ordinary course of the Business; and

    (b)     no Seller has taken any action prohibited by <u>Section 7.5(b)</u>.

**5.8**     **Sellers' Intellectual Property**.

    (a)     <u>Schedule 5.8(a)</u> sets forth a true, correct and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; (iii) registered Copyrights and pending applications for Copyrights; and (iv) Domain Names, in each case which is owned by a Seller. Sellers are the sole and exclusive beneficial and record owners of all of the Intellectual Property items set forth in <u>Schedule 5.8(a)</u>, and to the Knowledge of Sellers all such applications and registrations are in effect and subsisting and, to the extent applicable, are valid and enforceable.

    (b)     <u>Schedule 5.8(b)</u> sets forth a true, correct and complete list of all material licenses, sublicenses or other Contracts to which a Seller is (i) granted or obtains (or agrees to grant or obtain) any right to use any Intellectual Property (other than standard form Contracts granting rights to use readily available shrink wrap or click wrap Software having a replacement cost and annual license fee of less than $20,000 in the aggregate for all such related Contracts), or (ii) restricted in its rights, or permits (or agrees to permit) other Persons, to use, enforce or register any Intellectual Property, including any license agreements, coexistence agreements or covenants not to sue (each a "<u>License</u>"). Except as otherwise disclosed in <u>Schedule 5.8(b)</u>: (i) each License is valid and binding upon, and enforceable by or against the Seller party thereto and to Sellers' Knowledge, the other parties thereto in accordance with its terms except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, and (y) as set forth on <u>Schedule 5.8(b)</u>; (ii) with respect to each License, there is no

material breach or default (or event that with the giving of notice or passage of time would constitute a material breach or default) by a Seller, or to Sellers' Knowledge, any other party thereto; and (iii) there are no pending or, to Sellers' Knowledge, threatened claims by or against a Seller with respect to any License.

(c) Sellers own, or have a valid right to use, free and clear of all Encumbrances (other than Permitted Encumbrances or Other Encumbrances), all Intellectual Property used or held for use in, or necessary to conduct, the Business as currently conducted and has been conducted in the past two (2) years.

(d) Except as disclosed on <u>Schedule 5.8(f)</u>, to the Knowledge of Sellers (i) the conduct of the Business (including the products and services of Sellers) does not infringe, misappropriate, or otherwise violate (nor has infringed, misappropriated or otherwise violated) any Person's Intellectual Property rights, and there has been no such claim or Action asserted or threatened in the past three (3) years against any Sellers or any other Person, and (ii) no Person (including any current or former officer, director, employee or contractor of any Seller) is infringing, misappropriating, or otherwise violating any Business Intellectual Property, and no such claims or Actions have been asserted or threatened against any Person by Sellers or any other Person, in the past three (3) years.

(e) Sellers take reasonable measures to protect the confidentiality of Trade Secrets, including requiring all Persons having access thereto to execute written non-disclosure agreements.

(f) Except as described on <u>Schedule 5.8(f)</u>, the consummation of the transactions contemplated by this Agreement will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, Buyer's right to own, license, use, or hold for use any of the Intellectual Property owned, licensed, used or held for use by Sellers in the conduct of the Business as owned, licensed, used, or held for use by Sellers in the conduct of the Business as currently conducted.

**5.9** <u>**Employment Matters**</u>.

(a) To Sellers' Knowledge, Sellers' relations with their employees are good and assuming, prior to the Closing, Buyer offers employment to Sellers' employees on substantially the same terms in the aggregate as currently in effect, no Seller has any reasonable basis to believe that the consummation of the transactions contemplated by this Agreement would reasonably be expected to have a Material Adverse Effect on relations with Sellers' employees.

(b) Sellers are in compliance in all material respects with all applicable laws respecting employment and employment practices, terms and conditions of employment and wages and hours.

(c) Sellers are not engaged in any unfair labor practice or other unlawful employment practice. Except as disclosed on <u>Schedule 5.9(c)</u>, there are no unfair labor practice charges or other employee-related complaints or claims against Sellers pending or, to Sellers' Knowledge, threatened before the National Labor Relations Board, the Equal Employment

Opportunity Commission, the Occupational Safety and Health Review Commission, the Department of Labor or any other Governmental Authority by or concerning the employees, independent contractors or consultants of Sellers, that if decided adversely would reasonably be expected to have a Material Adverse Effect. Except as disclosed on Schedule 5.9(c), for the three (3) year period prior to the date of this Agreement, Sellers have not (i) been notified in writing by any Governmental Authority of any alleged violation by Sellers of applicable law that remains unresolved respecting employment, employment practices or terms and conditions of employment, or (ii) received any written notice of the intent of any Government Authority to conduct an investigation of Sellers and, to Sellers' Knowledge, no such investigation is in progress.

(d)     Except as set forth on Schedule 5.9(d), Sellers are not (i) party to any Collective Bargaining Agreement, (ii) currently negotiating any Collective Bargaining Agreement, or (iii) obligated to negotiate any Collective Bargaining Agreement. As related to Sellers and the Business, as of the date hereof (x) no labor organization or group of Sellers' employees has made a pending demand to Sellers for recognition or certification, (y) there are no existing organization drives, and (z) there are and have been no representation or certification proceedings, or petitions seeking a representation proceeding, with the National Labor Relations Board or any other labor relations tribunal or authority, nor have any such demands, proceedings or petitions been brought, or to Sellers' Knowledge, threatened to be brought, within the past three (3) years.

(e)     As of the date hereof, there are no strikes, slowdowns or work stoppages pending or, to Sellers' Knowledge, threatened with respect to Sellers' employees, nor has any such strike, slowdown or work stoppage occurred or, to Sellers' Knowledge, been threatened within three (3) years prior to the date hereof. As of the date hereof, there are no material arbitrations, grievances or other labor disputes pending or, to Sellers' Knowledge, threatened with respect to Sellers' employees.

(f)     Except as disclosed in writing to Buyer on the date hereof, Sellers have not promised any of their management or other employees that any of such persons will be employed or engaged by Buyer or its Affiliates subsequent to the date hereof or the Closing Date. The execution of this Agreement and the consummation of the transactions contemplated hereby will not result in the breach or other violation of any Collective Bargaining Agreement, employment agreement, consulting agreement or other labor-related agreement to which any Seller is a party.

(g)     All material levies, assessments and penalties made against Sellers pursuant to all applicable workers compensation legislation as of the date hereof have been paid by Sellers, and Sellers have not been reassessed under any such legislation.

(h)     Schedule 5.9(h) lists, as of the date of this Agreement, a true and complete list of each material (i) deferred compensation plan, (ii) incentive compensation plan, (iii) equity compensation plan, (iv) "welfare" plan, fund or program (within the meaning of Section 3(I) of ERISA), (v) "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA) (vi) "employee benefit plan" (within the meaning of Section 3(3) of ERISA, (vii) employment, termination, severance or "change in control" agreement, and (viii) other material employee

benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by Sellers or by any United States trade or business, whether or not incorporated (an "ERISA Affiliate"), that together with Sellers would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA, or to which Sellers or any ERISA Affiliate have any Liability or is a party, for the benefit of any employee or director or any former employee or director of Sellers (each such plan is referred to herein as a "Benefit Plan"). Each Benefit Plan is operated, funded and administered in all material respects in accordance with its terms, the terms of any applicable Collective Bargaining Agreement and applicable law (including ERISA and the Code), except as would not reasonably be expected to result in the imposition of any material Liabilities upon Buyer.

(i)     Except as set forth on Schedule 5.9(i), with respect to each Benefit Plan subject to Title IV or Section 302 of ERISA ("Title IV Plan"), no Liability under Title IV of ERISA has been incurred by Sellers or any ERISA Affiliate that has not been satisfied in full and, no condition exists that could reasonably be expected to result in the imposition of any material Liability upon Buyer. Except as set forth on Schedule 5.9(i), no Benefit Plan provides any medical, disability or life insurance benefits to any employees of the Business after termination of employment, other than COBRA continuation coverage or coverage mandated by state law. Insofar as the representation made in this Section 5.9(i) applies to sections 4064, 4069 or 4204 of Title IV of ERISA, it is made with respect to any employee benefit plan, program, agreement or arrangement subject to Title IV of ERISA to which Sellers or any ERISA Affiliate made, or was required to make, contributions during the five (5) year period ending on the last day of the most recent plan year ended prior to the date hereof.

(j)     The PBGC has not instituted proceedings to terminate any Title IV Plan and no condition exists that presents a material risk that such proceedings will be instituted.

(k)     Except as set forth on Schedule 5.9(k), with respect to each Title IV Plan the present value of accrued benefits under such plan, based upon the actuarial assumptions used for funding purposes in the most recent actuarial report prepared by such plan's actuary with respect to such plan did not exceed, as of its latest valuation date, the then current value of the assets of such plan allocable to such accrued benefits.

(l)     Except as provided in Schedule 5.9(l), (i) no Title IV Plan is a "multiemployer pension plan," as defined in section 3(37) of ERISA, nor is any Title IV Plan a plan described in section 4063(a) of ERISA, and (ii) neither Sellers nor any ERISA Affiliate has made or suffered a "complete withdrawal" or a "partial withdrawal," as such terms are respectively defined in sections 4203 and 4205 of ERISA (or any liability resulting therefrom has been satisfied in full).

(m)     Schedule 5.9(m) lists each Benefit Plan under which the consummation of the transactions contemplated hereby could, either alone or in combination with another event, (i) entitle any current or former employee, director or officer of Sellers or any ERISA Affiliate to severance pay or any other material payment, or (ii) accelerate the time of payment or vesting, or increase materially the amount of compensation due any such employee, director or officer. No payment or other entitlement referred to immediately above shall result in any Liability to Buyer, except where such Liability is an Assumed Liability.

(n)    As of the date hereof, there are no pending or, to Sellers' Knowledge, threatened or anticipated claims by or on behalf of any Benefit Plan, by any employee or beneficiary covered under any such Benefit Plan, or otherwise involving any Benefit Plan (other than routine claims for benefits) that could reasonably result in the imposition of any material Liability upon Buyer.

5.10    **Sufficiency of Assets**. Except as set forth on Schedule 5.10, the assets available to be purchased by Buyer pursuant to the terms of this Agreement and the other Ancillary Documents, will, as of the Closing Date, constitute all of the assets and rights necessary for Buyer to conduct the Business substantially as presently conducted by Sellers.

5.11    **Compliance with Laws; Permits**.

(a)    Except as would not, individually or in the aggregate, have a Material Adverse Effect, Sellers are in compliance with all Legal Requirements applicable to their respective operations of the Business. Except as set forth on Schedule 5.11(a), since January 1, 2008, no Seller has received written notice from any Governmental Authority with respect to, or been charged with, the violation of any Legal Requirement that would reasonably be expected to have a Material Adverse Effect.

(b)    Sellers currently have all material Permits required for the operation of the Business as presently conducted and all such material Permits are in full force and effect. No Seller is in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any such material Permit to which it is a party except where such default or violation would not reasonably be expected to have a Material Adverse Effect.

5.12    **Contracts**.

(a)    Schedule 5.12(a) lists or describes all Material Contracts. Sellers have made available to Buyer true and complete copies of the Material Contracts (including all amendments thereto and assignments thereof) set forth on Schedule 5.12(a).

(b)    Except as set forth on Schedule 5.12(b), each Material Contract is in full force and effect and is a valid and binding obligation of the Seller party thereto and, to Sellers' Knowledge, the other parties thereto, in accordance with its terms and conditions, except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, and (y) as set forth on Schedule 5.12(b). Upon entry of the Sale Order and payment of the Cure Costs, (i) no Seller will be in breach or default of its obligations under any Material Contracts, (ii) no condition exists that with notice or lapse of time or both would constitute a default by a Seller under any Material Contracts, and (iii) to the Seller's Knowledge, no other party to any Material Contract is in breach or default thereunder.

5.13    **Customers and Suppliers**. Schedule 5.13 sets forth a true, complete and correct list of the Business' ten (10) largest customers by Product volume and twenty (20) largest suppliers by volume of purchases for the period beginning December 31, 2009 and ending on the date hereof. Schedule 5.13 contains true and complete copies of Sellers' current standard

purchase order form and standard supply order form. With respect to any suppliers listed on Schedule 1.1(a), since the Reference Date to the date hereof, no Seller has received or provided written notice of, nor is there pending or to Sellers' Knowledge is there threatened, any material adverse change in pricing or other general terms and conditions of sale, or any material decrease in the rate of supply of materials, products or services from any supplier listed on Schedule 1.1(a).

**5.14** **Financial Statements**.

(a)     Schedule 5.14(a) contains true and complete copies of Holdings' consolidated audited balance sheet and the related consolidated statements of operations, stockholders' deficit and cash flows as of and for the year ended 2009 (the "Audited Financial Statements"), and the unaudited consolidated balance sheet of Holdings' and the related consolidated statements of operations and cash flows for the year ended 2010 (the "Unaudited Financial Statements") and the unaudited consolidated balance sheet of Holdings' as of February 28, 2011, and the related consolidated statements of operations and cash flows for the two month period then ended (the "Interim Unaudited Financial Statements"). The Audited Financial Statements were prepared in accordance with GAAP consistently applied and maintained throughout the period indicated and in accordance with and consistent with Sellers' books and records, and fairly present in all material respects the financial position, results of operations and cash flows of Holdings and its consolidated subsidiaries (which is composed of only the Sellers hereunder and VVP Auto Glass, Inc.) as of the date thereof and the period covered thereby. The Unaudited Financial Statements and Interim Unaudited Financial Statements were prepared in accordance with GAAP (subject to normal, recurring year end adjustments, the effect of which are not material in nature, and except for the omission of certain footnotes and other presentation items required by GAAP) consistently applied and maintained throughout the periods indicated, and in accordance with and consistent with Sellers' books and records, and fairly present in all material respects the financial position, results of operations and cash flows of Holdings and its consolidated subsidiaries as of the date thereof and for the period covered thereby.

(b)     Except as set forth in Schedule 5.14(a), there are no Liabilities of Sellers which have not been disclosed in the Financial Statements or this Agreement which Liabilities would attach to the Purchased Assets or the Business after the transfer to Buyer pursuant to the Sale Order.

(c)     With respect to any letter of credit outstanding on the date of this Agreement made for the benefit of the Business or made by or on behalf of any Seller, Schedule 5.14(c) sets forth such letter of credit, the issuing bank, the counterparty, and a description of the circumstances and transactions underlying such letter of credit.

(d)     No revenue of the Sellers is generated outside of the United States.

**5.15** **Litigation**.   Except as would not reasonably be expected to have a Material Adverse Effect, individually or in the aggregate, and for (a) the Filings, and any and all Actions pending in the Bankruptcy Court arising therefrom or related thereto, (b) and as set forth in Schedule 5.15 or (c) to the extent that any such Action constitutes an Excluded Liability, as of

the date hereof, there is no pending, or to Sellers' Knowledge there is no threatened, Action by or against any Sellers and relating to the Business or any of the Purchased Assets.

5.16 **Accounts Receivable**. All Accounts Receivable have arisen in the ordinary course of the Business, represent or will represent legal, valid, binding and enforceable obligations to a Seller and, subject only to reserves for bad debts established in a manner consistent with past practice, have been or (to Sellers' Knowledge) will be collected, or are or (to Sellers' Knowledge) will be collectible, in the aggregate recorded amounts thereof in accordance with their terms and, to Sellers' Knowledge, will not be subject to any material contests, claims, counterclaims or setoffs (except as described on Schedule 5.16).

5.17 **Inventory**. Except as set forth in Schedule 5.17, all Inventory of Sellers is of good merchantable quality, reasonably in balance, and readily saleable (in the case of Inventory held for sale) or currently usable (in the case of other Inventory) in the ordinary course of business, subject to the reserve on the most recent balance sheet delivered by Sellers. The value of obsolete, damaged or excess Inventory and of Inventory below standard quality has been written down on the most recent balance sheet delivered to Buyer pursuant to Section 5.14(a) or, with respect to Inventory purchased since such balance sheet date, on the books and records of Sellers, to ascertainable market value, or adequate reserves described on such balance sheet have been provided therefor, and the value at which Inventory are carried reflects the customary Inventory valuation policy of Sellers (which fairly reflects the value of obsolete, spoiled or excess Inventory) for stating Inventory, in accordance with GAAP. Sellers have made available to Buyer a true, correct and complete copy of a Inventory report for the week ending immediately prior to the date hereof and shall have delivered on or before the Closing Date to Buyer a true, correct and complete copy of an Inventory report for the week ending immediately prior to the Closing Date. Each such Inventory report shall be prepared based upon the books and records of Sellers (and not physical inventory) and shall set forth an Inventory list of Sellers and specify the amount, kinds, pricing and location of the Inventory covered thereby.

5.18 **Insurance**. Set forth on Schedule 5.18 is an accurate and complete list as of the date hereof of each insurance policy and insurance arrangement that covers businesses, properties, assets (including the Purchased Assets), Liabilities (including Assumed Liabilities) or employees (including self insurance, but excluding insurance policies providing benefits under Benefit Plans) of the Business (the "Insurance Policies"). To Sellers' Knowledge the Insurance Policies are in full force and effect, all premiums thereon have been paid, and Sellers are otherwise in compliance in all material respects with the terms and provisions of such policies. No Seller is in default under any of the Insurance Policies (or any policy required to be set forth on Schedule 5.18) and to Sellers' Knowledge, there exists no event, occurrence, condition or act (including the purchase of the Purchased Assets hereunder) that, with the giving of notice, the lapse of time or the happening of any other event or condition, would become a default thereunder. No Seller has received any written notice of cancellation or non-renewal of any such Insurance Policies nor has the termination of any such Insurance Policies been threatened, and to Sellers' Knowledge, there exists no event, occurrence, condition or act (including the purchase of the Purchased Assets hereunder) that, with the giving of notice, the lapse of time or the happening of any other event or condition, would entitle any insurer to terminate or cancel any such Insurance Policies. To Sellers' Knowledge, each of the Insurance Policies is of a type and in such amount and covers such risks as are consistent with customary practice and standards of

companies engaged in businesses and operations similar to the Business. Since January 1, 2010, there has not been, nor is there pending or to Sellers' Knowledge is there threatened, any material adverse change in any Sellers' relationship with its insurers, in the premiums payable, or the coverage provided pursuant to such Insurance Policies. Sellers have made available to Buyer all pending claims and the claims history with respect to the Business during the past five (5) years (including with respect to insurance obtained but not currently maintained).

5.19    **Product Returns**.    Within the past three (3) years, other than those in the ordinary course of the Business, Sellers have not experienced any material Product returns and, to the Knowledge of Sellers, no facts or circumstances exist that would provide a basis for any material Product returns with respect to Products manufactured or sold prior to the Closing other than those in the ordinary course of the Business.

5.20    **Customer Warranties**.    As of the date hereof, there are no pending, nor to Sellers' Knowledge threatened, claims under or pursuant to any warranty, whether expressed or implied, on the Products or services sold prior to the Reference Date by Sellers that are not fully reserved against in accordance with GAAP in the Financial Statements. All of the services rendered by Sellers (whether directly or indirectly through independent contractors) have been performed in all material respects in conformity with all express warranties and with all applicable contractual commitments, and except as set forth on <u>Schedule 5.20</u>, Sellers do not have any pending claims for replacement or repair or for other damages relating to or arising from any such services, except for in the ordinary course of the Business. No Material Contracts with any customer contain any warranty provisions materially different from Sellers' customary warranties that would impose material Liability on Sellers. Set forth in <u>Schedule 5.20</u> are the aggregate amounts of warranty claims incurred by Sellers during the last three (3) completed fiscal years. To Sellers' Knowledge there is no reason to expect a material increase in the amount of warranty claims (as a percentage of gross revenues of Sellers) for Products manufactured prior to the Closing Date.

5.21    **Affiliate Transactions**.    Except as disclosed on <u>Schedule 5.21</u>, no Affiliate of any Seller (a) is an officer, director, employee or consultant of any competitor, creditor, debtor, customer, distributor, supplier or vendor of any Seller, (b) is a party to any Contract with any Seller, (c) has any pending, or to Sellers' Knowledge threatened, Action against any Seller, or (d) has a loan outstanding from any Seller.

5.22    **No Broker**.    Sellers have engaged the firms of Morgan Joseph LLC and Alvarez & Marsal, LLC to assist them in connection with the matters contemplated by this Agreement and will be responsible for the fees and expenses of each such firm. Other than as described in the preceding sentence, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement, based upon arrangements made by or on behalf of any Seller or any of their respective Affiliates.

5.23    **Assets of Other Entities**.    Except for Holdings and VVP Funding Corporation, and as otherwise disclosed on <u>Schedule 5.23</u>, the Other Entities do not, directly or indirectly, own, any assets used in the Business or otherwise.

**5.24    Disclaimer**.

SUBJECT ONLY TO THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS <u>ARTICLE V</u>, BUYER IS ACQUIRING THE PURCHASED ASSETS AND THE BUSINESS "AS-IS, WHERE-IS AND WITH ALL FAULTS", AND SELLERS DO NOT MAKE (AND SELLERS EXPRESSLY DISCLAIM) ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS OR THE BUSINESS, INCLUDING WITHOUT LIMITATION IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SUBJECT ONLY TO THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS <u>ARTICLE V</u>, NONE OF THE SELLERS, THEIR AFFILIATES OR, ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES MAKE OR HAVE MADE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE BUSINESS OR ANY OF THE PURCHASED ASSETS, INCLUDING WITH RESPECT TO (I) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, (II) THE OPERATION OF THE BUSINESS BY BUYER AFTER THE CLOSING IN ANY MANNER OTHER THAN AS USED AND OPERATED BY THE SELLERS OR (III) THE PROBABLE SUCCESS OR PROFITABILITY OF THE BUSINESS AFTER THE CLOSING.

**ARTICLE VI**

**<u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>**

As an inducement to Sellers to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Sellers and agrees as follows:

**6.1    <u>Organization of Buyer</u>**.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has full corporate power and authority to own or lease and to operate and use its properties and assets and to carry on its business as now conducted.

**6.2    <u>Authority of Buyer</u>**.

(a)    Buyer has full corporate power and authority to execute, deliver and perform this Agreement and all of the Ancillary Documents to which it is a party. The execution, delivery and performance of this Agreement and such Ancillary Documents by Buyer have been duly authorized and approved by Buyer's board of directors and do not require any further authorization or consent of Buyer or its members. This Agreement has been duly authorized, executed and delivered by Buyer and is the legal, valid and binding agreement of Buyer enforceable against Buyer in accordance with its terms, and each Ancillary Document to which Buyer is a party has been duly authorized by Buyer and upon execution and delivery by Buyer will be a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance

with its terms, except as (i) enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting creditors rights generally and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses.

(b)    Subject to the receipt of the Third Party Consents, neither the execution and delivery of this Agreement or any of such Ancillary Documents or the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will:

(i)    conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, or an event of default under (1) Buyer's certificate of incorporation, (2) any Order to which Buyer is a party or by which it is bound or (3) any Legal Requirement affecting Buyer; or

(ii)    require the approval, consent, authorization or act of, or the making by Buyer of any declaration, filing or registration with, any Person, other than filings with the Bankruptcy Court.

In furtherance of the foregoing, neither the execution and delivery of this Agreement nor any of such Ancillary Documents nor the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will require the approval, consent, authorization or act of, or the making by Buyer of any declaration, filing or registration under the HSR Act or other anti-trust or competition laws.

**6.3**    **No Finder**.  Neither Buyer nor any Person acting on its behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement for which any Seller is liable, and Buyer shall hold harmless and indemnify Seller from any claims with respect to any such fees or commissions.

**6.4**    **Availability of Funds**.  Buyer will have available at Closing, all funds necessary to pay the Purchase Price and to consummate the transactions contemplated by this Agreement and the other Ancillary Documents.  Prior to the date hereof, Buyer has delivered to Sellers an executed equity commitment letter pursuant to which an Affiliate of Buyer has committed, subject to the terms and conditions set forth therein, to invest the amounts set forth therein, to purchase the equity interests of Buyer.

## ARTICLE VII

## ACTION PRIOR TO THE CLOSING DATE

The Parties hereto covenant and agree to take the following actions set forth in this Article VII between the date hereof to the earlier of termination of this Agreement and the Closing Date:

**7.1**    **Investigation of the Business by Buyer**.

(a)     Sellers shall afford and cause the Business to afford Buyer's authorized Representatives reasonable access during normal business hours to the offices, properties, employees, outside accountants, business, agreements and other documentation and financial records (including Computer files, retrieval programs and similar documentation) with respect to the Business, the Purchased Assets and the Assumed Liabilities, to the extent Buyer deems reasonably necessary, and shall permit Buyer and its Representatives to make copies of such materials. Sellers shall furnish to Buyer or its authorized Representatives such additional information concerning the Purchased Assets, the Business and the operations of the Business and the Assumed Liabilities as shall be reasonably requested, including all such information as shall be necessary to enable Buyer or its Representatives to (i) verify the accuracy of Sellers' representations and warranties contained in this Agreement, (ii) verify that Sellers' have complied with the covenants contained in this Agreement, and (iii) determine whether the conditions set forth in Article IX have been satisfied. Sellers shall use their commercially reasonable efforts to cause their outside accountants and outside counsel to cooperate with Buyer in its investigation. It is acknowledged and understood that no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Sellers in this Agreement.

(b)     As requested by Buyer from time to time, Sellers shall use commercially reasonable efforts to cooperate with Buyer in connection with Buyer and Sellers contacting suppliers and customers of the Business.

(c)     As requested by Buyer from time to time, Sellers shall reasonably cooperate with Buyer and provide Buyer with any information or documentation (including any owner's affidavits) reasonably required in order for a title company selected by Buyer to issue to Buyer an original policy or policies of title insurance in such amounts, with such endorsements and in such form with respect to the Owned Real Property satisfactory to Buyer acting reasonably, to insure Buyer's right, title and interest in Owned Real Property comprising a Purchased Assets, free of any Encumbrances other than Permitted Encumbrances (other than those encumbrances which are to be expunged or discharged pursuant to the Sale Order).  It being agreed and acknowledged by the Parties that any such policies of title insurance are not a condition to Closing.

**7.2     Preserve Accuracy of Representations and Warranties**.  Each Party hereto shall use its reasonable best efforts to refrain from taking any action that would render any representation or warranty contained in Article V or Article VI inaccurate as of the Closing Date. Each Party shall promptly notify the other of any Action that shall be instituted or threatened against such Party to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement or the Ancillary Documents.

**7.3     Third Party Consents; Permits**.

(a)     Sellers will reasonably cooperate with Buyer to secure, before the Closing Date, all Third Party Consents to the extent such consents are not provided for or satisfied by the Sale Order; provided that neither Sellers nor Buyer shall have any obligation to offer or pay any consideration in order to obtain any such consents, approvals or waivers except for such amounts as Sellers shall be obligated to pay as a condition to any such assumption and assignment

(including cure amounts) pursuant to Section 365(b) of the Bankruptcy Code; provided, however, Buyer shall not be required to waive any of the conditions to this Agreement set forth in Article IX.

(b)     The Parties, cooperating in good faith, shall use commercially reasonable efforts to take such steps, including the filing of any required applications with Governmental Authorities, as may be necessary (i) to effect the transfer of the Permits and Licenses to Buyer on or as soon as practicable after the Closing Date, to the extent such transfer is permissible under applicable law, and (ii) to enable Buyer to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations, and authorizations (whether governmental, regulatory, or otherwise) as may be necessary for the lawful operation of the Business from and after the Closing Date.  Any filing or other fees and other out-of-pocket expenses associated with the actions described in the foregoing clauses (i) and (ii) shall be paid by Buyer.

**7.4     Governmental Approvals**.

(a)     Sellers and Buyer shall act diligently and reasonably, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable Legal Requirements to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including, to secure any consents and approvals of any Governmental Authority required to be obtained by them in order to assign or transfer any Permits to Buyer, to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions set forth in Article IX, in each case as necessary to the extent such consents are not provided for or satisfied by the Sale Order; provided that Sellers shall not make any agreement or understanding affecting the Purchased Assets or the Business (excluding the Excluded Assets or Excluded Liabilities) as a condition for obtaining any such consents or approvals except with the prior written consent of Buyer. Buyer shall act diligently and reasonably to cooperate with Sellers, to the extent commercially reasonable, to obtain the consents and approvals contemplated by this Section 7.4(a); provided, however, Buyer shall not be required to waive any of the conditions to this Agreement set forth in Article IX.

(b)     Sellers and Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto. In addition, none of the Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement, or the transactions contemplated hereby, notification or request for approval, unless it consults with the other Party in advance and, to the extent permitted by any such Governmental Authority, gives the other Party the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, each Party shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with

respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Each Party shall also furnish the other Parties with such necessary information and assistance as such other Parties or their respective Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. Sellers and Buyer shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective reasonable best efforts to obtain the grant thereof by an Order as soon as possible.

**7.5** **Operations Prior to the Closing Date**.

(a) Sellers shall maintain the Purchased Assets and operate and carry on the Business only in the ordinary course consistent with past practice in conformance with all Legal Requirements, except as otherwise expressly provided in this Agreement. Consistent with the foregoing and to the extent permitted or required by the Bankruptcy Case, Sellers shall use reasonable best efforts to continue operating the Business as a going concern, and to maintain the business organization of the Business intact and to preserve the goodwill of the manufacturers, suppliers, contractors, licensors, employees, customers, distributors and others having business relations with the Business. In connection therewith, no Seller shall (i) transfer or cause to be transferred from the Business any employee or agent thereof, (ii) offer employment for any period on or after the Closing Date to any such employee or agent regarding whom Buyer makes offers of employment (if any), or (iii) otherwise attempt to persuade any such person to terminate his or her relationship with the Business, except, in the case of (i), (ii) and (iii), as disclosed to Buyer in writing prior to the date hereof or with the prior written consent of Buyer.

(b) Except as otherwise expressly provided in this Agreement, or with the express written approval of Buyer, no Seller shall:

(i) make any capital expenditure in excess of $400,000 in the aggregate with respect to the Business or enter into any Contract or commitment therefor, except in each case in the ordinary course of Business pursuant to existing Contracts or as funded with insurance proceeds following a casualty event;

(ii) enter into any Contract for or relating to the Business that cannot be assigned to Buyer or a permitted assignee of Buyer under Section 11.4 solely with approval of the Bankruptcy Court;

(iii) acquire, or enter into any Contract for the purchase of, real property (other than as contemplated by clause (v) below);

(iv) enter into any lease of real property;

(v) other than the sale of Inventory in the ordinary course of the Business consistent with past practice, the sale of certain real estate and related personal property as described on Schedule 7.5(b)(v), sales of obsolete or worn

out Equipment or other immaterial individual assets, sell, lease (as lessor), transfer or otherwise dispose of (including any transfer from the Business to any Affiliates of Sellers), or mortgage or pledge, or impose or suffer to be imposed, any Encumbrance on (other than Assumed Liabilities or Permitted Encumbrances or liens securing the DIP Credit Agreement) any of the Purchased Assets;

(vi)     other than in the ordinary course of the Business consistent with past practice, purchase any material assets;

(vii)     cancel or settle any material debts owed to or material claims held by the Business (including the settlement of any claims or litigation) other than the compromise of Accounts Receivable in the ordinary course of Business consistent with past practice or matters related exclusively to Excluded Assets;

(viii)     compromise, settle, or consent to judgment in, any one or more Actions or institute any Action if the Action involves or is expected to involve more than $150,000, including concerning any Intellectual Property, except as it relates exclusively to the collection of Accounts Receivable if in the ordinary course of the Business or Excluded Assets;

(ix)     enter into, or agree to enter into, any sale-leaseback transactions;

(x)     except in the ordinary course of business consistent with past practices, accelerate or delay collection of any Accounts Receivable generated by the Business in advance of or beyond their regular due dates;

(xi)     except in the ordinary course of the Business consistent with past practice, collect or agree to collect any such receivable for less than the amount billed therefor;

(xii)     delay or accelerate payment of any account payable or other liability of the Business beyond or in advance of its due date, except in the ordinary course of the Business consistent with past practice;

(xiii)     allow the Inventory level to decline below the level necessary for the continued operation of the Business;

(xiv)     fail to maintain any material portion of the tangible Purchased Assets in their present condition, reasonable wear and tear excepted;

(xv)     institute any material increase (including any increase in coverage) in any profit-sharing, bonus, incentive, deferred compensation, severance insurance, pension, retirement, medical, hospital, disability, welfare or other employee benefit plan with respect to directors, officers or employees of any Seller;

(xvi)     increase the compensation (including salary, bonus or incentive compensation) of the directors, officers, employees of, or independent contractors

or consultants to, any Seller, except for increases that are not material or are otherwise in the ordinary course of business, provided that Sellers may institute a key-employee retention plan, not to exceed $1,000,000 in aggregate value, which shall not constitute a Transferred Employee Plan and the terms and conditions of which shall be approved by the Bankruptcy Court;

(xvii)    enter into or amend any Collective Bargaining Agreement;

(xviii)   enter into any employment, deferred compensation, severance, consulting, independent contractor, nondisclosure, non-competition or similar agreement (or amend in any material manner that is adverse to the Business any such agreement) to which any Seller is a party or involving any of its directors, officers or employees in his or her capacity as a director, officer or employee of such Seller, except in the ordinary course of business;

(xix)    declare, set aside, make or pay any dividend or other distribution in respect of the capital stock, membership interests or other equity interests of any of Sellers, or repurchase, redeem or otherwise acquire any outstanding shares of the capital stock, membership interests or other securities of, or other ownership interests in, any of Sellers;

(xx)    transfer, issue, sell or dispose of any shares of capital stock or other securities of Sellers, provided that Sellers may transfer or sell any such interest in VVP Auto Glass, Inc. to Vitro, S.A.B. de C.V. or any of its Affiliates;

(xxi)    grant or acquire, from any Person, or dispose of or permit to lapse any rights to, any Intellectual Property, except in the ordinary course of business consistent with past practice (but solely to the extent such act would not reasonably be expected to materially adversely impact the Business), or disclose to any Person, other than representatives of Buyer, any Trade Secret;

(xxii)    grant or exercise options, warrants, calls or other rights to purchase or otherwise acquire shares of the capital stock or other securities of Sellers;

(xxiii)   except for the DIP Credit Agreement and related loan documents, enter into or amend any agreement in any material manner that is adverse to the Business (or incur any commitment) that involves or may involve total annual expenditure or revenues (individually or in the aggregate) in excess of $250,000, except for contracts for the sale of goods or services to customers in the ordinary course of the Business consistent with past practice;

(xxiv)   except pursuant to the DIP Credit Agreement, incur any indebtedness for borrowed money (including any intra-group borrowings), enter into any material guarantee, indemnity or other agreement to secure any obligation of a third party or create any Encumbrance (other than Permitted Encumbrances) for the benefit of a third party over any of the Purchased Assets, except in the ordinary course of the Business consistent with past practice;

(xxv) make any payment, or otherwise remit any monies, to any Affiliates of Seller for any purpose whatsoever, provided the foregoing does not restrict intercompany transfers, payables or receivables among Sellers or reimbursements to Vitro, S.A.B. de C.V. or certain of its subsidiaries with respect to information technology services, in each case made in the ordinary course of the Business consistent with past practice and with the approval of the Bankruptcy Court;

(xxvi) incur any material Liability except for the DIP Credit Agreement or otherwise in the ordinary course of the Business consistent with past practice;

(xxvii) change any accounting or Tax policy or practice except in the ordinary course of the Business;

(xxviii) amend the certificate of incorporation or by-laws or comparable organization documents of any Seller in any material respect;

(xxix) (i) modify in any material manner that is adverse to the Business, terminate (except for scheduled terminations), or fail to exercise any renewal right with respect to, any Assumed Contract or other Lease that by its terms would otherwise expire (other than in the ordinary course of the Business and, provided that, as to any other Lease, any such renewal does not constitute an assumption of such Lease absent designation as an Assumed Contract pursuant to the terms hereof), or (ii) enter into or modify any contract containing material penalties which would be payable as a result of, and upon the consummation of, the transaction contemplated by this Agreement;

(xxx) implement any plant closing or layoff of employees that would implicate the WARN Act;

(xxxi) fail to maintain any of Sellers' material business records in accordance with past practice; or

(xxxii) enter into any agreement or commitment to take any action prohibited by this <u>Section 7.5</u>.

**7.6** **Notification of Breach; Disclosure**. Sellers shall promptly notify Buyer of (a) any event, condition or circumstance of which any Seller becomes aware after the date hereof and prior to the Closing Date that would constitute a violation or breach of this Agreement (or a breach of any representation or warranty contained in this Agreement) or, if the same were to continue to exist as of the Closing Date, would constitute the non-satisfaction of any of the conditions set forth in <u>Article IX</u>, as the case may be or (b) any event, occurrence, transaction, or other item of which any Seller becomes aware which would have been required to have been disclosed on any schedule attached hereto had such event, occurrence, transaction or item existed as of the date hereof. During the period prior to the Closing Date, Sellers will promptly advise Buyer in writing of any written notice, or to Sellers' Knowledge other communication, from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement. It is acknowledged and understood that no notice

given pursuant to this <u>Section 7.6</u> shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein.

**7.7** **Insurance; Damage; Destruction**.  Sellers shall maintain (including necessary renewals thereof) insurance policies against risk and liabilities to the extent and in the manner and at the levels heretofore maintained by Sellers with respect to the Business and the Purchased Assets. Until the Closing, the Purchased Assets shall remain at the risk of Sellers. In the event of any material damage to or destruction of any Purchased Asset (other than normal wear and tear) after the date hereof and prior to the Closing (in any such case, a "<u>Loss</u>"), Sellers shall give notice thereof to Buyer. If any such Loss is covered by policies of insurance, all right and claim of Sellers to any proceeds of insurance for such Loss shall be assigned and (if previously received by Sellers and not used prior to the Closing Date to repair any damage or destruction) paid to Buyer at Closing, and Buyer shall complete the transactions contemplated by this Agreement without any reduction in the Purchase Price with respect to such Loss, though Buyer shall receive a credit against the Purchase Price of any uninsured or underinsured amounts and any deductible. If any such Loss is not covered by policies of insurance, Buyer shall have the right to reduce the Purchase Price by an amount equal to (i) the estimated cost to repair or restore the Purchased Assets affected by such Loss (the "<u>Affected Assets</u>") to substantially repair or restore their condition immediately prior to the occurrence of such Loss or (ii) if such Affected Assets are destroyed or damaged beyond repair, the replacement cost of the Affected Assets and, in either case Buyer shall complete the transactions contemplated by this Agreement and all compensation payable on account of such Loss shall be retained by Sellers. If Buyer elects to reduce the Purchase Price pursuant to this <u>Section 7.7</u>, Sellers and Buyer shall negotiate in good faith in an effort to agree upon the amount of such reduction. If the Parties are unable to reach agreement within five (5) Business Days after notice of the Loss is given by Sellers, then the amount of the reduction shall be determined by an independent, qualified insurance adjuster selected by the Parties (or, if they are unable to agree on such selection, one appointed by the Bankruptcy Court upon application of either Party).

**7.8** **Confidentiality**.  Subject to the requirements of the Bankruptcy Code or as may be imposed by the Bankruptcy Court, from and after the Closing: (a) Sellers shall, and shall cause their Affiliates to, hold in confidence all confidential information (including trade secrets, customer lists, marketing plans and pricing information) transferred to Buyer; (b) in the event that Sellers or an Affiliate shall be legally compelled to disclose any such information, Sellers shall provide Buyer with prompt written notice of such requirement so that Buyer may seek a protective order or other remedy; and (c) in the event that such protective order or other remedy is not obtained, Sellers or their Affiliates shall furnish only such information as is legally required to be provided.

**7.9** **Bankruptcy Court Matters**.

(a)     Sellers and Buyer acknowledge that this Agreement and the sale of the Purchased Assets and the assignment and assumption of the Assumed Contracts are subject to Bankruptcy Court approval. Sellers and Buyer acknowledge that (i) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration shall include

giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and (ii) Buyer shall use its reasonable best efforts to provide adequate assurance of future performance under the to-be-assigned leases and executory contracts.

(b)     Sellers shall use their commercially reasonable efforts to have the Bankruptcy Court enter on or before June 13, 2011, the Sale Order.

(c)     In the event an appeal is taken or a stay pending appeal is requested, from either the Bidding Procedures Order or the Sale Order, Sellers shall immediately notify Buyer of such appeal or stay request and shall promptly provide to Buyer a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(d)     Sellers shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or the Sale Order.

**7.10     Bankruptcy Filings**.  Sellers shall use their commercially reasonable efforts to provide such prior notice as may be reasonable under the circumstances before filing any papers in the Bankruptcy Case that relate, in whole or in part, to this Agreement or Buyer, and shall consult in good faith with Buyer regarding the content of such materials prior to any such filing.

**7.11     Information Technology**.  The information technology hardware, equipment, internally developed programs or interfaces and data, in each case that are Purchased Assets hereunder and that are owned by Sellers or that Sellers have sufficient rights to, shall be delivered to Buyer in complete and accurate form, in all material respects.  Prior to the Closing, at the request of Buyer, Sellers will use commercially reasonable efforts to cooperate with Buyer so that Buyer may secure transition services and other agreements from Affiliates of Seller in order to permit Buyer to access and utilize any information technology hardware, equipment, internally developed programs or interfaces and data (in each case that is not a Purchased Asset owned by Sellers or that Sellers have sufficient rights to) after the Closing in connection with the operation of the Purchased Assets and the Business.  Notwithstanding any other provision in this Agreement or any Ancillary Document to the contrary, it is agreed and acknowledged by the Parties that any transition services agreement is not a condition to the Closing.

**7.12     Non-Assignable Material Contracts**.  Sellers shall provide to Buyer a written list of any Material Contracts that may not be assignable by an Order of the Bankruptcy Court.

**7.13     Other Entities Assets**.  If any Other Entity, directly or indirectly, owns or has any right, title or interest in, any Purchased Asset or assets related to the Business, Sellers shall make reasonable best efforts to cooperate with Buyer in endeavoring to obtain for Buyer, or cause to be obtained for Buyer, all right, title and interest of such Other Entity in, to or under such Purchased Assets or other assets related to the Business, provided that Buyer desires to obtain such Purchased Asset or other assets related to the Business, in its sole discretion.

**7.14     Customer Liens/Bonds**.  Buyer acknowledges that Sellers have granted Encumbrances on certain of their assets pursuant to the indemnity agreements listed on

Schedule 7.14 to secure payment and performance under certain customer contracts to which Sellers are a party. The Parties agree that if Buyer assumes any such customer contracts, it will need to either assume the applicable indemnity agreement or otherwise satisfy any requirements with respect to posting bonds and/or granting liens as may be required under the terms of such assumed customer contract. If Buyer assumes such customer contracts, the Parties shall cooperate in good faith to satisfy any such requirements either through assumption of the underlying indemnity agreements or otherwise, at Buyer's option and if such contract is assumed, Sellers will be released from any further Liability under any indemnity agreements for any post-Closing matters relating to such assumed customer contracts.

7.15    **Renegotiation of Collective Bargaining Agreements**. As requested by Buyer from time to time and at Buyer's sole cost and expense, Sellers shall, in consultation with and at the direction of Buyer, use their commercially reasonable efforts to negotiate and enter into Collective Bargaining Agreements, whether in the form of new agreements or modifications to existing or expired agreements ("Renegotiated Collective Bargaining Agreements"), with all applicable unions and collective bargaining agents for the benefit of Buyer; provided, under no circumstances shall such Renegotiated Collective Bargaining Agreements be Assumed Contracts (or shall any Liabilities with respect to such Renegotiated Collective Bargaining Agreements be Assumed Liabilities) unless and until Buyer provides written notice to Sellers that such Renegotiated Collective Bargaining Agreements are acceptable to Buyer, in Buyer's sole discretion (including, without limitation, as to pension and retiree matters after Closing and as to Buyer, its officers, directors, employees, agents or delegates not having any Liability with respect to the existing or expired Collective Bargaining Agreements), and that such Renegotiated Collective Bargaining Agreements shall be Assumed Contracts. It is agreed and acknowledged by the Parties that any such Renegotiated Collective Bargaining Agreements are not a condition to the Closing.

## ARTICLE VIII

## ADDITIONAL AGREEMENTS

8.1    **Taxes**.

(a)    All real and personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets, whether imposed or assessed before or after the Closing Date ("Periodic Taxes") for a taxable period that includes (but does not end on) the Closing Date (a "Straddle Period"), shall be apportioned between Sellers and Buyer as of the Closing Date based on the number of days of such taxable period included in the period ending with and including the Closing Date (together with periods ending before the Closing Date, the "Pre-Closing Tax Period"), and the number of days of such taxable period beginning after the Closing Date (together with any periods beginning after the Closing Date, the "Post-Closing Tax Period"). At the Closing, (x) Sellers shall pay to Buyer (or Buyer shall withhold from the Purchase Price) an amount equal to excess, if any, of the (i) unpaid Periodic Taxes attributable to Pre-Closing Periods over (ii) Periodic Taxes paid by Sellers but apportioned hereunder to Buyer for Straddle Periods (each determined in accordance with the foregoing principles), or (y) Buyer shall pay to Sellers an amount equal to Periodic Taxes apportioned to Buyer with respect to Straddle Periods but previously paid by Sellers, as applicable. Except as provided in

Section 8.1(c), Sellers shall have no further responsibility to Buyer for any Periodic Taxes, and Buyer shall be responsible for the payment of unpaid Periodic Taxes (whether or not delinquent as of the Closing Date) to the applicable Governmental Authority. Buyer shall also be responsible for preparing and filing all Periodic Tax returns required to be filed after the Closing Date.

(b)        Any sales Tax, use Tax, real property transfer or gains Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order or by Section 1146(c) of the Bankruptcy Code ("Transfer Taxes") shall be borne 50% by Buyer, on the one hand, and 50% by Sellers, on the other hand. Sellers and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Purchased Assets from any such Transfer Taxes. Sellers shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by Buyer, Sellers shall prepare and deliver to Buyer a copy of such Tax Return at least ten (10) days before the due date thereof, and Buyer shall promptly execute such Tax Return and deliver it to Sellers, which shall cause it to be filed.

(c)        Sellers or Buyer, as the case may be, shall provide reimbursement for any Tax paid by one party all or a portion of which is the responsibility of the other party in accordance with the terms of this Section 8.1. Within a reasonable time prior to the payment of any said Tax, the Party paying such Tax shall give notice to the other of the Tax payable and each Party's respective liability therefor, although failure to do so will not relieve the other party from its liability hereunder.

(d)        Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claims, suit or proceeding relating to any Tax; provided, however, that neither Buyer nor any Seller shall be required to disclose the contents of its income tax returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(d) shall be borne by the Party requesting it.

**8.2    Employees and Employee Benefit Plans**.

(a)        Offers of Employment. Prior to the Closing, Buyer may offer employment to each of Sellers' employees who remain employed immediately prior to the Closing. Any such offers of employment shall be on such terms as Buyer deems appropriate in its sole discretion; provided, however, that any such offers of employment to Sellers' employees whose terms and conditions of employment are governed by a Renegotiated Collective Bargaining Agreement which is an Assumed Contract shall be in accordance with the terms and conditions of such Renegotiated Collective Bargaining Agreements, until the expiration, termination or modification of such Renegotiated Collective Bargaining Agreements in accordance with applicable law.

        (b)    <u>Transferred Employees</u>.  Those employees of Seller who accept Buyer's offer of employment and commence working for Buyer on the Closing Date shall hereafter be referred to as "<u>Transferred Employees</u>."  For periods prior to the Closing, with respect to employees, Sellers shall retain the sole responsibility for all matters relating to the maintenance of personnel and payroll records and the withholding and payment of federal, state and local income and payroll Taxes. Except as set forth in <u>Section 2.3</u>, at all times, Sellers shall retain responsibility for (i) any severance liability for any employees who do not become Transferred Employees, and (ii) any payment (including any acceleration of payments or rights) that may be triggered by the consummation of the transactions contemplated hereby. Upon Buyer's request and in accordance with Buyer's direction, Sellers will provide to affected employees and any required Governmental Authority designated by Buyer notice of termination as may be required by the WARN Act.  For purposes of WARN compliance on the part of both parties hereto, on or before the Closing Date, Seller will provide Buyer with a list of employee layoffs, by date and location, implemented by Seller in the ninety (90)-day period prior to Closing.

        (c)    <u>Employment Tax Reporting</u>. With respect to Transferred Employees, Buyer and Sellers shall use the standard procedure set forth in Revenue Procedure 2004-53, 2004-2 C.B. 320, for purposes of employment tax reporting.

        (d)    <u>Transition Coverage</u>.  Notwithstanding anything in the Agreement to the contrary, effective as of the Closing Date, Seller shall provide certain transition coverage to the Transferred Employees and employees of Buyer hired following the Closing Date, but prior to the first day of the third full month following the Closing Date (the "<u>Eligible Employees</u>") under Sellers' health and welfare plans until the last day of the second full month following the Closing Date (the "<u>H&W Transition Date</u>") and Buyer shall reimburse Sellers for the costs associated with such transition coverage in accordance with the terms set forth in <u>Schedule 8.2(c)</u>.

        (e)    <u>No Obligation</u>. Nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Transferred Employee. No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of any Seller or any other Person or entities (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

    **8.3**    **Collection of Receivables**.  If, after the Closing Date, Sellers shall receive payment from any account debtor with respect to any Accounts Receivable included in the Purchased Assets, Sellers shall immediately deliver such funds or assets to Buyer and take all steps necessary to vest title to such funds or assets in Buyer. Each Seller hereby designates Buyer and its respective officers as such Seller's true and lawful attorney-in-fact, with full power of substitution, to execute and endorse for the benefit of Buyer all checks, notes or other documents received by such Seller in payment of or in substitution or exchange for any of the Purchased Assets. Each Seller hereby acknowledges and agrees that the power of attorney set forth in the preceding sentence in favor of Buyer is coupled with an interest, and further agrees to execute and deliver to Buyer from time to time any documents or other instruments reasonably requested by Buyer to evidence such power of attorney.

**8.4** **Name Change**. Within ten (10) days after the Closing Date, Sellers shall cause each Other Entity to, and each of Vitro America, LLC, Super Sky International, Inc., and Super Sky Products, Inc. shall, take such corporate and other actions necessary to change their corporate and company names, including any necessary filings required by the general corporation law of any state of incorporation or formation, and shall change their names to names that are not similar to, or confusing with, their current names.

**8.5** **Real Property Prorations**. Except as provided in Section 8.1(a), at the Closing, all items of income and expense with respect to the Owned Real Property and the Leased Real Property shall be prorated by the parties as of 12:01 a.m. on the Closing Date. With respect to any amounts that have not yet been billed or otherwise determined, Seller and Buyer shall estimate such amounts and prorate such amounts based on the most recent ascertainable bill.

**8.6** **Post-Closing Books and Records and Personnel**. For three (3) years after the Closing Date (or such longer period as may be required by any Governmental Authority or ongoing claim), (a) Buyer shall not dispose of or destroy any of the business records and files of the Business received by Buyer as Purchased Assets that Buyer is required by law to retain or is otherwise material to the Business and (b) Buyer shall allow Sellers (including, for clarity, any trust established under a chapter 11 plan of Sellers or any other successors of Sellers) and any of their directors, officers, employees, counsel, representatives, accountants and auditors reasonable access during normal business hours, at Sellers' sole expense and upon reasonable advance notice, to all relevant employees and files of Buyer and Documents included in the Purchased Assets for purposes relating to the Bankruptcy Case, the wind-down of the operations of Sellers, the functions of any such trusts or successors, or other reasonable business purposes, and Sellers (including any such trust or successors) and such directors, officers, employees, counsel, representatives, accountants and auditors shall have the right to make copies of any such files, books, records and other materials so long as such parties retain such information pursuant to the same confidentiality obligations set forth in Section 7.8 hereof as are applicable to Sellers. Until the closing of the Bankruptcy Case or the liquidation and winding up of the Sellers' estates, Sellers shall preserve and keep the records retained by them relating to the Business and the Purchased Assets and, at Buyer's sole expense, shall make such records and Sellers' personnel available to Buyer as may be reasonably required by Buyer in connection the Business or in order to enable Buyer to comply with its obligations under this Agreement and each Ancillary Document. In the event any Party desires to destroy any such records during the time that they must be maintained pursuant to this Section 8.6, such Party shall first give ninety (90) days prior written notice to the other Parties and any such other Parties shall have the right at their option and expense, upon prior written notice given within such ninety (90) day period to the Party desiring to destroy such records, to take possession of the records within one hundred and eighty (180) days after the date of such notice, or such shorter period as the liquidation and winding up of the Sellers' estates shall permit.

**8.7** **Insurance**. Immediately following the Closing, Sellers shall cancel each occurrence-based Insurance Policy, other than those listed on Schedule 2.1(e), and, in furtherance of the provisions of Section 2.1(o), promptly remit to Buyer, as a Purchased Asset, any pro-rata return premium actually received by Sellers from the cancellation of such Insurance Policies.

## ARTICLE IX

## CONDITIONS TO CLOSING

**9.1** **Conditions to Obligations of Each Party**. The respective obligations of each Party to effect the sale and purchase of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing Date, of the following conditions:

(a) all requisite authorizations or consents from Governmental Authorities or waiting periods following governmental filings shall have been obtained or expired; and

(b) no Governmental Authority shall have enacted, issued, promulgated or entered any Order that is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated.

**9.2** **Conditions to Obligations of Buyer**. The obligation of Buyer to effect the purchase of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

(a) the representations and warranties of Sellers contained in this Agreement (A) that are not qualified by "materiality" should be true and correct in all material respects on and as of the date hereof and the Closing Date, and (B) that are qualified as to "materiality" shall be true and correct on and as of the date hereof and the Closing Date without regard to any qualifiers as to "materiality," except that any such representations or warranties which expressly relate to an earlier date need only have been accurate as of such date. Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof;

(b) each covenant and obligation that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects (except that those covenants and obligations which are qualified as to materiality or similar expressions shall have been performed and complied with in all respects), and Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof;

(c) [Intentionally omitted.];

(d) [Intentionally omitted.];

(e) the Bankruptcy Court shall have approved and authorized (i) the assumption and assignment of the Assumed Contracts that are set forth on Schedule 2.1(e) as of the date hereof, (ii) the assumption and assignment of any Designated Remaining Contract that Buyer designates as an Assumed Contract pursuant to Section 2.7(c), and (iii) all provisions of this Agreement regarding or related to Designated Remaining Contracts, including but not limited to Section 2.7 hereof;

(f) the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order;

(g)      each of the deliveries required to be made to Buyer pursuant to <u>Section 4.4</u> shall have been so delivered; and

Any condition specified in this <u>Section 9.2</u> may be waived by Buyer; provided that no such waiver shall be effective against Buyer unless it is set forth in a writing executed by Buyer.

**9.3      <u>Conditions to Obligations of Sellers</u>**.  The obligation of Sellers to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

(a)      the representations and warranties of Buyer contained in this Agreement (A) that are not qualified by "materiality" should be true and correct in all material respects on and as of the date hereof and the Closing Date, and (B) that are qualified as to "materiality" shall be true and correct on and as of the date hereof and the Closing Date without regard to any qualifiers as to "materiality," except that any such representations or warranties which expressly relate to an earlier date need only have been accurate as of such date. Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof;

(b)      each covenant and obligation that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects (except that those covenants and obligations which are qualified as to materiality or similar expressions shall have been performed and complied with in all respects), and Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof;

(c)      the Sale Order shall have been entered and not stayed; and

(d)      each of the deliveries required to be made to Sellers pursuant to <u>Section 4.3</u> shall have been so delivered.

(e)      Any condition specified in this <u>Section 9.3</u> may be waived by Sellers; <u>provided</u> that no such waiver shall be effective against Sellers unless it is set forth in writing executed by Sellers.

**ARTICLE X**

**<u>TERMINATION</u>**

**10.1      <u>Termination</u>**.      Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date:

(a)      by the mutual consent of Buyer and Sellers;

(b)      by Sellers if the Closing Date has not occurred on or before June 17, 2011 (unless the failure to consummate the transactions contemplated by this Agreement is due to a material breach by Sellers);

(c)     by Buyer if (i) the Sale Hearing is not held on or before June 9, 2011, (ii) the Bankruptcy Court has not approved the Sale Order in the same form in all material respects as attached hereto as <u>Exhibit D</u> by June 17, 2011, or (iii) the Closing Date has not occurred on or before June 17, 2011 (unless the failure to consummate is due to a material breach by Buyer);

(d)     by either Party if a Governmental Authority issues a ruling or Order prohibiting the transactions contemplated hereby;

(e)     by Buyer in the event of any material breach by Sellers of any of Sellers' agreements, covenants, representations or warranties contained herein or in the Bidding Procedures Order or the Sale Order, and the failure of Sellers to cure such breach by the earlier of June 17, 2011 and within ten (10) days after receipt of the Termination Notice specified in this subsection; <u>provided</u>, <u>however</u>, that Buyer (i) is not itself in material breach of any of its representations, warranties or covenants contained herein or in the Bidding Procedures Order or the Sale Order, (ii) notifies Sellers in writing (the "<u>Termination Notice</u>") of its intention to exercise its rights under this Agreement as a result of the breach, and (iii) specifies in such Termination Notice the representation, warranty or covenant contained herein or in the Bidding Procedures Order or the Sale Order of which Sellers are allegedly in material breach;

(f)     by Sellers in the event of any material breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein or in the Bidding Procedures Order or the Sale Order, and the failure of Buyer to cure such breach by the earlier of June 17, 2011 and within ten (10) days after receipt of the Termination Notice specified in this subsection; <u>provided</u>, <u>however</u>, that Sellers (i) are not themselves in material breach of any of their representations, warranties or covenants contained herein or in the Bidding Procedures Order or the Sale Order, (ii) send a Termination Notice, and (iii) specify in such Termination Notice the representation, warranty or covenant contained herein or in the Bidding Procedures Order or the Sale Order of which Buyer is allegedly in material breach;

(g)     by Buyer, if Sellers enter into (or proposes, accepts or files with the Bankruptcy Court a motion, application or other request for approval regarding) an Alternative Transaction;

(h)     by Buyer, if (i) Sellers withdraw or seek authority to withdraw the Sale Motion, or announce any stand alone plan of reorganization or liquidation (or support any such plan filed by any other party); (ii) Sellers cease to operate the Business as a going concern; (iii) the aggregate amount of the Determined Cured Costs exceed the Purchase Price minus the expected adjustment pursuant to <u>Section 3.3</u>, as determined in Buyer's reasonable discretion or (iv) the General Release is not delivered by the applicable parties thereto other than Buyer;

(i)     by Buyer, upon the sale, transfer or other disposition, directly or indirectly, of any material portion of the Business or the Purchased Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of Sellers;

(j)     by Buyer, if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Sellers and such trustee rejects the transactions contemplated by this Agreement; or

(k)     by Buyer, if any condition to the obligations of Buyer set forth in Section 9.1 or 9.2 shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement.

**10.2     Effect of Termination**.

(a)     In the event of termination of this Agreement by either Party, except as otherwise provided in this Section 10.2, all rights and obligations of the Parties under this Agreement shall terminate without any liability of any Party to any other Party, except that nothing in this Agreement will relieve any Party from liability for any willful breach of any representation, warranty, covenant or agreement set forth in this Agreement prior to such termination. The provisions of Sections 3.6, 10.2 and 11.11 shall expressly survive the expiration or termination of this Agreement.

(b)     Notwithstanding Section 10.2(a), in the event of a termination pursuant to Section 10.1(f), Sellers shall be entitled to retain the Deposit as liquidated damages as its sole and exclusive remedy against Buyer in all respects for any claim against Buyer arising under this Agreement or otherwise.

(c)     In the event of a termination of this Agreement pursuant to any provision of this Article X (other than pursuant to Section 10.1(f)), Sellers shall promptly (but in any event within two (2) Business Days) return to Buyer the Deposit (including interest thereon).

**10.3     Specific Performance**.   In the event the Sale Order is entered by the Bankruptcy Court, Buyer shall be entitled to seek specific performance for a breach by Seller of its obligations hereunder.

## ARTICLE XI

## GENERAL PROVISIONS

**11.1     Survival of Obligations**. The representations and warranties respectively made by Sellers and Buyer in this Agreement and in any certificate delivered hereunder will expire as of the Closing. Subsequent to Closing, no Claim with respect to any breach of any representation or warranty contained in this Agreement and no Claim with respect to any known breach of a covenant to be performed at or prior to Closing contained in this Agreement may be pursued or maintained (either hereunder or otherwise) against any other Party. The Parties hereto agree that the covenants contained in this Agreement to be performed after the Closing shall survive the Closing hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof.

**11.2     No Public Announcement**.   Neither Sellers nor Buyer shall, without the approval of the other, make any press release or other public announcement concerning the transactions

contemplated by this Agreement, except as and to the extent that any such party shall be so obligated by law, including as may be required by the Bankruptcy Case, or the rules of any stock exchange, in which case the other party shall be advised and the parties shall use their best efforts to cause a mutually agreeable release or announcement to be issued.

**11.3** **Notices**. All notices or other communications required or permitted hereunder shall be in writing and shall be given or delivered by personal delivery, by registered or certified mail (first class postage prepaid) or by a nationally recognized private overnight courier service addressed as follows:

If to Buyer, to:

AMERICAN GLASS ENTERPRISES, LLC
c/o Sun Capital Partners, Inc.
5200 Town Center Circle, Suite 600
Boca Raton, FL 33486
Tel.: (561) 394-0550
Fax: (561) 394-0540
Attn: Jason Neimark, Aaron Wolfe    and C. Deryl Couch

with a copy to (which shall not constitute notice):

KIRKLAND & ELLS LLP
300 North LaSalle
Chicago, IL 60654
Tel. : (312) 862-2000
Fax: (312) 862-2200
Attn: Douglas C. Gessner, P.C., Patrick J. Nash, Jr., and Jeremy S. Liss

If to Sellers, to:

VITRO AMERICA, LLC
965 Ridge Lake Boulevard, Suite 300
Memphis, TN 38120
Tel.: (901) 767-7111
Fax: (901) 682-3062 Attn: Arturo Carrillo

with a copy to:

FULBRIGHT & JAWORSKI LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201-2784
Tel.: (214) 855-8000
Fax: (214) 855-8200
Attn: Bill Greendyke

or to such other address as such party may indicate by a notice delivered to the other party hereto.

Any notice, consent, authorization, direction or other communication delivered as aforesaid shall be deemed to have been effectively delivered and received, if sent by a nationally recognized private overnight courier service, on the date following the date upon which it is delivered for overnight delivery to such courier service, if sent by mail, on the earlier of the date of actual receipt or the fifth (5) Business Day after deposit in the United States mail, or, if delivered personally, on the date of such delivery.

**11.4** **Successors and Assigns**.

(a) The rights of each Party under this Agreement shall not be assignable by such Party prior to the Closing without the written consent of the other Party, except that all or any portion of the rights of Buyer hereunder may be assigned prior to the Closing, without the consent of Sellers, to any one or more of Buyer's Affiliates; provided that (i) the assignee(s) shall assume in writing all or a portion of Buyer's obligations to Sellers hereunder (as applicable), and (ii) Buyer shall not be released from any of its obligations hereunder by reason of such assignment(s); provided, further, that at the Closing Buyer may assign any of its rights and obligations hereunder to any one or more of its Affiliates and upon such assignment Buyer will not have any further rights or obligations with respect to such assets and liabilities so transferred, except as necessary to cause the Closing Date Payment to be paid to Sellers at Closing.

(b) This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns. The successors and permitted assigns hereunder shall include any permitted assignee as well as the successors in interest to such permitted assignee (whether by merger, consolidation, liquidation (including successive mergers, consolidations or liquidations) or otherwise). Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this Section 11.4 any right, remedy or claim under or by reason of this Agreement.

**11.5** **Entire Agreement; Amendments**. This Agreement, the Exhibits and Disclosure Schedules referred to herein, the documents delivered pursuant hereto and prior to the Closing, the Confidentiality Agreement dated April 12, 2011 entered into between Morgan Joseph TriArtisan LLC and Sun Capital Partners Group V, LLC (the "Confidentiality Agreement"), contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or letters of intent between or among any of the parties hereto. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the Parties. Notwithstanding the foregoing, the Parties agree that the Confidentiality Agreement shall be automatically terminated and of no further force or effect at the Closing.

**11.6** **Waivers**. Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the Party or Parties entitled to the benefit thereof. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as

to any Party, it is authorized in writing by an authorized representative of such Party. The failure of any Party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

      **11.7**   **Expenses**. Except as otherwise provided herein, each party hereto will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants.

      **11.8**   **Partial Invalidity**. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

      **11.9**   **Execution in Counterparts**. This Agreement may be executed in counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by and delivered to each of the parties hereto. Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

      **11.10**   **Further Assurances**. From time to time following the Closing and subject to any approval of the Bankruptcy Court that may be required, Sellers shall execute and deliver, or cause to be executed and delivered, to Buyer such other documents and instruments, including instruments of conveyance and transfer, as Buyer may reasonably request, and Sellers shall take all other actions as may be reasonably necessary, to more effectively convey and transfer to, and vest in, Buyer and put Buyer in possession and control of the Business and the Purchased Assets, and to effect the transactions contemplated by this Agreement and the Ancillary Documents. Sellers shall also use commercially reasonable efforts to cooperate with and assist Buyer in preparing and submitting any information required in connection with registrations and licenses that relate to periods of time before and after the Closing Date. Sellers and Buyer further agree to reasonably cooperate with each other with respect to the appropriate disposition of any Assumed Liability or Excluded Liability, including without limitation any Actions, provided that such duty to reasonably cooperate shall in no event affect the status of any liability as an Assumed Liability or an Excluded Liability. Notwithstanding anything in this Agreement to the contrary, the Parties agree and acknowledge that after the Closing, Sellers will remain in operation only to the extent necessary to settle the affairs of Sellers' estates and if necessary, to implement the liquidating Chapter 11 plan process, and Sellers' estates will have limited personnel and limited financial and other resources. Any actions requested to be taken by Sellers at the request of Buyer pursuant to this Agreement or any Ancillary Document after the Closing, shall be at the

cost and expense of Buyer in accordance with <u>Section 2.6(a)</u>, except for immaterial costs that are not material in the aggregate to Sellers' estates at such time.

**11.11** **<u>Governing Law</u>**.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that State.

(b)     All actions and proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the Parties to this Agreement hereby irrevocably submit to the exclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. The Parties hereto hereby consent to service of process by mail (in accordance with <u>Section 11.3</u>) or any other manner permitted by law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLERS, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

**11.12** **<u>No Third Party Beneficiaries</u>**.  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

**[SIGNATURE PAGES FOLLOW]**

**SELLERS:**

**VVP HOLDINGS, LLC**

By: _____
Name: Arturo Carrillo
Title: President & Chief Executive Officer

**VITRO AMERICA, LLC**

By: _____
Name: Arturo Carrillo
Title: President & Chief Executive Officer

**SUPER SKY INTERNATIONAL, INC.**

By: _____
Name: Arturo Carrillo
Title: Vice President

**SUPER SKY PRODUCTS, INC.**

By: _____
Name: Arturo Carrillo
Title: Vice President

**VVP FUNDING CORPORATION**

By: _____
Name: Arturo Carrillo
Title: President & Chief Executive Officer

**VVP FINANCE CORPORATION**

By: _____

Name: _____

Title: President & Chief Executive Officer

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed the day and year first above written.

**BUYER:**

**AMERICAN GLASS ENTERPRISES, LLC**

By: _____

Name:  Aaron P. Wolfe

Title:   Vice President and Assistant Secretary

*[Signature Page to Asset Purchase Agreement]*

**EXHIBIT A**

**ASSUMPTION AGREEMENT**

**EXHIBIT A**

## ASSUMPTION AGREEMENT

This ASSUMPTION AGREEMENT, dated as of June [_], 2011 (this "Assumption Agreement"), by and among Vitro America, LLC ("Vitro America"), a Delaware limited liability company and certain subsidiaries of Vitro America (together with Vitro America, "Sellers"), and American Glass Enterprises, LLC, a Delaware limited liability company ("Buyer").

**W I T N E S S E T H**

WHEREAS, Buyer and Sellers have entered into an Asset Purchase Agreement (as the same may be amended, modified or supplemented from time to time, the "Asset Purchase Agreement"), dated as of June 8, 2011;

WHEREAS, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement;

WHEREAS, pursuant to the Asset Purchase Agreement, Buyer has agreed to assume from Sellers the Assumed Liabilities upon the terms and subject to the conditions of the Asset Purchase Agreement; and

WHEREAS, the parties desire to carry out the intent and purpose of the Asset Purchase Agreement by Buyer's execution and delivery to Sellers of this instrument evidencing the assumption of the Assumed Liabilities, subject to the provisions of the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

Section 1.  As of the date hereof, Buyer, pursuant to Section 2.3 of the Asset Purchase Agreement, hereby assumes the Assumed Liabilities, subject to the provisions of the Asset Purchase Agreement.  For avoidance of doubt, Buyer is not assuming and will have no responsibility with respect to any Excluded Liability and Sellers hereby acknowledge that Sellers are retaining the Excluded Liabilities.

Section 2.  Nothing in this Assumption Agreement, express or implied, is intended or shall be construed to confer upon, or give to, any Person, other than Sellers and their successors and permitted assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or conditions hereof, and all the terms, covenants and conditions, promises and agreements contained in this instrument shall be for the sole and exclusive benefit of Sellers and their successors and permitted assigns.

Section 3.  Subject to the terms of Section 11.4 of the Asset Purchase Agreement, this Assumption Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, effective immediately upon its delivery to Sellers.

Section 4.  Nothing contained in this Assumption Agreement shall in any way supersede, modify, replace, amend, change, rescind, expand, exceed or enlarge or in any way affect the provisions, including the warranties, covenants, agreements, conditions, rights, remedies or obligations of Sellers or Buyer set forth in the Asset Purchase Agreement.  Notwithstanding anything contained herein to the contrary, in the event of any inconsistency between the terms set forth herein and the terms set forth in the Asset Purchase Agreement, the terms set forth in the Asset Purchase Agreement shall control.

Section 5.  This Assumption Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflicts of law rules of such state.

Section 6.  Any provision of this Assumption Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Assumption Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

Section 7.  This Assumption Agreement may be executed in one or more counterparts, all of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  In proving this Assumption Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

Section 8.  The terms set forth in Article 11 of the Asset Purchase Agreement are incorporated by reference herein, except that, as applicable, any and all references in said Article 11 to "this Agreement" shall mean and refer to this Assumption Agreement.

[*Signature Page Follows*]

       IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed by the signature of its duly authorized officer as of the date above first written.

**BUYER:**

**AMERICAN GLASS ENTERPRISES, LLC**

By: _____

Name: _____

Title: _____


**SELLERS:**

**VVP HOLDINGS, LLC**

By: _____

Name: _____

Title: _____

**VITRO AMERICA, LLC**

By: _____

Name: _____

Title: _____


**SUPER SKY INTERNATIONAL, INC.**


By: _____

Name: _____

Title: _____


**SUPER SKY PRODUCTS, INC.**


By: _____

Name: _____

Title: _____


**[Signature Page to Assumption Agreement]**

**VVP FUNDING CORPORATION**

By: _____

Name: _____

Title: _____

**VVP FINANCE CORPORATION**

By: _____

Name: _____

Title: _____

**[Signature Page to Assumption Agreement]**

**EXHIBIT B**

**BIDDING PROCEDURES**

## VITRO AMERICA, LLC

### Bid Procedures

Set forth below are the bid procedures (the "Bid Procedures") to be employed with respect to the proposed sale (the "Proposed Sale") of assets of Vitro America, LLC, and certain of its subsidiaries and affiliates f/k/a Vitro America, Inc. ("Vitro America"), Super Sky Products, Inc. ("Super Sky Products"), Super Sky International, Inc. ("Super Sky International"), and VVP Finance Corporation ("VVP Finance"), as debtors and debtors-in-possession (the "Debtors" or the, "Sellers") in the Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court," and together with the cases of certain of the Debtors' affiliates, jointly administered in the Bankruptcy Court under Case No. 11-32600 the "Bankruptcy Cases"). The Debtors will seek entry of an order from the Bankruptcy Court authorizing and approving the Proposed Sale to the Proposed Purchaser (defined below) or another Qualified Bidder (defined below) that are determined to have made the highest or otherwise best offer (the "Sale Transaction"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement (defined below).

### Amended and Restated Purchase Agreement

Vitro America, LLC, and certain of its subsidiaries and affiliates, entered into an Amended and Restated Asset Purchase Agreement (the "Amended and Restated Purchase Agreement") with Vitro America Acquisition Corporation (the "Buyer" or "Proposed Purchaser") to be effective as of May 9, 2011. Pursuant to the Amended and Restated Purchase Agreement, the Buyer proposes to acquire free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests therein or thereon to the maximum extent permitted by the Bankruptcy Code (collectively, the "Interests"), real and personal, tangible and intangible property and assets of any kind or nature whatsoever, whether now owned or hereafter acquired by the Sellers, and all proceeds, rents or profits thereof, including, but not limited to, cash, accounts receivable, any and all claims and causes of action, all trade names, trademarks, copyrights, and other intellectual property and license rights owned by the Sellers, but excluding those certain assets expressly identified as "Excluded Assets" in the Amended and Restated Purchase Agreement (the "Assets"). Notwithstanding every other provision in the Bid Procedures Motion, Amended and Restated Purchase Agreement, or herein, to the extent the Debtors assume and assign any contracts bonded by International Fidelity Insurance Company ("IFIC") to the Buyer, such Buyer will assume all obligations and liabilities pursuant to such contracts, including liability for work in place, latent defects, warranties, and payments to subcontractors and suppliers, regardless of when such obligations and liabilities were incurred, whether before or after the Order for Relief date.

### Bidding Procedures Motion and Order

On April 7, 2011, the Debtors filed a Motion for Entry of an Order (A) Approving Bidding Procedures and Bidding Protections in Connection with Sale of Certain of the Debtors' Assets, (B) Establishing Procedures to Determine Cure Amounts and Deadlines for Objections for Certain Contracts and Leases to be Assumed and Assigned by the Debtors; (C) Scheduling a Hearing on the Sale Motion; and (D) Granting Related Relief (the "Bidding Procedures

Motion"). The relief requested in the Bidding Procedures Motion, including the Bidding Protections as modified by the announcements of the Proposed Purchaser at the hearing on the Bidding Procedures Motion and as provided in the Amended and Restated Purchase Agreement, was approved and authorized by the Bankruptcy Court by an order entered by the Court on May 9, 2011 (the "Bidding Procedures Order").

## The Bidding Process

The Debtors and their advisors, in consultation with the Pre-Petition Lender (defined below), IFIC, and advisors to the Official Committee of Unsecured Creditors (the "Creditors' Committee") appointed in the Debtors' Bankruptcy Cases shall (i) determine whether any bid for the Assets is a Qualified Bid (defined below), (ii) coordinate the efforts of Qualified Bidders (as defined below) in conducting their due diligence investigations, (iii) receive offers from Qualified Bidders, and (iv) negotiate in good faith any offers made to purchase the Assets (collectively, the "Bidding Process").

## Participation Requirements

Any person interested in receiving confidential information from the Debtors in connection with the Bidding Process (an "Interested Party") must sign a confidentiality agreement satisfactory to the Debtors in consultation with the Creditors' Committee. Upon execution of the confidentiality agreement and delivery of a statement identifying any parties with whom the Interested Party is participating in the Bidding Process, the Interested Party shall receive, at the Debtors' discretion, a confidential information memorandum. Upon review of such confidential information memorandum, any Interested Parties that wish to participate further in the Bidding Process will be required to submit a non-binding indication of interest to the Debtors and counsel to the Creditors' Committee. The indication of interest must contain the following:

(i)     a detailed description of the Interested Party;

(ii)    the assets of the Debtors that the Interested Party wishes to purchase and the amount and form of consideration to be provided;

(iii)   contact information for such Interested Party, and provide full disclosure of all parties participating with the Interested Party, as well as full disclosure of any pre-petition or post-petition affiliation that the Interested Party may have with: (a) the Debtors, (b) the Debtors' affiliates, (c) major creditors of the Debtors, (d) equity security holders of the Debtors and/or (e) any of the Debtors' former officers, directors or other insiders; and

(iv)    sufficient information, as reasonably requested by the Debtors or the Creditors' Committee, to allow the Debtors, after consultation with the Creditors' Committee, to determine that the Interested Party has the financial wherewithal to close the Sale Transaction, including, but not limited to, current audited financial statements (or such other form of financial disclosure and credit quality support or enhancement acceptable

to the Debtors) of the Interested Party or of those entities that will guarantee the obligations of the Interested Party.

(v) proof of its ability to obtain replacement bonds for each bonded contract to be transferred (and obtain the return of the bonds issued by IFIC and release of IFIC from all liability in connection with such bonds) or provide evidence that IFIC has agreed to allow its bonds to stay in effect (whether IFIC will allow its bonds to stay in effect will be determined by IFIC in its sole and absolute discretion). IFIC will, at a minimum, require that an indemnity agreement be provided by any buyer in order for any IFIC bonds to remain in place and will further evaluate the financial status of the buyer, ability to complete the work and collateral package offered in making this determination.

Upon receipt of an indication of interest, the Debtors and their advisors and the Creditors' Committee and its advisors will review the indication of interest. An Interested Party that delivers the documents described in subparagraphs (i) - (v), and that the Debtors, after consultation with the Creditors' Committee, determine is reasonably likely (based on the financial information submitted by the Interested Party, the availability of financing, experience and other considerations deemed relevant by the Debtors) to submit a bona fide offer and to be able to consummate a sale if selected as a Successful Bidder (defined below) shall be allowed to conduct further due diligence including access to the online data room and shall be deemed a potential bidder (a "<u>Potential Bidder</u>").

### Due Diligence

The Debtors shall afford any Potential Bidder reasonable time and the opportunity to conduct reasonable due diligence; <u>provided</u>, <u>however</u>, that the Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (defined below). The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Potential Bidders. Neither the Debtors nor any of their affiliates (or any of their respective representatives) are obligated to furnish any information to any person other than a Potential Bidder. If the Debtors provide any due diligence materials to a Potential Bidder, and such materials have not previously been provided to the other Potential Bidders, including the Proposed Purchaser, then the Debtors shall post such materials in a data room and provide email notice of such posting to all Potential Bidders, including the Proposed Purchaser. Notwithstanding anything herein to the contrary, the Debtors reserve the right to withhold information or restrict access to certain materials in any data room if providing such information or materials to a Potential Bidder will, in the Debtors' business judgment, after consultation with the Creditors' Committee, put the Debtors at a competitive disadvantage.

### Purchase Price Allocation

The Debtors shall file with the Court and serve on the Notice Parties (defined below) a notice of the Debtor's proposed methodology for allocating the purchase price of the Successful Bid (defined below) to each of the Debtors by **5:00 PM (CST), May 16, 2011**.

**Proposed Cure Amounts**

The Debtors shall file with the Court and serve on all parties to executory contracts and unexpired leases subject to assumption and/or assignment (the "Contract Counterparties") and IFIC a notice of proposed cure amounts (the "Cure Notice") by **5:00 PM (CST), May 20, 2011**. Such notice shall also include information advising the Contract Counterparties of when and the location of the electronic dataroom (the "Data Room") where they may obtain information related to (a) which contracts each Qualified Bidder proposes to assume, and (b) adequate assurance of future performance by each Qualified Bidder. The inclusion of contracts on the Cure Notice shall not constitute or be deemed to be a determination or admission by the Debtors or any other party in interest that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved). The Debtors shall consult with the Creditors' Committee regarding the form and substance of the Cure Notice before such notice is filed and served.

**Bid Deadline**

A Potential Bidder that desires to make a bid shall deliver written copies of its bid not later than **3:00 p.m. (CST) on May 20, 2011** (the "Bid Deadline") to each of the following notice parties (the "Notice Parties"): (i) Vitro America, LLC, 965 Ridge Lake Blvd., Suite 300, Memphis, Tennessee 38120 (Attn: Arturo Carrillo), (ii) Fulbright & Jaworski LLP, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201 (Attn: William Greendyke, Esq. and Ryan Manns, Esq.), attorneys for the Debtors, (iii) Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, Illinois 60606 (Attn: Kimberly deBeers, Esq., Matthew Murphy, Esq. and Jonathan G. Pfleeger, Esq.), attorneys for Proposed Purchaser, (iv) Parker, Hudson, Rainer & Dobbs, LLP, 285 Peachtree Center Ave., N.E., 1500 Marquis II Tower, Atlanta, Georgia 30303 (Attn: C. Edward Dobbs, Esq.), attorney for the Pre-Petition Lender; (v) Akin Gump Strauss Hauer & Feld, LLP One Bryant Park, New York, New York 10036 (Attn: Michael S. Stamer, Esq. and Abid Qureshi, Esq.) and 1700 Pacific Avenue, Suite 4100 Dallas, Texas 75082 (Attn: Sarah Link Schultz, Esq.), attorneys for the Creditors Committee; and (viii) Manier & Herod, a Tennessee Professional Corporation, (Attn: Mary Paty Lynn LeVan and Michael E. Collins) 150 4th Avenue North, Suite 2200, Nashville, Tennessee, 37219, counsel for IFIC..

**Bid Requirements**

All bids must include (unless such requirement is waived by the Debtors, after consultation with the Creditors' Committee) the following documents and requirements (the "Bid Requirements"):

- an offer to purchase substantially all of the Assets (or an offer to purchase less than substantially all of the Assets on terms that, in the Debtors' business judgment, are no less favorable than the terms and conditions set forth in the Amended and Restated Purchase Agreement) upon the terms and conditions as substantially set forth in the Amended and Restated Purchase Agreement, including without limitation, with respect to certainty and timing of closing, or upon alternative terms and conditions that the Debtors determine in their

4

reasonable business judgment are no less favorable than the terms and conditions set forth in the Amended and Restated Purchase Agreement;

• if proposing a purchase of all or substantially all of the assets of the Debtors, a purchase price, the value of which is determined by the Debtors to be equal to or greater than the sum of (a) the purchase price set forth in the Amended and Restated Purchase Agreement, (b) the Break-Up Fee (which amount is equal to 1.9% of $44,000,000) and Expense Reimbursement, and (c) $250,000, (the sum of which shall be the "Initial Incremental Bid Amount");

• for the avoidance of doubt, a Potential Bidder's offer may consist of cash and/or other forms of consideration, including, but not limited to, notes or other securities, which other consideration shall be valued for purposes of determining a higher and better offer by the Debtors after consultation with the Creditors' Committee. Notwithstanding the foregoing and any other provision herein or in the Bid Procedures Order:

   o (x) any offer to purchase assets consisting of collateral securing obligations owed to IFIC must be consented to in writing by IFIC in its discretion or consist of a cash portion sufficient in amount to pay (or, in the case of contingent obligations, cash collateralize), the portion of the Purchase Price allocable to assets of Super Sky Products, Inc., the Durham County Subcontract, and any other assets for which IFIC has a first-priority security or other interest; and

   o (y) any offer to purchase Assets consisting of collateral (the "Bank Collateral") securing obligations (collectively, the "Obligations") owed to Bank of America, N.A. (the "Pre-Petition Lender") or Banc of America Leasing & Capital, LLC ("BALC") must be either (i) consented to in writing by the Pre-Petition Lender and BALC in their discretion or (ii) consist of a cash portion sufficient in amount to pay (or, in the case of contingent Obligations, cash collateralize) all Obligations owed by the Debtors to the Pre-Petition Lender or BALC, after first deducting from such cash proceeds the amount of any liens that are senior in priority to the liens of the Pre-Petition Lender and BALC with respect to such Assets, any Break-Up Fee and Expense Reimbursement (to the extent payable prior to the payment in full of the Obligations), any amounts payable to any Court-approved investment banker or other professional for services rendered or expenses incurred in connection with the Auction (to the extent payable prior to the payment in full of the Obligations), and amounts attributable to the Assets of a Debtor which are sold and in which the Pre-Petition Lender and BALC do not have a security interest or lien on or after the Order for Relief Date (such assets being hereinafter referred to as the "Non-Bank Collateral");

- a preliminary, non-binding allocation of the consideration offered in the offer to each of the Debtors (the preliminary, non-binding allocation shall not preclude the Debtors or any party in interest from raising any objection as to the appropriate allocation);

- if proposing a purchase of Assets consisting of Bank Collateral and Non-Bank Collateral, an allocation of the portion of the purchase price that is allocable to the Bank Collateral and the portion that is allocable to the Non-Bank Collateral;

- a letter stating that the Potential Bidder's offer is irrevocable until two (2) business days after the Assets have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court;

- a $2,000,000 good faith deposit ("Good Faith Deposit") that will be held in escrow with the Debtors;

- the offer must not be contingent on financing and must include written evidence of a commitment for financing or other evidence of the ability of the Potential Bidder to consummate the sale satisfactory to the Debtors (after consultation with the Creditors' Committee) with appropriate contact information for any such financing sources;

- written evidence that the Potential Bidder has provided: (i) proof of the Potential Bidder's ability to obtain replacement bonds for each bonded contract to be transferred (and obtain the return of the bonds of IFIC and has released IFIC from all liability in connection with such bonds); or (ii) written evidence that the Potential Bidder has provided evidence that IFIC has agreed to allow its bonds to stay in effect, which will be determined by IFIC in its sole and absolute discretion;

- a redline comparing the Potential Bidder's proposed purchase agreement against that of the Amended and Restated Purchase Agreement;

- except for the Proposed Purchaser, does not request or entitle the Potential Bidder to a break-up fee, termination fee, expense reimbursement or similar type of payment;

- must not be conditioned on the outcome of due diligence by the Potential Bidder and must include an acknowledgement and representation as described herein that the Potential Bidder had an opportunity to conduct any and all required due diligence prior to making its bid;

- fully discloses the identity of each entity that will be bidding for all or any portion of the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation, including the identification of the Potential Bidder's principal advisors; and

- an agreement to provide to BALC and any other Contract Counterparty that makes a request to the attorneys for the Debtors, not later than five (5) days after the bid deadline, reasonable information relating to such bidder's ability to provide adequate assurances of future performances of the leases[4] in accordance with their terms, including current financial information regarding such bidder and any other person or entity (if any) that such bidder indicates will guarantee payment of, or provide other payment assurances with respect to, the aforementioned leases;

- evidence, in form and substance reasonably satisfactory to the Debtors (after consultation with the Creditors' Committee) of compliance or anticipated compliance with all antitrust and other regulatory approvals, the anticipated time frame for such compliance and any anticipated impediments for obtaining such approvals;

- provide to the Debtors a final list of the Debtors' executory contracts and unexpired leases with respect to which the Potential Bidder seeks assignment from the Debtors by **12:00 PM (CST), May 24, 2011**;

- each bidder, in order to constitute a Qualified Bidder, must provide to the Debtors a final list of the liabilities the bidder proposes to assume under the Sale Transaction by **12:00 PM (CST), May 24, 2011**; and

- the Debtors shall file with the Court and serve on the Contract Counterparties and Notice Parties a notice identifying each Qualified Bidder's final list of the Debtors' executory contracts and unexpired leases with respect to which the Potential Bidder seeks assignment from the Debtors and the liabilities the bidder proposes to assume under the Sale Transaction by **12:00 PM (CST), May 25, 2011**.

A bid received from a Potential Bidder that satisfies all of the Bid Requirements shall be a "Qualified Bid," and at such time the Debtors and their advisors, in consultation with the advisors for the Pre-Petition Lender (as defined below) and the Creditors' Committee, shall designate the Potential Bidder a qualified bidder ("Qualified Bidder"). The Proposed Purchaser is a Qualified Bidder, and the Amended and Restated Purchase Agreement is a Qualified Bid. The Pre-Petition Lender shall be deemed to be a Qualified Bidder (without the requirement of making any deposit or submitting any mark-up of the Amended and Restated Purchase

---

[4] Before the commencement of these cases, BALC, as lessor, and Vitro America, as lessee entered into a certain Master Lease Agreement (Number 15486-11500) (the "Master Lease") dated April 29, 2005, together with the following Schedules made a part of, and incorporated into, the Master Lease :
- Schedule to Lease Agreement (Schedule Number 15486-11500-001) dated July 7, 2005;
- Schedule to Lease Agreement (Schedule Number 15486-11500-002) dated December 26, 2005;
- Schedule to Lease Agreement (Schedule Number 15486-11500-003) dated March 6, 2006;
- Schedule to Lease Agreement (Schedule Number 15486-11500-004) dated August 25, 2006;
- Schedule to Lease Agreement (Schedule Number 15486-11500-005) dated October 29, 2007;
- Schedule to Lease Agreement (Schedule Number 15486-11500-006) dated November 21, 2008;

Agreement in its sole discretion), and any credit bid that the Pre-Petition Lender may make shall be deemed a Qualified Bid.

### Break-Up Fee and Expense Reimbursement

If the Debtors accept a Qualified Bid other than a bid of the Proposed Purchaser as the Successful Bid (defined below), then the Debtors shall pay to the Proposed Purchaser as compensation for Proposed Purchaser's efforts in connection with the negotiation and execution of the Amended and Restated Purchase Agreement and the transactions contemplated thereby an amount equal to the Break-Up Fee and Expense Reimbursement due to the Proposed Purchaser pursuant to the terms of the Amended and Restated Purchase Agreement, as approved by the Bankruptcy Court under the Bidding Procedures Order.

### "As Is, Where Is"

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, its agents or its estate except to the extent set forth in the Amended and Restated Purchase Agreement or the purchase agreement of another Successful Bidder. By submitting a bid, the Proposed Purchaser and each other Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or, (i) as to the Proposed Purchaser, as expressly stated in the terms of the sale of the Assets set forth in the Amended and Restated Purchase Agreement and ancillary documents, or (ii) as to another Successful Bidder, as expressly stated in the terms of the sale of the Assets set forth in the applicable purchase agreement and ancillary documents.

### Free of Any And All Interests

Except as otherwise provided in the Amended and Restated Purchase Agreement or another Successful Bidder's purchase agreement, all of the Debtors' right, title and interest in the Assets shall be sold free and clear of all Interests thereon and there against to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Assets with the same validity and priority as such Interests applied against the Assets.

### Auction, Bidding Increments and Bids Remaining Open

If more than one Qualified Bid has been received by the Debtors (in addition to the Amended and Restated Purchase Agreement), the Debtors shall conduct an auction (the "Auction") with respect to the Assets. The Auction shall commence at **9:00 a.m. (CST) June 1, 2011** at Fulbright & Jaworski LLP, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201. The Debtors shall notify all Qualified Bidders that have submitted Qualified Bids of the time of the Auction.

At least one (1) day prior to the Auction, the Debtors shall provide the Proposed Purchaser and all Qualified Bidders with complete copies of all Qualified Bids. The Auction shall be conducted in accordance with the following procedures:

(i) Only the Debtors, Proposed Purchaser, the Pre-Petition Lender, the Creditors' Committee, counsel for Fintech Investments Ltd., counsel for IFIC (and any additional parties in the Debtors' discretion) and any Qualified Bidders (and the advisors to each of the foregoing) and the advisors to each shall be entitled to attend the Auction and only the Proposed Purchaser and such Qualified Bidders shall be entitled to make any subsequent Qualified Bids at the Auction.

(ii) At the Auction, all Qualified Bidders shall be permitted to improve their Qualified Bids in accordance with the procedures set forth herein (each, a "Subsequent Bid"). All Subsequent Bids presented during the Auction shall be made and received in one room on an open basis. All participating Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each participating Qualified Bidder shall be fully disclosed to all other Qualified Bidders and that all material terms of each Subsequent Bid presented during the Auction will be fully disclosed to the Proposed Purchaser and all other participating Qualified Bidders throughout the entire Auction.

(iii) All Qualified Bidders at the Auction must have at least one individual representative with authority to bind such Qualified Bidder present in person at the Auction.

(iv) All proceedings at the Auction shall be conducted before and transcribed by a court stenographer.

(v) At least one (1) day prior to the Auction, the Debtors will advise the Proposed Purchaser and all other Qualified Bidders which Qualified Bid the Debtors, in consultation with the Creditors' Committee, have determined in their reasonable business judgment constitutes the then highest or otherwise best offer for the Assets (the "Starting Bid").

(vi) Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round (a) at least one Subsequent Bid is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid and meets the overbid requirement set forth in paragraph (vii) below, and (b) the Debtors, in consultation with the Creditors' Committee, determine in their reasonable business judgment that a Subsequent Bid is a higher or otherwise better offer than the then current leading Qualified Bid.

(vii) Bidding at the Auction shall be in increments of $250,000 and shall continue until such time as the highest and best bid is determined by the Debtors in their reasonable business judgment, after consultation with the Creditors' Committee. The Debtors, after consultation with the Creditors' Committee, shall

have the right to modify the bidding increments throughout the course of the Auction. For the purpose of evaluating the value of the consideration provided by each bid (including any Subsequent Bid by the Proposed Purchaser) presented at the Auction, the Debtors may take into consideration, among other things, the financial and contractual terms as well as factors relevant to the sale process, including any issues affecting the speed and certainty of consummating the proposed sale or antitrust or unfair competition issues (including, but not limited to, any inquiries or complaints filed with, or submitted to, Vitro America, LLC or the Department of Justice with respect to a bid).

(viii)    After each round of bidding, the Debtors shall announce the Qualified Bid or Subsequent Bid, as the case may be, that the Debtors have determined to be in their reasonable business judgment and after consultation with the Creditors' Committee to be the then highest or otherwise best bid (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has an opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

(ix)    At the conclusion of the Auction, the Debtors will announce the Qualified or Subsequent Bid which they, after consultation with the Creditors' Committee, have determined in their reasonable business judgment to be the highest or otherwise best bid (the "Successful Bid" and the entity or entities submitting such Successful Bid, the "Successful Bidder") and such Successful Bid will be submitted to the Court for approval at the Sale Hearing (defined below), along with the second highest and best Qualified Bid (the "Back-Up Bid").

(x)    The Debtors shall file with the Court, post in the Data Room and serve on the Contract Counterparties and the Notice Parties a notice of the Successful Bid (the "Supplement") via email or fax and Federal Express overnight delivery by **12:00 PM (CST), June 2, 2011.** The Supplement may be downloaded at http://www.kccllc.net/vitro or obtained from counsel of the Debtors upon written request to Fulbright & Jaworski L.L.P., Attn: William R. Greendyke, Esq. and Ryan E. Manns, Esq., 2200 Ross Avenue, Suite 2800, Dallas, Texas, 75201, wgreendyke@fulbright.com, rmanns@fulbright.com). The Supplement shall identify, among other things: (a) the Successful Bidder; (b) the bidder that presented the Back-Up Bid; (c) the consideration to be paid for the Assets; (d) the Successful Bidder's proposed allocation of the consideration to each of the Assets; (e) the executory contracts or leases to be assumed and assigned to the Successful Bidder in connection with the sale of the Assets; (f) the liabilities to be assumed by the Successful Bidder in connection with the sale of the Assets; and (g) copies of the respective purchase agreement entered into by the Successful Bidder and the Back-Up Bidder.

### Acceptance of Qualified Bids

The Debtors shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after a hearing (the "Sale Hearing"). The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not

constitute the Debtors' acceptance of the Qualified Bid. The Debtors will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Debtors' selection of the Successful Bidder (including the assignment of any of such objector's executory contract or unexpired lease thereto, provided, however, that objection to such assignment on the basis of the cure amount must be made and/or reserved as set forth in any order of the Bankruptcy Court).

### Objection Deadline

Objections to any aspect of the proposed Sale Transaction, including the proposed assumption or assignment of any contract or lease or the proposed cure amounts for any such contract or lease, must be filed with the Court and served on the attorneys for the Debtors, attorneys for the Successful Bidder, attorneys for the Creditors Committee, and attorneys for the Pre-Petition Lender by **5:00 PM (CST), June 6, 2011**.

### Sale Hearing

The Sale Hearing shall be conducted by the Bankruptcy Court at **9:00 AM (CST), June 9, 2011**. Following the approval of the sale of the Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale, the Debtors shall be authorized, but not required, to deem the Back-Up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such bid without further order of the Bankruptcy Court.

### Return of Good Faith Deposit

The Good Faith Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at closing. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until two (2) days after closing of the transactions contemplated by the Successful Bid, and thereafter returned to the respective bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Successful Bidder.

### Modifications

The Debtors, after consultation with the Creditors' Committee, may (i) determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale, or (c) contrary to the best interests of the Debtors, their estates and creditors.

**EXHIBIT C**

**BIDDING PROCEDURES ORDER**

Exhibit C-1



U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*Barbara J. Houser*

**United States Bankruptcy Judge**

**Signed May 10, 2011**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| VITRO ASSET CORP., et al., | § | Case No. 11-32600-hdh-11 |
| | § | |
| Alleged Debtors.[1] | § | Jointly Administered |
| | § | |

| | | |
|---|---|---|
| | § | Chapter 11 |
| In re: Vitro America, LLC | § | Case No. 11-32602- hdh-11 |
| In re: Super Sky Products, Inc. | § | Case No. 11-32604- hdh-11 |
| In re: Super Sky International, Inc. | § | Case No. 11-32605- hdh-11 |
| In re: VVP Finance Corporation | § | Case No. 11-32611- hdh-11 |
| Debtors.[2] | § | (Jointly Administered Under |
| | § | Case No. 11-32600- hdh-11) |

**ORDER: (A) APPROVING BIDDING PROCEDURES AND BIDDING
PROTECTIONS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS; (B) ESTABLISHING PROCEDURES FOR
FILING OBJECTIONS TO THE PROPOSED ASSUMPTION AND ASSIGNMENT
OF CERTAIN CONTRACTS AND CURE AMOUNTS;**

---

[1] The Alleged Debtors are:  Vitro Asset Corp. (f/k/a American Asset Holdings Corp.), Troper Services, Inc., In, VVP Holdings, LLC, Amsilco Holdings, Inc., B.B.O. Holdings, Inc., Binswanger Glass Company (f/k/a Troper Inc.), Crisa Corporation, and V-MX Holdings, LLC (f/k/a Crisa Holdings Corp.).

[2] The Debtors are:  Vitro America, LLC (Case No. 11-32602), Super Sky Products, Inc. (Case No. 11-32604), Super Sky International, Inc. (Case No. 11-32605), and VVP Finance Corporation (Case No. 11-32611).

## (C) SCHEDULING A HEARING ON THE SALE MOTION; AND (D) GRANTING RELATED RELIEF

Upon the motion, dated April 7, 2011 (the "Motion"),[3] of the above-captioned debtors and debtors in possession (the "Debtors"), seeking, in part, entry of an order (this "Bidding Procedures Order") pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving (A) Bidding Procedures and Bidding Protections in Connection with Sale of Substantially All of Certain of the Debtors' Assets; (B) Establishing Procedures to Determine Cure Amounts and Deadlines for Objections for Certain Contracts and Leases to be Assumed and Assigned by the Debtors; (C) Scheduling a Hearing on the Sale Motion; and (D) Granting Related Relief, all as more fully set forth in the Motion; and the Court having reviewed the Motion and heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and after considering the evidence presented and the arguments of counsel; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and the Court having made findings of fact and conclusions of law on the record in open court which are incorporated herein by reference; and after due deliberation and sufficient cause appearing therefor,

THE COURT HEREBY FINDS THAT:

A.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]     All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

B.      Notice of the Motion and proposed entry of this Bidding Procedures Order has been provided to: (i) the Office of the United States Trustee for the Northern District of Texas, 1100 Commerce Street, Dallas, Texas 75242, Attn. George McElreath, Esq. and Erin Schmidt, Esq.; (ii) Fulbright & Jaworski LLP, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201 (Attn: William R. Greendyke, Esq. and Ryan E. Manns, Esq.), attorneys for the Debtors; (iii) Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, Illinois 60606 (Attn: Kimberly A. deBeers, Esq. and Matthew M. Murphy, Esq.), attorneys for Vitro America Acquisition Corporation ("Purchaser"); (iv) Akin Gump Strauss Hauer & Feld, LLP One Bryant Park, New York, New York 10036 (Attn:  Michael S. Stamer, Esq. and Abid Qureshi, Esq.) and 1700 Pacific Avenue, Suite 4100 Dallas, Texas 75082 (Attn:  Sarah Link Schultz, Esq.), attorneys for the Creditors Committee; (v) all parties who are known to claim liens or other interests upon the Assets; (vi) the Internal Revenue Service and all other applicable federal, state and local taxing and regulatory authorities; (vii) all non-debtor counterparties to the Debtors' executory contracts and unexpired leases; (viii) entities known or reasonably believed to have expressed an interest in acquiring any of the assets offered for sale; and (ix) all persons or entities that have requested notice of the proceedings in this Chapter 11 case (the "Notice Parties").

C.      Under the circumstances, requisite notice of the Motion and the relief requested thereby and in this Bidding Procedures Order has been provided in accordance with Bankruptcy Rules 2002, 6004 and 9014, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, section 102(1) of the Bankruptcy Code, and no further notice of, or hearing on, the Motion with respect to this Bidding Procedures Order is necessary or required.

D.      The Debtors have articulated good and sufficient reasons for this Court to: (i) approve the Bidding Procedures, as modified by the Court at the hearing and as memorialized in the attached Exhibit 1; (ii) set the Sale Hearing and approve the manner and notice of the Motion and the Sale Hearing; (iii) approve the procedures for the assumption and assignment of executory contracts and unexpired leases that are to be assumed and assigned (the "Assigned Contracts"), including notice of proposed cure amounts, each as modified at the hearing on the Motion, (the "Cure Amounts"); (iv) approve the breakup fee, in the modified amount, as stated at the hearing on the Motion (the "Breakup Fee") and expense reimbursement (the "Expense Reimbursement", and together with the Breakup Fee, the "Bid Protections") to be paid to the Purchaser as provided in the Amended and Restated Purchase Agreement.

E.      The Bid Protections (i) were negotiated in good-faith and at arm's-length between the Debtors and the Purchaser, (ii) are reasonable and appropriate given, among other things, the size and nature of the transaction and the efforts that have been expended and will continue to be expended by the Purchaser to enter into the Amended and Restated Purchase Agreement, and (iii) are a material inducement for, and condition of, the Purchaser's entry into the Amended and Restated Purchase Agreement.  The Bid Protections are commensurate with the real and substantial post-petition benefits conferred upon the Debtors' estates by the Purchaser and constitute actual and necessary costs and expenses incurred by the Debtors in preserving the value of their estates within the meaning of section 503(b) of the Bankruptcy Code.

F.      The procedures for the assumption and assignment of the Assigned Contracts, including notice of proposed Cure Amounts, are reasonable and appropriate and consistent with the provisions of section 365 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6006.  The procedures have been tailored to provide adequate opportunity for all non-debtor

4

counterparties to the Assigned Contracts to raise any objections to proposed assumptions and assignments or Cure Amounts.

G.    The Debtors have exercised sound business judgment and presented sound business reasons for approval of the Bid Procedures and Bid Protections.  The Bid Procedures and Bid Protections are fair, reasonable, and appropriate, and are designed to maximize recoveries and the realization of value by the Debtors' estates.

H.    The entry of this Bidding Procedures Order is in the best interests of the Debtors, their estates, creditors, and other parties-in-interest.

IT IS HEREBY ORDERED THAT:

1.    The Motion is granted to the extent provided herein.

2.    All objections, if any, to the Motion that have not been withdrawn, waived or settled as announced to the Court at, or prior to, the Hearing or by stipulation are hereby overruled.

3.    The form of the Amended and Restated Purchase Agreement (which may be downloaded at http://www.kccllc.net/vitro or obtained from counsel of the Debtors upon written request to Fulbright & Jaworski L.L.P., Attn: William R. Greendyke, Esq. and Ryan E. Manns, Esq., 2200 Ross Avenue, Suite 2800, Dallas, Texas, 75201, wgreendyke@fulbright.com, rmanns@fulbright.com), is hereby approved to be used at the Auction and is appropriate and reasonably calculated to enable the Debtors and other parties in interest to easily compare and contrast the differing terms of the bids presented at the Auction.

4.    The Bidding Procedures, in the form attached hereto as **Exhibit 1**, are hereby approved.  The failure to specifically include or reference any particular provision, section or

article of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such procedure, it being the Court's intent that the Bidding Procedures be authorized and approved in their entirety unless otherwise modified by this Order.

5.      The form of the Sale Notice, substantially in the form attached hereto as **Exhibit 2**, and service thereof is hereby approved and (ii) is reasonably calculated to give due and sufficient notice and an opportunity to participate to any affected party, and constitutes good and sufficient notice of the Auction, Sale Hearing, and the Debtors' proposed Assigned Contracts and Cure Amounts for the same. No other or further notice is required.

6.      The Debtors shall serve the Sale Notice by U.S. first class mail within two business days after entry of this Bidding Procedures Order on the Notice Parties.

7.      The Debtors shall publish the Sale Notice in the national edition of the Wall Street Journal, and such other regional newspapers as the Debtors, in consultation with the Creditors' Committee, deem appropriate. The Debtors shall make commercially reasonable best efforts to effectuate publication notice on or before five days from entry of this Bidding Procedures Order. Such publication conforms with the requirements of Federal Rules of Bankruptcy Procedure 1005, 2002(l), 2002(n), and 9008, and is reasonably calculated to provide notice to any affected party and afford the affected party the opportunity to exercise any rights affected by the Motion.

8.      The Auction, if one is required, shall be conducted at the offices of Fulbright & Jaworski LLP, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201 commencing on **June 1, 2011 at 9:00 a.m. (CST)**. In the event the Debtors do not receive any Qualified Bids except for the Qualified Bid of the Purchaser by the Bid Deadline, the Debtors will not hold the

Auction and instead shall seek approval of the Amended and Restated Purchase Agreement at the Sale Hearing on June 9, 2011 at 9:00 a.m (CST).

9.      The following Bid Protections are hereby approved: (i) a Break-Up Fee equal to 1.9% of the Purchase Price; and (ii) an Expense Reimbursement of up to $1,000,000; provided that, prior to the payment of such Expense Reimbursement, the Purchaser must serve on counsel for the Debtors and counsel for the Creditors' Committee, a notice of the proposed amount of Expense Reimbursement with attachments supporting the amount. Counsel for the Debtors and the Creditors' Committee shall have five (5) business days (the "Expense Reimbursement Objection Deadline") from being served with such notice to file an objection, if any, with the Court to the Expense Reimbursement. In the event that the Debtors and the Creditors' Committee do not file an objection by the Expense Reimbursement Objection Deadline, the Expense Reimbursement shall be paid pursuant to the Amended and Restated Purchase Agreement.

10.      The Debtors' obligations to pay the Bid Protections, subject to objections as set forth in paragraph 9 of this Order, shall constitute superpriority administrative expense obligations under section 364(c)(1) of the Bankruptcy Code with priority over any and all expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to any superpriority claims of the Debtors' existing debtor-in-possession secured lenders or International Fidelity Insurance Company ("IFIC"). The Debtors, the Creditors' Committee and Proposed Purchaser reserve their rights to object and or file a motion to determine whether IFIC in fact has a superpriority claim, first lien position, and/or issue with respect to priority of the bid protections.

11.     The Debtors shall file with the Court a notice of a proposed methodology for allocating the stalking horse purchase price to each of the Debtors (which proposed methodology shall include Debtors' good faith estimates of the percentage of gross sale proceeds contemplated in the stalking horse purchase price attributable to each respective Debtor) by **5:00 PM (CST), May 16, 2011**.

12.     The Debtors shall file with the Court and serve on the Notice Parties and counterparties to any contract that may be assumed and assigned by the Debtors to the successful bidder ("Contract Counterparties") a notice of proposed Cure Amounts (the "Cure Notice") by **5:00 PM (CST), May 20, 2011**.  Such notice shall also include information advising the Notice Parties and Contract Counterparties of when and the location of the electronic data room (the "Data Room") where they may obtain information related to (a) which contracts each Qualified Bidder proposes to assume, and (b) adequate assurance of future performance by each Qualified Bidder.  The inclusion of contracts on the Cure Notice shall not constitute or be deemed to be a determination or admission by the Debtors or any other party in interest that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).  The Debtors shall consult with the Creditors' Committee regarding the form and substance of the Cure Notice before such notice is filed and served.

13.     Qualified Bidders (including the Purchaser) shall provide the Debtors and attorneys for the Debtors a final list of all Assigned Contracts each such party seeks assignment from the Debtors by **12:00 PM (CST), May 24, 2011**.

14.     The Debtors shall serve on the Notice Parties (including in any case OldcastleBuilding Envelope) and Contract Counterparties each Qualified Bidder's (including

the Purchaser's) final list of the Assigned Contracts with respect to which Qualified Bidder

seeks assignment from the Debtors, which list of proposed assumed liabilities shall include

the name and address of each creditor whose liability is to be assumed, the amount owed to

each such creditor, the name of the Debtor who owes the liability, and the payment priority

under the Bankruptcy Code that the Debtors assign each such liability (the "Assignment

List") by **12:00 PM (CST), May 25, 2011**. The Debtors will also post the Assignment List

in the Data Room.

15. The Debtors shall serve on the Notice Parties and Contract Counterparties each

Qualified Bidder's final list of the Debtors' liabilities the bidder proposes to assume from the

Debtors (the "Assumed Liabilities List") by **12:00 PM (CST), May 24, 2011**. Any

objections to the assumption and/or assignment of any Assigned Contracts identified on the

Assignment List (a "Assignment Objection"), or to the proposed Cure Amount set forth on

the Cure Notice (a "Cure Objection"), must be in writing, filed with the Court and be

**actually received** on or before **June 6, 2011 at 5:00 a.m. (CST)** (the "Assumption and Cure

Objection Deadline"). Cure Objections shall be served on (i) the Office of the United States

Trustee for the Northern District of Texas, 1100 Commerce Street, Dallas, Texas 75242,

Attn. George McElreath, Esq. and Erin Schmidt, Esq.; (ii) Fulbright & Jaworski LLP, 2200

Ross Avenue, Suite 2800, Dallas, Texas 75201 (Attn: William R. Greendyke, Esq. and Ryan

E. Manns, Esq.), attorneys for the Debtors; and (iii) Akin Gump Strauss Hauer & Feld LLP,

One Bryant Park, New York, New York 10036 (Attn: Michael S. Stamer, Esq. & Abid

Qureshi, Esq.) and 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75082 (Attn: Sarah Link

Schultz, Esq.) attorneys for the Creditors' Committee.

16.     If a Contract Counterparty does not file and serve an Assignment or Cure

Objection prior to the Cure Objection Deadline and in accordance with paragraph [15] of this

Order, that party (i) will be deemed to have stipulated that the Cure Amount(s) set forth in

the Cure Notice as determined by the Debtors is correct; (ii) shall be forever barred, estopped

and enjoined from asserting any additional Cure Amount under the Assigned Contracts; and

(iii) will be forever barred from objecting to the assignment of the Assigned Contracts to the

Successful Bidder or to the Successful Bidder's adequate assurance of future performance.

No contract bonded by IFIC ("IFIC Bonded Contracts") can be assumed unless: (i) IFIC

receives from the buyer, proof of the buyer's ability to obtain replacement bonds for each

bonded contract to be transferred (and the buyer obtains the return of IFIC's bonds and

releases IFIC from all liability in connection with such bonds); or (ii) the buyer provides

evidence that IFIC has agreed to allow its bonds to stay in effect, which will be determined

by IFIC in its sole and absolute discretion.  IFIC will, at a minimum, require that an

indemnity agreement be provided by any Successful Bidder in order for any of IFIC's bonds

to remain in place and will further evaluate the financial status of the buyer, ability to

complete the work, and collateral package offered in making this determination.

17.     If a timely Assignment or Cure Objection is received and such Assignment or

Cure Objection cannot otherwise be resolved by the parties, the Court will hear such

Assignment or Cure Objection at the Sale Hearing.  If appropriate, the Court may continue

such hearing to a subsequently scheduled omnibus hearing date.

18.     If no Cure Amount is due under the Assigned Contracts and the Contract

Counterparties do not otherwise object to the Debtors' assumption and assignment of the

Assigned Contracts, no further action need be taken on the part of such non-debtor parties.

19.     Assumption and/or Cure Objections that object solely to the Cure Amount may not prevent or delay the Debtors' assumption and assignment of the Assigned Contracts.  If a party objects solely to a Cure Amount, the Debtors may, with the consent of the Creditors' Committee, hold the claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties.  So long as the Debtors hold the claimed Cure Amount in reserve, and there are no other unresolved objections to assumption and assignment, the Debtors can, without further delay, assume and assign the Assigned Contracts that is the subject of the objection.  Under such circumstances, the objecting party's recourse is limited to the funds held in reserve.

20.     The Debtors' decision to assume and assign the Assigned Contracts to the Successful Bidder is subject to Court approval and the consummation of the sale under the Amended and Restated Purchase Agreement or the Successful Bidder's purchase agreement (the "Sale"), as applicable.  Accordingly, absent such Sale, the Assigned Contracts shall not be deemed assumed nor assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.  The inclusion of the Assigned Contracts in the Cure Notice shall not constitute or be deemed to be a determination or admission by the Debtors or the Buyer (or another Successful Bidder) that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

21.     The Assumption Procedures are appropriate and fair to all Contract Counterparties and comply in all respects with the Bankruptcy Code.

22.     If the Auction occurs, then the Debtors shall file with the Court and make available at http://www.kccllc.net/vitro or upon written request to Fulbright & Jaworski

11

L.L.P., Attn: William R. Greendyke, Esq. and Ryan E. Manns, Esq., 2200 Ross Avenue, Suite 2800, Dallas, Texas, 75201, wgreendyke@fulbright.com, rmanns@fulbright.com), a notice of the Successful Bid (the "Supplement") by **12:00 PM (CST), June 2, 2011.** The Supplement shall identify, among other things: (a) the Successful Bidder that presented the highest or otherwise best offer; (b) the Alternative Bidder that presented the second highest or otherwise best offer; (c) the consideration to be paid for the Assets; (d) the Successful Bidder's proposed allocation of the consideration to each respective Debtor, which proposed allocation shall express the Successful Bidder's good faith estimates of that portion of the total consideration (to be paid for the Assets) attributable to each respective Debtor; (e) the Assigned Contracts or leases to be assumed and assigned to the Successful Bidder in connection with the sale of the Assets; (f) liabilities to be assumed by the Successful Bidder in connection with the sale of the Assets (which list of proposed assumed liabilities shall include the name and address of each creditor whose liability is to be assumed, the amount owed to each such creditor, the name of the Debtor who owes each such liability, and the payment priority under the Bankruptcy Code that the Debtors assign each such liability; and (g) copies of the purchase agreements entered into by the Successful Bidder and the Alternative Bidder. The Debtors shall also serve upon the Notice Parties and Contract Counterparties a notice of the filing of the Supplement by **12:00 PM (CST), June 2, 2011.**

23. The Sale Hearing shall be held before the Honorable Judge Harlin D. Hale, United States Bankruptcy Judge for the United States Bankruptcy Court for the Northern District of Texas, Earl Cabell Federal Building, United States Courthouse, 1100 Commerce Street – 14th Floor, Courtroom No. 1, Dallas, Texas, 75242-1496, on **June 9, 2011 at 9:00 a.m. (CST)**. The Sale Hearing may be adjourned by the Debtors, upon consultation with the

Creditors' Committee (which consultation shall occur at least twenty-four hours in advance

of any request for adjournment), without further notice other than by announcement at the

Sale Hearing.

24.     Objections to the entry of the Sale Order shall be in writing, filed and served on or

prior to **June 6, 2011 at 5:00 p.m. (CST)** by (i) the Office of the United States Trustee for

the Northern District of Texas, 1100 Commerce Street, Room 976, Dallas, Texas 75242

(Attn. Mr. George McElreath, Esq. and Ms. Erin Schmidt, Esq.); (ii) Fulbright & Jaworski

LLP, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201 (Attn: William R. Greendyke,

Esq. and Ryan E. Manns, Esq.), attorneys for the Debtors; Akin Gump Strauss Hauer & Feld,

LLP One Bryant Park, New York, New York 10036 (Attn: Michael S. Stamer, Esq. and

Abid Qureshi, Esq.) and 1700 Pacific Avenue, Suite 4100 Dallas, Texas 75082 (Attn: Sarah

Link Schultz, Esq.), attorneys for the Creditors' Committee, (iv) Skadden, Arps, Slate,

Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, Illinois 60606 (Attn: Kimberly A.

deBeers, Esq., Matthew M. Murphy, Esq. and Jonathan G. Pfleeger, Esq.), attorneys for the

Purchaser; and (v) all persons or entities that have requested notice of the proceedings in this

Chapter 11 case (collectively, the "Objection Notice Parties").

25.     The Debtors' sole and exclusive remedy, if any, in connection with a breach by

the Purchaser of the Amended and Restated Purchase Agreement shall be limited to the Good

Faith Deposit (as defined in the Amended and Restated Purchase Agreement), whether at

Law or in equity, for any breach by the Purchaser of the terms and conditions of the

Amended and Restated Purchase Agreement.

26.     To the extent that any chapter 11 plan is confirmed in this case or any order

confirming any such plan or any other order in this case (including any order entered after

any conversion of this case to a case under chapter 7 of the Bankruptcy Code) alters, conflicts with or derogates from the provisions of this Bidding Procedures Order, the provisions of this Bidding Procedures Order shall control.  The Debtors' obligations under this Bidding Procedures Order, the provision of this Bidding Procedures Order and the portions of the Amended and Restated Purchase Agreement pertaining to the Bidding Procedures shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Debtors, and the reorganized or reconstituted debtors, as the case may be, after the effective date of a confirmed plan in the Debtors' case.

27.     Nothing in this Bidding Procedures Order shall be construed as binding any creditor or party in interest to the value allocations (or proposed methodology of the same) contemplated in this order.

28.     Nothing in this Bidding Procedures Order shall be construed as approving or disapproving (or overruling Oldcastle Building Envelope's objections to) the propriety of the stalking horse bid's proposal to assume certain debts.

29.     All rights of IFIC are hereby reserved, including but not limited to, its rights of equitable subrogation, pursuant to applicable law and equity, and the right to object to (i) the final form of the approved Purchase Agreement; (ii) the allocation of the Purchase Price; (iii) the Bidder to be selected; and (iv) any other matter related to any proposed sale.

30.     As provided by Bankruptcy Rule 6004(h), this Bidding Procedures Order shall not be stayed for fourteen days after the entry thereof and shall be effective and enforceable immediately upon entry on this Court's docket.

31.     This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Bidding Procedures Order, including, but not limited to, any matter,

claim or dispute arising from or relating to the Bid Protections, the Bidding Procedures and

the implementation of this Bidding Procedures Order.

# # # END OF ORDER # # #

# EXHIBIT 1

## VITRO AMERICA, LLC

### Bid Procedures

Set forth below are the bid procedures (the "Bid Procedures") to be employed
with respect to the proposed sale (the "Proposed Sale") of assets of Vitro America, LLC, and
certain of its subsidiaries and affiliates f/k/a Vitro America, Inc. ("Vitro America"), Super Sky
Products, Inc. ("Super Sky Products"), Super Sky International, Inc. ("Super Sky International"),
and VVP Finance Corporation ("VVP Finance"), as debtors and debtors-in-possession (the
"Debtors" or the, "Sellers") in the Bankruptcy Court for the Northern District of Texas (the
"Bankruptcy Court," and together with the cases of certain of the Debtors' affiliates, jointly
administered in the Bankruptcy Court under Case No. 11-32600 the "Bankruptcy Cases").  The
Debtors will seek entry of an order from the Bankruptcy Court authorizing and approving the
Proposed Sale to the Proposed Purchaser (defined below) or another Qualified Bidder (defined
below) that are determined to have made the highest or otherwise best offer (the "Sale
Transaction").  Capitalized terms used but not otherwise defined herein shall have the meanings
ascribed to them in the Asset Purchase Agreement (defined below).

### Amended and Restated Purchase Agreement

Vitro America, LLC, and certain of its subsidiaries and affiliates, entered into an
Amended and Restated Asset Purchase Agreement (the "Amended and Restated Purchase
Agreement") with Vitro America Acquisition Corporation (the "Buyer" or "Proposed
Purchaser") to be effective as of May 9, 2011.  Pursuant to the Amended and Restated Purchase
Agreement, the Buyer proposes to acquire free and clear of all pledges, liens, security interests,
encumbrances, claims, charges, options and interests therein or thereon to the maximum extent
permitted by the Bankruptcy Code (collectively, the "Interests"), real and personal, tangible and
intangible property and assets of any kind or nature whatsoever, whether now owned or hereafter
acquired by the Sellers, and all proceeds, rents or profits thereof, including, but not limited to,
cash, accounts receivable, any and all claims and causes of action, all trade names, trademarks,
copyrights, and other intellectual property and license rights owned by the Sellers, but excluding
those certain assets expressly identified as "Excluded Assets" in the Amended and Restated
Purchase Agreement (the "Assets").  Notwithstanding every other provision in the Bid
Procedures Motion, Amended and Restated Purchase Agreement, or herein, to the extent the
Debtors assume and assign any contracts bonded by International Fidelity Insurance Company
("IFIC") to the Buyer, such Buyer will assume all obligations and liabilities pursuant to such
contracts, including liability for work in place, latent defects, warranties, and payments to
subcontractors and suppliers, regardless of when such obligations and liabilities were incurred,
whether before or after the Order for Relief date.

### Bidding Procedures Motion and Order

On April 7, 2011, the Debtors filed a Motion for Entry of an Order (A) Approving
Bidding Procedures and Bidding Protections in Connection with Sale of Certain of the Debtors'
Assets, (B) Establishing Procedures to Determine Cure Amounts and Deadlines for Objections
for Certain Contracts and Leases to be Assumed and Assigned by the Debtors; (C) Scheduling a
Hearing on the Sale Motion; and (D) Granting Related Relief (the "Bidding Procedures

<u>Motion</u>").  The relief requested in the Bidding Procedures Motion, including the Bidding Protections as modified by the announcements of the Proposed Purchaser at the hearing on the Bidding Procedures Motion and as provided in the Amended and Restated Purchase Agreement, was approved and authorized by the Bankruptcy Court by an order entered by the Court on May 9, 2011 (the "<u>Bidding Procedures Order</u>").

## The Bidding Process

The Debtors and their advisors, in consultation with the Pre-Petition Lender (defined below), IFIC, and advisors to the Official Committee of Unsecured Creditors (the "<u>Creditors' Committee</u>") appointed in the Debtors' Bankruptcy Cases shall (i) determine whether any bid for the Assets is a Qualified Bid (defined below), (ii) coordinate the efforts of Qualified Bidders (as defined below) in conducting their due diligence investigations, (iii) receive offers from Qualified Bidders, and (iv) negotiate in good faith any offers made to purchase the Assets (collectively, the "<u>Bidding Process</u>").

## Participation Requirements

Any person interested in receiving confidential information from the Debtors in connection with the Bidding Process (an "<u>Interested Party</u>") must sign a confidentiality agreement satisfactory to the Debtors in consultation with the Creditors' Committee.  Upon execution of the confidentiality agreement and delivery of a statement identifying any parties with whom the Interested Party is participating in the Bidding Process, the Interested Party shall receive, at the Debtors' discretion, a confidential information memorandum.  Upon review of such confidential information memorandum, any Interested Parties that wish to participate further in the Bidding Process will be required to submit a non-binding indication of interest to the Debtors and counsel to the Creditors' Committee.  The indication of interest must contain the following:

(i)     a detailed description of the Interested Party;

(ii)    the assets of the Debtors that the Interested Party wishes to purchase and the amount and form of consideration to be provided;

(iii)   contact information for such Interested Party, and provide full disclosure of all parties participating with the Interested Party, as well as full disclosure of any pre-petition or post-petition affiliation that the Interested Party may have with: (a) the Debtors, (b) the Debtors' affiliates, (c) major creditors of the Debtors, (d) equity security holders of the Debtors and/or (e) any of the Debtors' former officers, directors or other insiders; and

(iv)    sufficient information, as reasonably requested by the Debtors or the Creditors' Committee, to allow the Debtors, after consultation with the Creditors' Committee, to determine that the Interested Party has the financial wherewithal to close the Sale Transaction, including, but not limited to, current audited financial statements (or such other form of financial disclosure and credit quality support or enhancement acceptable

to the Debtors) of the Interested Party or of those entities that will guarantee the obligations of the Interested Party.

(v)     proof of its ability to obtain replacement bonds for each bonded contract to be transferred (and obtain the return of the bonds issued by IFIC and release of IFIC from all liability in connection with such bonds) or provide evidence that IFIC has agreed to allow its bonds to stay in effect (whether IFIC will allow its bonds to stay in effect will be determined by IFIC in its sole and absolute discretion).  IFIC will, at a minimum, require that an indemnity agreement be provided by any buyer in order for any IFIC bonds to remain in place and will further evaluate the financial status of the buyer, ability to complete the work and collateral package offered in making this determination.

Upon receipt of an indication of interest, the Debtors and their advisors and the Creditors' Committee and its advisors will review the indication of interest.  An Interested Party that delivers the documents described in subparagraphs (i) - (v), and that the Debtors, after consultation with the Creditors' Committee, determine is reasonably likely (based on the financial information submitted by the Interested Party, the availability of financing, experience and other considerations deemed relevant by the Debtors) to submit a bona fide offer and to be able to consummate a sale if selected as a Successful Bidder (defined below) shall be allowed to conduct further due diligence including access to the online data room and shall be deemed a potential bidder (a "Potential Bidder").

## Due Diligence

The Debtors shall afford any Potential Bidder reasonable time and the opportunity to conduct reasonable due diligence; provided, however, that the Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (defined below).  The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.  Neither the Debtors nor any of their affiliates (or any of their respective representatives) are obligated to furnish any information to any person other than a Potential Bidder.  If the Debtors provide any due diligence materials to a Potential Bidder, and such materials have not previously been provided to the other Potential Bidders, including the Proposed Purchaser, then the Debtors shall post such materials in a data room and provide email notice of such posting to all Potential Bidders, including the Proposed Purchaser.  Notwithstanding anything herein to the contrary, the Debtors reserve the right to withhold information or restrict access to certain materials in any data room if providing such information or materials to a Potential Bidder will, in the Debtors' business judgment, after consultation with the Creditors' Committee, put the Debtors at a competitive disadvantage.

## Purchase Price Allocation

The Debtors shall file with the Court and serve on the Notice Parties (defined below) a notice of the Debtor's proposed methodology for allocating the purchase price of the Successful Bid (defined below) to each of the Debtors by **5:00 PM (CST), May 16, 2011**.

**Proposed Cure Amounts**

The Debtors shall file with the Court and serve on all parties to executory contracts and unexpired leases subject to assumption and/or assignment (the "Contract Counterparties") and IFIC a notice of proposed cure amounts (the "Cure Notice") by **5:00 PM (CST), May 20, 2011**. Such notice shall also include information advising the Contract Counterparties of when and the location of the electronic dataroom (the "Data Room") where they may obtain information related to (a) which contracts each Qualified Bidder proposes to assume, and (b) adequate assurance of future performance by each Qualified Bidder. The inclusion of contracts on the Cure Notice shall not constitute or be deemed to be a determination or admission by the Debtors or any other party in interest that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved). The Debtors shall consult with the Creditors' Committee regarding the form and substance of the Cure Notice before such notice is filed and served.

**Bid Deadline**

A Potential Bidder that desires to make a bid shall deliver written copies of its bid not later than **3:00 p.m. (CST) on May 20, 2011** (the "Bid Deadline") to each of the following notice parties (the "Notice Parties"): (i) Vitro America, LLC, 965 Ridge Lake Blvd., Suite 300, Memphis, Tennessee 38120 (Attn: Arturo Carrillo), (ii) Fulbright & Jaworski LLP, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201 (Attn: William Greendyke, Esq. and Ryan Manns, Esq.), attorneys for the Debtors, (iii) Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, Illinois 60606 (Attn: Kimberly deBeers, Esq., Matthew Murphy, Esq. and Jonathan G. Pfleeger, Esq.), attorneys for Proposed Purchaser, (iv) Parker, Hudson, Rainer & Dobbs, LLP, 285 Peachtree Center Ave., N.E., 1500 Marquis II Tower, Atlanta, Georgia 30303 (Attn: C. Edward Dobbs, Esq.), attorney for the Pre-Petition Lender; (v) Akin Gump Strauss Hauer & Feld, LLP One Bryant Park, New York, New York 10036 (Attn: Michael S. Stamer, Esq. and Abid Qureshi, Esq.) and 1700 Pacific Avenue, Suite 4100 Dallas, Texas 75082 (Attn: Sarah Link Schultz, Esq.), attorneys for the Creditors Committee; and (viii) Manier & Herod, a Tennessee Professional Corporation, (Attn: Mary Paty Lynn LeVan and Michael E. Collins) 150 4th Avenue North, Suite 2200, Nashville, Tennessee, 37219, counsel for IFIC..

**Bid Requirements**

All bids must include (unless such requirement is waived by the Debtors, after consultation with the Creditors' Committee) the following documents and requirements (the "Bid Requirements"):

- an offer to purchase substantially all of the Assets (or an offer to purchase less than substantially all of the Assets on terms that, in the Debtors' business judgment, are no less favorable than the terms and conditions set forth in the Amended and Restated Purchase Agreement) upon the terms and conditions as substantially set forth in the Amended and Restated Purchase Agreement, including without limitation, with respect to certainty and timing of closing, or upon alternative terms and conditions that the Debtors determine in their

4

reasonable business judgment are no less favorable than the terms and conditions set forth in the Amended and Restated Purchase Agreement;

• if proposing a purchase of all or substantially all of the assets of the Debtors, a purchase price, the value of which is determined by the Debtors to be equal to or greater than the sum of (a) the purchase price set forth in the Amended and Restated Purchase Agreement, (b) the Break-Up Fee (which amount is equal to 1.9% of $44,000,000) and Expense Reimbursement, and (c) $250,000, (the sum of which shall be the "Initial Incremental Bid Amount");

• for the avoidance of doubt, a Potential Bidder's offer may consist of cash and/or other forms of consideration, including, but not limited to, notes or other securities, which other consideration shall be valued for purposes of determining a higher and better offer by the Debtors after consultation with the Creditors' Committee. Notwithstanding the foregoing and any other provision herein or in the Bid Procedures Order:

  o (x) any offer to purchase assets consisting of collateral securing obligations owed to IFIC must be consented to in writing by IFIC in its discretion or consist of a cash portion sufficient in amount to pay (or, in the case of contingent obligations, cash collateralize), the portion of the Purchase Price allocable to assets of Super Sky Products, Inc., the Durham County Subcontract, and any other assets for which IFIC has a first-priority security or other interest; and

  o (y) any offer to purchase Assets consisting of collateral (the "Bank Collateral") securing obligations (collectively, the "Obligations") owed to Bank of America, N.A. (the "Pre-Petition Lender") or Banc of America Leasing & Capital, LLC ("BALC") must be either (i) consented to in writing by the Pre-Petition Lender and BALC in their discretion or (ii) consist of a cash portion sufficient in amount to pay (or, in the case of contingent Obligations, cash collateralize) all Obligations owed by the Debtors to the Pre-Petition Lender or BALC, after first deducting from such cash proceeds the amount of any liens that are senior in priority to the liens of the Pre-Petition Lender and BALC with respect to such Assets, any Break-Up Fee and Expense Reimbursement (to the extent payable prior to the payment in full of the Obligations), any amounts payable to any Court-approved investment banker or other professional for services rendered or expenses incurred in connection with the Auction (to the extent payable prior to the payment in full of the Obligations), and amounts attributable to the Assets of a Debtor which are sold and in which the Pre-Petition Lender and BALC do not have a security interest or lien on or after the Order for Relief Date (such assets being hereinafter referred to as the "Non-Bank Collateral");

- a preliminary, non-binding allocation of the consideration offered in the offer to each of the Debtors (the preliminary, non-binding allocation shall not preclude the Debtors or any party in interest from raising any objection as to the appropriate allocation);

- if proposing a purchase of Assets consisting of Bank Collateral and Non-Bank Collateral, an allocation of the portion of the purchase price that is allocable to the Bank Collateral and the portion that is allocable to the Non-Bank Collateral;

- a letter stating that the Potential Bidder's offer is irrevocable until two (2) business days after the Assets have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court;

- a $2,000,000 good faith deposit ("Good Faith Deposit") that will be held in escrow with the Debtors;

- the offer must not be contingent on financing and must include written evidence of a commitment for financing or other evidence of the ability of the Potential Bidder to consummate the sale satisfactory to the Debtors (after consultation with the Creditors' Committee) with appropriate contact information for any such financing sources;

- written evidence that the Potential Bidder has provided:  (i) proof of the Potential Bidder's ability to obtain replacement bonds for each bonded contract to be transferred (and obtain the return of the bonds of IFIC and has released IFIC from all liability in connection with such bonds); or (ii) written evidence that the Potential Bidder has provided evidence that IFIC has agreed to allow its bonds to stay in effect, which will be determined by IFIC in its sole and absolute discretion;

- a redline comparing the Potential Bidder's proposed purchase agreement against that of the Amended and Restated Purchase Agreement;

- except for the Proposed Purchaser, does not request or entitle the Potential Bidder to a break-up fee, termination fee, expense reimbursement or similar type of payment;

- must not be conditioned on the outcome of due diligence by the Potential Bidder and must include an acknowledgement and representation as described herein that the Potential Bidder had an opportunity to conduct any and all required due diligence prior to making its bid;

- fully discloses the identity of each entity that will be bidding for all or any portion of the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation, including the identification of the Potential Bidder's principal advisors; and

- an agreement to provide to BALC and any other Contract Counterparty that makes a request to the attorneys for the Debtors, not later than five (5) days after the bid deadline, reasonable information relating to such bidder's ability to provide adequate assurances of future performances of the leases[4] in accordance with their terms, including current financial information regarding such bidder and any other person or entity (if any) that such bidder indicates will guarantee payment of, or provide other payment assurances with respect to, the aforementioned leases;

- evidence, in form and substance reasonably satisfactory to the Debtors (after consultation with the Creditors' Committee) of compliance or anticipated compliance with all antitrust and other regulatory approvals, the anticipated time frame for such compliance and any anticipated impediments for obtaining such approvals;

- provide to the Debtors a final list of the Debtors' executory contracts and unexpired leases with respect to which the Potential Bidder seeks assignment from the Debtors by **12:00 PM (CST), May 24, 2011**;

- each bidder, in order to constitute a Qualified Bidder, must provide to the Debtors a final list of the liabilities the bidder proposes to assume under the Sale Transaction by **12:00 PM (CST), May 24, 2011**; and

- the Debtors shall file with the Court and serve on the Contract Counterparties and Notice Parties a notice identifying each Qualified Bidder's final list of the Debtors' executory contracts and unexpired leases with respect to which the Potential Bidder seeks assignment from the Debtors and the liabilities the bidder proposes to assume under the Sale Transaction by **12:00 PM (CST), May 25, 2011**.

A bid received from a Potential Bidder that satisfies all of the Bid Requirements shall be a "Qualified Bid," and at such time the Debtors and their advisors, in consultation with the advisors for the Pre-Petition Lender (as defined below) and the Creditors' Committee, shall designate the Potential Bidder a qualified bidder ("Qualified Bidder").  The Proposed Purchaser is a Qualified Bidder, and the Amended and Restated Purchase Agreement is a Qualified Bid. The Pre-Petition Lender shall be deemed to be a Qualified Bidder (without the requirement of making any deposit or submitting any mark-up of the Amended and Restated Purchase

---

[4] Before the commencement of these cases, BALC, as  lessor, and Vitro America, as lessee entered  into a certain Master Lease Agreement (Number 15486-11500) (the "Master Lease") dated April 29, 2005, together with the following Schedules made a part of, and incorporated into, the Master Lease :
- Schedule to Lease Agreement (Schedule Number 15486-11500-001) dated July 7, 2005;
- Schedule to Lease Agreement (Schedule Number 15486-11500-002) dated December 26, 2005;
- Schedule to Lease Agreement (Schedule Number 15486-11500-003) dated March 6, 2006;
- Schedule to Lease Agreement (Schedule Number 15486-11500-004) dated August 25, 2006;
- Schedule to Lease Agreement (Schedule Number 15486-11500-005) dated October 29, 2007;
- Schedule to Lease Agreement (Schedule Number 15486-11500-006) dated November 21, 2008;

Agreement in its sole discretion), and any credit bid that the Pre-Petition Lender may make shall be deemed a Qualified Bid.

### Break-Up Fee and Expense Reimbursement

If the Debtors accept a Qualified Bid other than a bid of the Proposed Purchaser as the Successful Bid (defined below), then the Debtors shall pay to the Proposed Purchaser as compensation for Proposed Purchaser's efforts in connection with the negotiation and execution of the Amended and Restated Purchase Agreement and the transactions contemplated thereby an amount equal to the Break-Up Fee and Expense Reimbursement due to the Proposed Purchaser pursuant to the terms of the Amended and Restated Purchase Agreement, as approved by the Bankruptcy Court under the Bidding Procedures Order.

### "As Is, Where Is"

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, its agents or its estate except to the extent set forth in the Amended and Restated Purchase Agreement or the purchase agreement of another Successful Bidder. By submitting a bid, the Proposed Purchaser and each other Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or, (i) as to the Proposed Purchaser, as expressly stated in the terms of the sale of the Assets set forth in the Amended and Restated Purchase Agreement and ancillary documents, or (ii) as to another Successful Bidder, as expressly stated in the terms of the sale of the Assets set forth in the applicable purchase agreement and ancillary documents.

### Free of Any And All Interests

Except as otherwise provided in the Amended and Restated Purchase Agreement or another Successful Bidder's purchase agreement, all of the Debtors' right, title and interest in the Assets shall be sold free and clear of all Interests thereon and there against to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Assets with the same validity and priority as such Interests applied against the Assets.

### Auction, Bidding Increments and Bids Remaining Open

If more than one Qualified Bid has been received by the Debtors (in addition to the Amended and Restated Purchase Agreement), the Debtors shall conduct an auction (the "Auction") with respect to the Assets. The Auction shall commence at **9:00 a.m. (CST) June 1, 2011** at Fulbright & Jaworski LLP, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201. The Debtors shall notify all Qualified Bidders that have submitted Qualified Bids of the time of the Auction.

At least one (1) day prior to the Auction, the Debtors shall provide the Proposed Purchaser and all Qualified Bidders with complete copies of all Qualified Bids. The Auction shall be conducted in accordance with the following procedures:

(i)     Only the Debtors, Proposed Purchaser, the Pre-Petition Lender, the Creditors' Committee, counsel for Fintech Investments Ltd., counsel for IFIC (and any additional parties in the Debtors' discretion) and any Qualified Bidders (and the advisors to each of the foregoing) and the advisors to each shall be entitled to attend the Auction and only the Proposed Purchaser and such Qualified Bidders shall be entitled to make any subsequent Qualified Bids at the Auction.

(ii)    At the Auction, all Qualified Bidders shall be permitted to improve their Qualified Bids in accordance with the procedures set forth herein (each, a "Subsequent Bid"). All Subsequent Bids presented during the Auction shall be made and received in one room on an open basis. All participating Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each participating Qualified Bidder shall be fully disclosed to all other Qualified Bidders and that all material terms of each Subsequent Bid presented during the Auction will be fully disclosed to the Proposed Purchaser and all other participating Qualified Bidders throughout the entire Auction.

(iii)   All Qualified Bidders at the Auction must have at least one individual representative with authority to bind such Qualified Bidder present in person at the Auction.

(iv)    All proceedings at the Auction shall be conducted before and transcribed by a court stenographer.

(v)     At least one (1) day prior to the Auction, the Debtors will advise the Proposed Purchaser and all other Qualified Bidders which Qualified Bid the Debtors, in consultation with the Creditors' Committee, have determined in their reasonable business judgment constitutes the then highest or otherwise best offer for the Assets (the "Starting Bid").

(vi)    Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round (a) at least one Subsequent Bid is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid and meets the overbid requirement set forth in paragraph (vii) below, and (b) the Debtors, in consultation with the Creditors' Committee, determine in their reasonable business judgment that a Subsequent Bid is a higher or otherwise better offer than the then current leading Qualified Bid.

(vii)   Bidding at the Auction shall be in increments of $250,000 and shall continue until such time as the highest and best bid is determined by the Debtors in their reasonable business judgment, after consultation with the Creditors' Committee. The Debtors, after consultation with the Creditors' Committee, shall

have the right to modify the bidding increments throughout the course of the Auction. For the purpose of evaluating the value of the consideration provided by each bid (including any Subsequent Bid by the Proposed Purchaser) presented at the Auction, the Debtors may take into consideration, among other things, the financial and contractual terms as well as factors relevant to the sale process, including any issues affecting the speed and certainty of consummating the proposed sale or antitrust or unfair competition issues (including, but not limited to, any inquiries or complaints filed with, or submitted to, Vitro America, LLC or the Department of Justice with respect to a bid).

(viii) After each round of bidding, the Debtors shall announce the Qualified Bid or Subsequent Bid, as the case may be, that the Debtors have determined to be in their reasonable business judgment and after consultation with the Creditors' Committee to be the then highest or otherwise best bid (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has an opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

(ix) At the conclusion of the Auction, the Debtors will announce the Qualified or Subsequent Bid which they, after consultation with the Creditors' Committee, have determined in their reasonable business judgment to be the highest or otherwise best bid (the "Successful Bid" and the entity or entities submitting such Successful Bid, the "Successful Bidder") and such Successful Bid will be submitted to the Court for approval at the Sale Hearing (defined below), along with the second highest and best Qualified Bid (the "Back-Up Bid").

(x) The Debtors shall file with the Court, post in the Data Room and serve on the Contract Counterparties and the Notice Parties a notice of the Successful Bid (the "Supplement") via email or fax and Federal Express overnight delivery by **12:00 PM (CST), June 2, 2011.** The Supplement may be downloaded at http://www.kccllc.net/vitro or obtained from counsel of the Debtors upon written request to Fulbright & Jaworski L.L.P., Attn: William R. Greendyke, Esq. and Ryan E. Manns, Esq., 2200 Ross Avenue, Suite 2800, Dallas, Texas, 75201, wgreendyke@fulbright.com, rmanns@fulbright.com). The Supplement shall identify, among other things: (a) the Successful Bidder; (b) the bidder that presented the Back-Up Bid; (c) the consideration to be paid for the Assets; (d) the Successful Bidder's proposed allocation of the consideration to each of the Assets; (e) the executory contracts or leases to be assumed and assigned to the Successful Bidder in connection with the sale of the Assets; (f) the liabilities to be assumed by the Successful Bidder in connection with the sale of the Assets; and (g) copies of the respective purchase agreement entered into by the Successful Bidder and the Back-Up Bidder.

### Acceptance of Qualified Bids

The Debtors shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after a hearing (the "Sale Hearing"). The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not

constitute the Debtors' acceptance of the Qualified Bid. The Debtors will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Debtors' selection of the Successful Bidder (including the assignment of any of such objector's executory contract or unexpired lease thereto, provided, however, that objection to such assignment on the basis of the cure amount must be made and/or reserved as set forth in any order of the Bankruptcy Court).

### Objection Deadline

Objections to any aspect of the proposed Sale Transaction, including the proposed assumption or assignment of any contract or lease or the proposed cure amounts for any such contract or lease, must be filed with the Court and served on the attorneys for the Debtors, attorneys for the Successful Bidder, attorneys for the Creditors Committee, and attorneys for the Pre-Petition Lender by **5:00 PM (CST), June 6, 2011**.

### Sale Hearing

The Sale Hearing shall be conducted by the Bankruptcy Court at **9:00 AM (CST), June 9, 2011**. Following the approval of the sale of the Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale, the Debtors shall be authorized, but not required, to deem the Back-Up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such bid without further order of the Bankruptcy Court.

### Return of Good Faith Deposit

The Good Faith Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at closing. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until two (2) days after closing of the transactions contemplated by the Successful Bid, and thereafter returned to the respective bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Successful Bidder.

### Modifications

The Debtors, after consultation with the Creditors' Committee, may (i) determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale, or (c) contrary to the best interests of the Debtors, their estates and creditors.

EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| VITRO ASSET CORP., et al., | § | Case No. 11-32600-hdh-11 |
| | § | |
| Alleged Debtors. | § | Jointly Administered |
| | § | |

| | | |
|---|---|---|
| | § | Chapter 11 |
| In re: Vitro America, LLC | § | Case No. 11-32602- hdh-11 |
| | § | |
| In re: Super Sky Products, Inc. | § | Case No. 11-32604- hdh-11 |
| In re: Super Sky International, Inc. | § | Case No. 11-32605- hdh-11 |
| | § | |
| In re: VVP Finance Corporation | § | Case No. 11-32611- hdh-11 |
| | § | |
| Debtors.[1] | § | (Jointly Administered Under |
| | § | Case No. 11-32600- hdh-11) |

**NOTICE OF: (A) AUCTION; (B) FINAL HEARING TO APPROVE THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (C) INTENT TO ASSUME AND ASSIGN CONTRACTS AND LEASES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND THE FIXING OF CURE AMOUNTS; AND (D) DEADLINES FOR FILING OBJECTIONS TO THE PROPOSED SALE, PROPOSED ASSUMPTION AND ASSIGNMENT, AND CURE AMOUNTS**

NOTICE IS HEREBY GIVEN, as follows:

1.      On April 7, 2011, Vitro America, LLC and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors" or "Sellers") filed a motion (the "Motion"),[2] for entry of an order, among other things, (i) approving bidding procedures and bidding protections (the "Bidding Procedures") in connection with the sale  (the "Sale") of substantially all of the Debtors' assets (the "Assets"), (ii) establishing procedures to determine cure amounts (the "Cure Amounts") and deadlines for objections for certain executory contracts and unexpired leases to be assumed and assigned by the Debtors (the "Assigned Contracts"), and (iii) scheduling an auction (the "Auction") for the Sale, and (iv) scheduling a hearing for approval of the Sale (the "Sale Hearing").

2.      On May 9, 2011, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") entered an order (the "Bidding Procedures Order") approving, among other things, the Bidding Procedures and the Sale Hearing schedule.

---

[1] The Debtors are:  Vitro America, LLC  (Case No. 11-32602), Super Sky Products, Inc. (Case No. 11-32604), Super Sky International, Inc. (Case No. 11-32605), and VVP Finance Corporation (Case No. 11-32611).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Amended and Restated Purchase Agreement (as defined below), as applicable.

3. The Sellers and Vitro America Acquisition Corporation (the "Buyer" or "Proposed Purchaser") have entered into that certain asset purchase agreement, dated April 5, 2011, and subsequently amended (the "Amended and Restated Purchase Agreement"), for the Sale of the Assets, whereby the Sellers have agreed to sell the Assets to the Buyer, subject to higher and/or otherwise better offers.

4. As part of the Sale, the Debtors will assume the Assigned Contracts pursuant to section 365 of the Bankruptcy Code and assign it to the Buyer or another Successful Bidder (each as defined in the Bidding Procedures Order) at the Auction, pursuant to the terms of the Amended and Restated Purchase Agreement.

5. The Debtors believe that any and all defaults (other than the filing of these chapter 11 cases) under the Assigned Contracts can be cured by the payment of the Cure Amount. A notice of proposed Cure Amounts will be filed with the Court and served on counterparties to the Assigned Contracts (the "Contract Counterparties") and Notice Parties (as defined in the Bidding Procedures Order) by **5:00 p.m. (CST), May 20, 2011**.

6. A notice of the Assigned Contracts each Qualified Bidder (as defined in the Bidding Procedures Order) intends for the Debtors to assume and assign under the Sale will be filed with the Court and served on the Contract Counterparties and Notice Parties by **12:00 p.m. (CST), May 25, 2011**.

7. A notice of the Debtors' liabilities each Qualified Bidder (as defined in the Bidding Procedures Order) intends to assume under the Sale will be filed with the Court and served on the Contract Counterparties and Notice Parties in the manner required by the Bidding Procedures Order by **12:00 p.m. (CST), May 25, 2011**.

8. Pursuant to the Bidding Procedures Order, if the Sellers receive any higher and/or otherwise better bids for the Assets, the Auction for the Assets shall take place on **June 1, 2011 at 9:00 a.m. (CST)**, at the offices of Fulbright & Jaworski LLP, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201. The Debtors shall notify all qualified bidders ("Qualified Bidders") that have submitted qualified bids ("Qualified Bids") of the time and place of the Auction.

9. Only parties that have submitted a Qualified Bid pursuant to the Bidding Procedures Order may participate in the Auction. A potential bidder that desires to make a bid shall, not later than **3:00 p.m. (CST) on May 20, 2011** (the "Bid Deadline"), deliver written copies of its bid in accordance with the Bidding Procedures to the following parties (the "Sale Notice Parties"): (i) Vitro America, LLC, 965 Ridge Lake Blvd., Suite 300, Memphis, Tennessee 38120 (Attn: Arturo Carrillo), (ii) Fulbright & Jaworski LLP, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201 (Attn: William Greendyke, Esq. and Ryan Manns, Esq.), attorneys for the Debtors, (iii) Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, Illinois 60606 (Attn: Kimberly deBeers, Esq., Matthew Murphy, Esq. and Jonathan G. Pfleeger, Esq.), attorneys for Proposed Purchaser, (iv) Parker, Hudson, Rainer & Dobbs, LLP, 285 Peachtree Center Ave., N.E., 1500 Marquis II Tower, Atlanta, Georgia 30303 (Attn: C. Edward Dobbs, Esq.), attorney for the Pre-Petition Lender; (v) Akin Gump Strauss Hauer & Feld, LLP One Bryant Park, New York, New York 10036 (Attn: Michael S. Stamer, Esq. and Abid Qureshi, Esq.) and 1700 Pacific Avenue, Suite 4100 Dallas, Texas 75082 (Attn: Sarah Link

Schultz, Esq.), attorneys for the Creditors Committee; and (viii) Manier & Herod, a Tennessee Professional Corporation, (Attn: Mary Paty Lynn LeVan and Michael E. Collins) 150 4th Avenue North, Suite 2200, Nashville, Tennessee, 37219, counsel for IFIC.

10.    A notice of the Successful Bid (the "Supplement") will be filed with the Court and made available at http://www.kccllc.net/vitro or upon written request to Fulbright & Jaworski L.L.P., Attn: William R. Greendyke, Esq. and Ryan E. Manns, Esq., 2200 Ross Avenue, Suite 2800, Dallas, Texas, 75201, wgreendyke@fulbright.com, rmanns@fulbright.com), a notice of the Successful Bid (the "Supplement"), by **12:00 PM (CST), June 2, 2011.** The Supplement shall identify, among other things: (a) the Successful Bidder; (b) the bidder that presented the Back-Up Bid; (c) the consideration to be paid for the Assets; (d) the bidder's proposed allocation of the consideration to each of the Assets; (e) the Assigned Contracts to be assumed and assigned to the Successful Bidder in connection with the sale of the Assets; (f) the liabilities to be assumed by the Successful Bidder in connection with the sale of the Assets; and (g) a copy of the purchase agreement entered into by the Successful Bidder and the Back-Up Bidder. The Debtors will also serve upon the Notice Parties and Contract Counterparties a notice of the filing of the Supplement by **12:00 PM (CST), June 2, 2011.**

11.    The Sale Hearing shall be conducted by the Bankruptcy Court on **June 9, 2011 at 9:00 a.m. (CST)** before the Honorable Judge Harlin D. Hale, Earl Cabell Federal Building, United States Courthouse, 1100 Commerce Street – 14th Floor, Courtroom No. 1, Dallas, Texas, 75242-1496. Following the approval of the sale of the Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale, the Debtors shall be authorized, but not required, to deem the next highest or otherwise best Qualified Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such bid without further order of the Court.

12.    At the Sale Hearing, the Sellers shall request that the Court enter an order, authorizing, among other things, the Sale of the Assets held by the Sellers to the Buyer pursuant to the Amended and Restated Purchase Agreement, or authorizing the Sale of the Assets to the Successful Bidder (as defined in the Bidding Procedures Order) following the Auction, respectively.

13.    At the Sale Hearing, the Sellers shall also request that the Court enter an order authorizing the assumption and assignment of the Assigned Contracts to the Buyer or the Successful Bidder and the approval of the Cure Amounts for the Assigned Contracts.

14.    At the Sale Hearing, the Court may enter such orders as it deems appropriate under the applicable law and as required by the circumstances and equities of these chapter 11 cases.

15.    Any objection (an "Objection") to the Sale of the Assets to the Buyer at the Sale Hearing shall be in writing, shall conform to applicable bankruptcy rules, shall set forth the name of the objecting party, the nature and amount of any claims or interest held or asserted against the Sellers' estates or properties, the basis for the Objection and the specific grounds therefor, and

shall be filed with the Court and served so as to be actually received on or before **June 6, 2011 at 5:00 p.m. (CST)** (the "Objection Deadline") upon the Sale Notice Parties.

16.    If an Objection is timely filed, a hearing with respect to that Objection shall be held before the Honorable Judge Harlin D. Hale, Earl Cabell Federal Building, United States Courthouse, 1100 Commerce Street – 14th Floor, Courtroom No. 1, Dallas, Texas, 75242-1496, at the Sale Hearing.

17.    Any objections to the Debtors' assumption and assignment of the Assigned Contracts or the amount asserted as the Cure Amount (each, an "Assumption and/or Cure Objection") must be in writing and set forth with specificity the nature of the objection and the cure amount that the objecting party believes should be paid in connection with the assumption of the Assigned Contracts (the "Claimed Cure Amount").

18.    If a party objects to approval of the assumption and assignment of the Assigned Contracts to the Buyer or Successful Bidder at the Sale Hearing, to be considered a timely Assumption and/or Cure Objection, such objection must be filed with the Court and served so as to be actually received on or before the Objection Deadline upon the Sale Notice Parties.

19.    If an Assumption and/or Cure Objection is timely filed, a hearing with respect to that Objection shall be held before the Honorable Judge Harlin D. Hale, Earl Cabell Federal Building, United States Courthouse, 1100 Commerce Street – 14th Floor, Courtroom No. 1, Dallas, Texas, 75242-1496, at the Sale Hearing.

20.    Unless the Assumption and/or Cure Objection is timely filed and served, the assumption and assignment of the Assigned Contracts by the Debtors will proceed without further notice following the Sale Hearing.

21.    Parties that fail to file and serve timely Assumption and/or Cure Objections shall be deemed to have waived and released any and all rights to assert Cure Amounts different from those listed on the Cure Notice, and shall be forever barred and estopped from asserting or claiming against the Debtors, the Buyer or Successful Bidder, or any assignee of the Assigned Contracts that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied, under the Assigned Contracts.

22.    If no Cure Amount is due under the Assigned Contracts and the counterparties to the Assigned Contracts do not otherwise object to the Debtors' assumption and assignment of the Assigned Contracts, no further action need be taken on the part of such non-debtor parties.

23.    Assumption and/or Cure Objections that object solely to the Cure Amount may not prevent or delay the Debtors' assumption and assignment of the Assigned Contracts.  If a party objects solely to a Cure Amount, the Debtors may, in their sole discretion, hold the claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties. So long as the Debtors hold the claimed Cure Amount in reserve, and there are no other unresolved objections to assumption and assignment, the Debtors can, without further delay, assume and assign the Assigned Contracts that is the subject of the objection.   Under such circumstances, the objecting party's recourse is limited to the funds held in reserve.

24.    The Debtors' decision to assume and assign the Assigned Contracts to the Buyer or the Successful Bidder is subject to Court approval and the closing of the Amended and Restated Purchase Agreement or the Successful Bidder's purchase agreement (the "Closing"). Accordingly, absent such Closing, the Assigned Contracts shall not be deemed assumed nor assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.  The inclusion of the Assigned Contracts in the Cure Notice shall not constitute or be deemed to be a determination or admission by the Debtors or the Buyer (or another Successful Bidder) that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

25.    A copy of the Amended and Restated Purchase Agreement, the Bidding Procedures Order, notices referenced herein (within a reasonable time of their filing with the Court), and other documents related to the Sale and the above-captioned bankruptcy cases, may be downloaded at http://www.kccllc.net/vitro or obtained from counsel for the Debtors upon written request to Fulbright & Jaworski L.L.P., Attn: William R. Greendyke, 2200 Ross Avenue, Suite 2800, Dallas, Texas, 75201, wgreendyke@fulbright.com.

Dated: May _____, 2011                    Respectfully submitted,

By:    /s/ William R. Greendyke
Louis R. Strubeck, Jr. (SBT 19425600)
William R. Greendyke (SBT 08390450)
Ryan E. Manns (SBT 24041391)
Gregory M. Wilkes (SBT 24047105)
Camisha L. Simmons (SBT 24056328)
Elizabeth N. Boydston (SBT 24053684)
Fulbright & Jaworski L.L.P
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

**ATTORNEYS FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION**

**Exhibit A**

**Cure Schedule for the Assigned Contracts**

| Debtor(s) | Counterparty Name and Address | Description of Agreement | Cure Amount |
|---|---|---|---|
| | | | |

**EXHIBIT D**

**SALE ORDER**

**EXHIBIT E**

**ASSIGNMENT AND BILL OF SALE**

**EXHIBIT E**

## <u>ASSIGNMENT AND BILL OF SALE</u>

This ASSIGNMENT AND BILL OF SALE, dated as of June [_], 2011 (this "<u>Bill of Sale</u>"), by and among Vitro America, LLC ("Vitro America"), a Delaware limited liability company and certain subsidiaries of Vitro America (together with Vitro America, "Sellers"), and American Glass Enterprises, LLC, a Delaware limited liability company ("<u>Buyer</u>").

## W I T N E S S E T H

WHEREAS, Buyer and Sellers have entered into an Asset Purchase Agreement (as the same may be amended, modified or supplemented from time to time, the "<u>Asset Purchase Agreement</u>"), dated as of June 8, 2011;

WHEREAS, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement;

WHEREAS, pursuant to the Asset Purchase Agreement, Sellers have agreed to sell, assign, convey, transfer and deliver the Purchased Assets to Buyer, and Buyer has agreed to purchase or be assigned and assume the Purchased Assets upon the terms and subject to the conditions of the Asset Purchase Agreement;

WHEREAS, the parties desire to carry out the intent and purpose of the Asset Purchase Agreement by Sellers' execution and delivery to Buyer of this instrument evidencing the vesting in Buyer of the Purchased Assets, subject to the provisions of the Asset Purchase Agreement; and

WHEREAS, Sellers shall execute and deliver as of the date hereof (i) the Copyright Assignment, (ii) the Domain Name Assignment, (iii) the Patent Assignment, and (iv) the Trademark Assignment (collectively, the "<u>Other Transfer Documents</u>");

NOW, THEREFORE, in consideration of the promises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

<u>Section 1</u>.  As of the date hereof, Sellers, pursuant to the Asset Purchase Agreement and on the same terms and conditions as stated therein, hereby convey, grant, sell, transfer, assign, and deliver unto Buyer and its successors and assigns forever all of Sellers' right, title and interest, in and to the Purchased Assets (other than those Purchased Assets sold, conveyed, transferred, assigned and delivered pursuant to the Other Transfer Documents) (the "<u>Bill of Sale Acquired Assets</u>"), free and clear of all Encumbrances (other than Permitted Encumbrances, except for those Permitted Encumbrances that are to be expunged and discharged pursuant to the Sale Order), subject to the provisions of the Asset Purchase Agreement.  As of the date hereof, Buyer hereby accepts the foregoing sale and assignment.  Sellers expressly do not convey, grant, sell, transfer, assign, or deliver unto Buyer any asset that is an Excluded Asset.

Section 2.  The Sellers hereby irrevocably designate, make, constitute and appoint Buyer, its successors and assigns, as the Sellers' true and lawful attorney (and agent-in-fact), with full power of substitution, in the Sellers' name and stead, on behalf of and for the benefit of Buyer, its successors and assigns, to: (a) demand and receive any and all of the Bill of Sale Acquired Assets and to give receipts and releases for and in respect of the Bill of Sale Acquired Assets, or any part thereof, (b) from time to time institute and prosecute in the Sellers' name, at the sole expense and for the benefit of Buyer, its successors and assigns, any and all proceedings at law, in equity or otherwise, which Buyer, its successors and assigns, may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to any item of the Bill of Sale Acquired Assets, to defend or compromise any and all actions, suits or proceedings in respect of any item of the Bill of Sale Acquired Assets, and to do all such acts and things in relation thereto as Buyer shall deem advisable, including, without limitation, for the collection or reduction to possession of any of the Bill of Sale Acquired Assets, (c) endorse Sellers' name on any payment, instrument, notice or other similar document or agreement relating to the Bill of Sale Acquired Assets for the period commencing with the date hereof that may come in to the possession of Buyer or under Buyer's control with respect to the Bill of Sale Acquired Assets and (d) collect the moneys which become due and payable at any time on or after the date hereof under every Bill of Sale Acquired Asset.  Sellers acknowledge that the foregoing powers are coupled with an interest and shall be irrevocable by Sellers.

Section 3.  The Sellers hereby covenant that, from time to time after the delivery of this instrument, at Buyer's request, the Sellers will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, without further consideration, such further acts, conveyances, documents, transfers, assignments, powers of attorney and assurances as Buyer may reasonably require to convey, transfer to and vest in Buyer, and to put Buyer in possession of, any of the Bill of Sale Acquired Assets, and to obtain the full benefit of this Bill of Sale.  In order that the full value of every Bill of Sale Acquired Asset may be realized by and for the benefit of Buyer, its successors and assigns, the Sellers covenant and agree with Buyer that the Sellers, and their respective successors and assigns, will, at the request of Buyer, and under the direction and in the name of Buyer or otherwise as Buyer shall specify and as shall be provided by law, from and after the date hereof, cooperate in the enforcement of every right created by or relating to every Bill of Sale Acquired Asset and facilitate the collection of moneys which become due and payable at any time on or after the date hereof in and under every Bill of Sale Acquired Asset; and the Sellers do hereby covenant to hold in trust for and promptly pay over to Buyer, its successors and assigns, all moneys or things of value collected by or paid to Sellers and their respective successors or assigns, in respect of amounts which become due and payable on or after the date hereof under every Bill of Sale Acquired Asset.

Section 4.  Nothing in this instrument, express or implied, is intended or shall be construed to confer upon, or give to, any Person other than Buyer and its respective successors and permitted assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or conditions hereof, and all the terms, covenants

2

and conditions, promises and agreements contained in this instrument shall be for the sole and exclusive benefit of Buyer and its respective successors and assigns.

Section 5.  Subject to the terms of Section 11.4 of the Asset Purchase Agreement, this Bill of Sale shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, effective immediately upon its delivery to Buyer.

Section 6.  Nothing contained in this Bill of Sale shall in any way supersede, modify, replace, amend, change, rescind, expand, exceed or enlarge or in any way affect the provisions, including the warranties, covenants, agreements, conditions, rights, remedies, or obligations of Sellers or Buyer set forth in the Asset Purchase Agreement.  Notwithstanding anything contained herein to the contrary, in the event of any inconsistency between the terms set forth herein and the terms set forth in the Asset Purchase Agreement, the terms set forth in the Asset Purchase Agreement shall control.

Section 7.  This Bill of Sale shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflicts of law rules of such state.

Section 8. Any provision of this Bill of Sale may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Bill of Sale, or in the case of a waiver, by the party against whom the waiver is to be effective.

Section 9.  This Bill of Sale may be executed in one or more counterparts, all of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  In proving this Bill of Sale, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

Section 10.  The terms set forth in Article 11 of the Asset Purchase Agreement are incorporated by reference herein, except that, as applicable, any and all references in said Article 11 to "this Agreement" shall mean and refer to this Bill of Sale.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned has caused this Bill of Sale to be executed by the signature of its duly authorized officer as of the date above first written.

**BUYER:**

**AMERICAN GLASS ENTERPRISES, LLC**

By: _____

Name: _____

Title: _____

**SELLERS:**

**VVP HOLDINGS, LLC**

By: _____

Name: _____

Title: _____

**VITRO AMERICA, LLC**

By: _____

Name: _____

Title: _____

**SUPER SKY INTERNATIONAL, INC.**

By: _____

Name: _____

Title: _____

**SUPER SKY PRODUCTS, INC.**

By: _____

Name: _____

Title: _____

**[Signature Page to Assignment and Bill of Sale]**

**VVP Funding Corporation**

By: _____

Name: _____

Title: _____


**VVP Finance Corporation**

By: _____

Name: _____

Title: _____

**[Signature Page to Assignment and Bill of Sale]**

# EXHIBIT F

## ASSIGNMENT OF PATENTS

## PATENT ASSIGNMENT

This PATENT ASSIGNMENT (this "Assignment") is made as of June [_], 2011, by and among Vitro America, LLC ("Vitro America"), a Delaware limited liability company and those affiliates of Vitro America that are signatories hereto (together with Vitro America, "Assignors"), and American Glass Enterprises, LLC, a Delaware limited liability company ("Assignee").

**WHEREAS,** Assignors and Assignee have entered into an Asset Purchase Agreement dated as of June 8, 2011 (as the same may be amended, modified or supplemented from time to time, the "Asset Purchase Agreement");

**WHEREAS,** capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement;

**WHEREAS,** pursuant to the Asset Purchase Agreement, Assignors have agreed to sell, transfer, assign, convey, and deliver the Purchased Assets to Assignee, and Assignee has agreed to purchase or be assigned and assume, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title and interest of Assignors in, to or under the Purchased Assets upon the terms and subject to the conditions of the Asset Purchase Agreement; and

**WHEREAS,** pursuant to the Asset Purchase Agreement, Assignors wish to sell, transfer, assign, convey and deliver to Assignee, and Assignee wishes to purchase and acquire from Assignors, free and clear of all Encumbrances(other than Permitted Encumbrances), all of Assignors' right, title and interest in, to or under all Patents owned, leased, licensed, used or held for use in, or relating to, the Business, including but not limited to the issued Patents and Patent applications set forth on Schedule A attached hereto (collectively, the "Assigned Patents").

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

Assignors hereby sell, transfer, assign, convey and deliver to Assignee, and its successors, assigns, and legal representatives, their entire right, title and interest in and to the Assigned Patents, including any reissues, divisions, continuations, continuations-in-part, reexaminations, extensions, and foreign equivalents thereof, and all other corresponding rights that are or may be secured under the laws of the United States or any foreign country, now or hereafter in effect, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignors if this Assignment had not been made, together with all income, royalties, damages, claims, and payments with respect thereto due or payable as of the Closing Date or thereafter, and in and to all causes of action, including, without limitation, all causes of action (either in law or equity) and claims for damages by reason of past, present or future infringement, dilution or other unauthorized use of the Assigned Patents, with the right to sue for, and collect the same for Assignee's own use and enjoyment and for the use and enjoyment of its successors, assigns or other legal representatives.

Section 2.6 of the Asset Purchase Agreement is hereby incorporated herein by reference. In the event of a conflict between the terms and conditions of the Asset Purchase Agreement and

the terms and conditions of this Assignment, the terms and conditions of the Asset Purchase Agreement shall control.

Assignors hereby authorize and request the Commissioner of Patents and Trademarks, and the corresponding entities or agencies in any applicable foreign countries, to record Assignee as the assignee and owner of the entire right, title and interest in and to the Assigned Patents, including any reissues, divisions, continuations, continuations-in-part, reexaminations, extensions, and foreign equivalents thereof.

*    *    *    *    *

**IN WITNESS WHEREOF,** Assignors and Assignee have caused this Assignment to be executed by their duly authorized representatives effective as of the Closing Date.

ASSIGNEE:

AMERICAN GLASS ENTERPRISES, LLC

By: _____

Name: _____

Title: _____

ASSIGNORS:

VVP HOLDINGS, LLC

By: _____

Name: _____

Title: _____

VITRO AMERICA, LLC

By: _____

Name: _____

Title: _____

SUPER SKY INTERNATIONAL, INC.

By: _____

Name: _____

Title: _____

[Signature Page to Patent Assignment]

SUPER SKY PRODUCTS, INC.

By: _____

Name: _____

Title: _____


VVP FUNDING CORPORATION

By: _____

Name: _____

Title: _____


VVP FINANCE CORPORATION

By: _____

Name: _____

Title: _____


**[Signature Page to Patent Assignment]**

STATE OF               )
                                     ) SS.

COUNTY OF          )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Assignee.

_____
Notary Public


STATE OF               )
                                     ) SS.

COUNTY OF          )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of VVP Holdings, LLC.

_____
Notary Public


STATE OF               )
                                     ) SS.

COUNTY OF          )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Vitro America, LLC.

_____
Notary Public

**[Patent Assignment]**

STATE OF                            )
                                      ) SS.
COUNTY OF                      )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Super Sky International, Inc.

_____
Notary Public

STATE OF                            )
                                      ) SS.
COUNTY OF                      )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Super Sky Products, Inc.

_____
Notary Public

STATE OF                            )
                                      ) SS.
COUNTY OF                      )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of VVP Funding Corporation.

_____
Notary Public

**[Patent Assignment]**

STATE OF                          )
                                  ) SS.
COUNTY OF                         )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of VVP Finance Corporation.

_____
Notary Public

**SCHEDULE A**

**PATENTS**

| Assignor | Description | Registration No. | Date | Country |
|----------|-------------|------------------|------|---------|
| Super Sky Products, Inc. | Skylight-Framework | 5,092,087 | 03/03/92 | USA |
| Super Sky Products, Inc. | ENCASED SKYLIGHT FRAMEWORK | 5,291,705 | 03/08/94 | USA |
| Super Sky Products, Inc. | PANEL CONNECTION SYSTEM | 6,088,978 | 07/18/00 | USA |

**EXHIBIT G**

**ASSIGNMENT OF TRADEMARKS**

## TRADEMARK ASSIGNMENT

This TRADEMARK ASSIGNMENT (this "Assignment") is made as of June [_], 2011, by and among Vitro America, LLC ("Vitro America"), a Delaware limited liability company and those affiliates of Vitro America that are signatories hereto (together with Vitro America, "Assignors"), and American Glass Enterprises, LLC, a Delaware limited liability company ("Assignee").

**WHEREAS**, Assignors and Assignee have entered into an Asset Purchase Agreement dated as of June 8, 2011 (as the same may be amended, modified or supplemented from time to time, the "Asset Purchase Agreement");

**WHEREAS**, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement;

**WHEREAS**, pursuant to the Asset Purchase Agreement, Assignors have agreed to sell, transfer, assign, convey, and deliver the Purchased Assets to Assignee, and Assignee has agreed to purchase or be assigned and assume, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title and interest of Assignors in, to or under the Purchased Assets upon the terms and subject to the conditions of the Asset Purchase Agreement; and

**WHEREAS**, pursuant to the Asset Purchase Agreement, Assignors wish to sell, transfer, assign, convey and deliver to Assignee, and Assignee wishes to purchase and acquire from Assignors, free and clear of all Encumbrances (other than Permitted Encumbrances), all of Assignors' right, title and interest in, to or under all Trademarks owned, leased, licensed, used or held for use in, or relating to, the Business, including but not limited to the Trademark registrations and Trademark applications set forth on Schedule A attached hereto (collectively, the "Assigned Trademarks").

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

Assignors hereby sell, transfer, assign, convey and deliver to Assignee, and its successors, assigns, and legal representatives their entire right, title and interest in and to the Assigned Trademarks, for the United States and for all foreign countries, including, without limitation, any registrations and applications therefor, any renewals and extensions of the registrations, all goodwill associated therewith or symbolized thereby, and all other corresponding rights that are or may be secured under the laws of the United States or any foreign country, now or hereafter in effect, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignors if this Assignment had not been made, together with all income, royalties, damages, claims, and payments with respect thereto due or payable as of the Closing Date or thereafter, and in and to all causes of action, including, without limitation, all causes of action (either in law or equity) and claims for damages by reason of past, present or future infringement, dilution or other unauthorized use of the Assigned Trademarks, with the right to sue for, and collect the same for Assignee's own use and enjoyment and for the use and enjoyment of its successors, assigns or other legal representatives.

Section 2.6 of the Asset Purchase Agreement is hereby incorporated herein by reference. In the event of a conflict between the terms and conditions of the Asset Purchase Agreement and the terms and conditions of this Assignment, the terms and conditions of the Asset Purchase Agreement shall control.

Assignors hereby authorize and request the Commissioner of Patents and Trademarks, and the corresponding entities or agencies in any applicable foreign countries, to record Assignee as the assignee and owner of the entire right, title and interest in and to the Assigned Trademarks.

*    *    *    *    *

IN WITNESS WHEREOF, Assignors and Assignee have caused this Assignment to be executed by their duly authorized representatives effective as of the Closing Date.

ASSIGNEE:

AMERICAN GLASS ENTERPRISES, LLC

By: _____

Name: _____

Title: _____


ASSIGNORS:

VVP HOLDINGS, LLC

By: _____

Name: _____

Title: _____


VITRO AMERICA, LLC

By: _____

Name: _____

Title: _____


SUPER SKY INTERNATIONAL, INC.

By: _____

Name: _____

Title: _____


**[Signature Page to Trademark Assignment]**

SUPER SKY PRODUCTS, INC.


By: _____

Name: _____

Title: _____



VVP FUNDING CORPORATION


By: _____

Name: _____

Title: _____


VVP FINANCE CORPORATION


By: _____

Name: _____

Title: _____

STATE OF                        )
                                ) SS.
COUNTY OF                       )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Assignee.

_____
Notary Public


STATE OF                        )
                                ) SS.
COUNTY OF                       )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of VVP Holdings, LLC.

_____
Notary Public


STATE OF                        )
                                ) SS.
COUNTY OF                       )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Vitro America, LLC.

_____
Notary Public


**[Trademark Assignment]**

STATE OF                   )
                                      ) SS.

COUNTY OF                )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Super Sky International, Inc.

_____
Notary Public

STATE OF                   )
                                      ) SS.

COUNTY OF                )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Super Sky Products, Inc.

_____
Notary Public

STATE OF                   )
                                      ) SS.

COUNTY OF                )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of VVP Funding Corporation.

_____
Notary Public

**[ Trademark Assignment]**

STATE OF                                    )
                                            ) SS.
COUNTY OF                                   )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of VVP Finance Corporation.


_____
Notary Public

## SCHEDULE A

## TRADEMARKS

| Assignor | Description | Registration Number | Issue Date | Country |
|---|---|---|---|---|
| VVP Finance Corporation | ACI Distribution (with design) | 2,103,016 | 10/7/1997 | USA |
| VVP Finance Corporation | Binswanger Glass (with design) | 1,669,313 | 12/24/1991 | USA |
| VVP Finance Corporation | Binswanger Mirror (with design) | 1,669,460 | 12/24/1991 | USA |
| VVP Finance Corporation | Scargard | 1,960,132 | 03/05/1996 | USA |
| Super Sky Products, Inc. | Super Sky and design | 843,096 | 01/30/1968 | USA |
| Super Sky Products, Inc. | S-Super Sky and design | 2,963,179 | 06/21/2005 | USA |
| Super Sky Products, Inc. | Super Sky | 1,545,397 | 06/27/1989 | USA |
| Super Sky Products, Inc. | Super Sky | 1,589,066 | 04/17/1995 | Argentina |
| Supr Sky Products, Inc. | Super Sky | A 488351 | 06/02/1988 | Australia |
| Supr Sky Products, Inc. | Super Sky | TMA 361361 | 10/27/1989 | Canada |
| Supr Sky Products, Inc. | Super Sky | 1,528,706 | 02/28/2001 | People's Republic of China |
| Super Sky Products, Inc. | The Edge Max | 2,540,825 | 02/19/2002 | USA |
| VVP Finance Corporation | M-Pactsafe | 3,248,268 | 05/29/2007 | USA |
| Super Sky Products, Inc. | The Edge | 2,457,777 | 06/5/2001 | USA |
| Supr Sky Products, Inc. | Super Sky | 816033331 | 06/09/1992 | Brazil |
| *To Come* | Super Sky | B06461/1995 | 06/07/1988 | Hong Kong |
| Vitro America, LLC | Envision the possibilities | 3,604,051 | 04/07/2009 | USA |
| Vitro America, LLC | Envision | 3,719,517 | 12/01/2009 | USA |
| Vitro America, LLC | E-Glaze | 3,706,471 | 11/03/2009 | USA |
| Vitro America, LLC | Energyglaze | 3,706,473 | 11/03/2009 | USA |
| Vitro America, LLC | Heatpro | 3,709,900 | 11/10/2009 | USA |
| *Pending Trademark Applications* | | | | |
| Vitro America, LLC | Structural Integrity Entrances | Pending trademark app. 85-181241 | 11/19/2010 | USA |
| Vitro America, LLC | Sound Safe | Pending trademark app. 85-120954 | 09/01/2010 | USA |
| Vitro America, LLC | Classic Line | Pending trademark app. 85-181228 | 11/19/2010 | USA |

# EXHIBIT H

## ASSIGNMENT OF COPYRIGHTS

**EXHIBIT H**

## COPYRIGHT ASSIGNMENT

This COPYRIGHT ASSIGNMENT (this "Assignment") is made as of June 17, 2011, by and among Vitro America, LLC ("Vitro America"), a Delaware limited liability company and those affiliates of Vitro America that are signatories hereto (together with Vitro America, "Assignors"), and American Glass Enterprises, LLC, a Delaware limited liability company ("Assignee").

WHEREAS, Assignors and Assignee have entered into an Asset Purchase Agreement dated as of June 8, 2011 (as the same may be amended, modified or supplemented from time to time, the "Asset Purchase Agreement");

WHEREAS, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement;

WHEREAS, pursuant to the Asset Purchase Agreement, Assignors have agreed to sell, transfer, assign, convey, and deliver the Purchased Assets to Assignee, and Assignee has agreed to purchase or be assigned and assume, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title and interest of Assignors in, to or under the Purchased Assets upon the terms and subject to the conditions of the Asset Purchase Agreement; and

WHEREAS, pursuant to the Asset Purchase Agreement, Assignors wish to sell, transfer, assign, convey and deliver to Assignee, and Assignee wishes to purchase and acquire from Assignors, free and clear of all Encumbrances (other than Permitted Encumbrances), all of Assignors' right, title and interest in, to or under all Copyrights owned, leased, licensed, used or held for use in, or relating to, the Business, including but not limited to the Copyright registrations and applications set forth on Schedule A attached hereto (collectively, the "Assigned Copyrights").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

Assignors hereby sell, transfer, assign, convey and deliver to Assignee, and its successors, assigns, and legal representatives their entire right, title, and interest in and to the Assigned Copyrights, for the United States and for all foreign countries, whether or not copyright registration is secured, including, without limitation, any registrations and applications therefor, any renewals and extensions thereof, and in and to all works based upon, derived from, or incorporating the Assigned Copyrights, and in and to all income, royalties, damages, claims, and payments with respect thereto due or payable as of the Closing Date or thereafter, and in and to all causes of action, including, without limitation, all causes of action (either in law or equity) and claims for damages by reason of past, present or future infringement, dilution or other unauthorized use of the Assigned Copyrights, with the right to sue for, and collect the same for Assignee's own use and enjoyment and for the use and enjoyment of its successors, assigns or other legal representatives, and in and to all rights corresponding to the foregoing throughout the world, and all the rights embraced therein, including but not limited to, the right to duplicate, reproduce, copy, distribute, display, license, adapt, and prepare derivative works from the Assigned Copyrights, together with all physical or tangible embodiments of the Assigned Copyrights, in Assignors' possession or under Assignors' control, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns or other legal

representatives, as fully and entirely as the same would have been held and enjoyed by Assignors if this Assignment had not been made.

Section 2.6 of the Asset Purchase Agreement is hereby incorporated herein by reference. In the event of a conflict between the terms and conditions of the Asset Purchase Agreement and the terms and conditions of this Assignment, the terms and conditions of the Asset Purchase Agreement shall control.

Assignors hereby authorize and request the Register of Copyrights of the United States, and the corresponding entities or agencies in any applicable foreign country, to record Assignee as the assignee and owner of the entire right, title, and interest in and to the Assigned Copyrights.

*    *    *    *    *

IN WITNESS WHEREOF, Assignors and Assignee have caused this Assignment to be executed by their duly authorized representatives effective as of the Closing Date.

ASSIGNEE:

AMERICAN GLASS ENTERPRISES, LLC

By: _____

Name: _____

Title: _____

ASSIGNORS:

VVP HOLDINGS, LLC

By: _____

Name: _____

Title: _____

VITRO AMERICA, LLC

By: _____

Name: _____

Title: _____

TROPER SERVICES, INC.

By: _____

Name: _____

Title: _____

**[Signature Page to Copyright Assignment]**

SUPER SKY INTERNATIONAL, INC.

By: _____

Name: _____

Title: _____


SUPER SKY PRODUCTS, INC.

By: _____

Name: _____

Title: _____


VVP FUNDING CORPORATION

By: _____

Name: _____

Title: _____


VVP FINANCE CORPORATION

By: _____

Name: _____

Title: _____


**[Signature Page to Copyright Assignment]**

STATE OF                )
                                   ) SS.

COUNTY OF          )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Assignee.

_____
Notary Public


STATE OF                )
                                   ) SS.

COUNTY OF          )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of VVP Holdings, LLC.

_____
Notary Public


STATE OF                )
                                   ) SS.

COUNTY OF          )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Vitro America, LLC.

_____
Notary Public

STATE OF                          )
                                     ) SS.

COUNTY OF                   )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Super Sky International, Inc.

_____
Notary Public

STATE OF                          )
                                       ) SS.

COUNTY OF                   )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Super Sky Products, Inc.

_____
Notary Public

STATE OF                          )
                                       ) SS.

COUNTY OF                   )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of VVP Funding Corporation.

_____
Notary Public

**[Copyright Assignment]**

STATE OF                           )

                                             ) SS.

COUNTY OF                     )

On this _____ day of _____, there appeared before me _____, personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of VVP Finance Corporation.

_____
Notary Public

**[Copyright Assignment]**

# SCHEDULE A

## COPYRIGHTS

| COPYRIGHTS | | | |
|---|---|---|---|
| **Holder** | **Description** | **Registration No.** | **Date** |
| Vitro America, LLC | Metal: No. 3, Doors and Frames | Pau002932699 | 2004 |
| Vitro America, LLC | Metal: No. 4, Doors and Frames Hardware | Pau002932702 | 2004 |
| VVP Finance Corporation | Industrial Training Video-Backing and Parking | PAU2-417-455 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Bloodborne Pathogens | PAU2-417-439 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Breakdowns | PAU2-417-450 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-City and Highway Driving | PAU2-417-452 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Drug Use and Abuse | PAU2-417-451 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Electrical Hazards | PAU2-417-461 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Eye Care | PAU2-417-448 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Fire Extinguisher Training | PAU2-417-444 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Fire Prevention | PAU2-417-464 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Foot Protection | PAU2-417-440 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Forklift Safety | PAU2-417-462 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Hazard Communications | PAU2-417-469 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Hazard Recognition | PAU2-417-463 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Hearing Protection | PAU2-417-466 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Heat Can Kill | PAU2-417-468 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Housekeeping | PAU2-417-441 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Night Driving | PAU2-417-447 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Overhead Crane Inspection | PAU2-417-446 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Portable Hand and Power Tools | PAU2-417-465 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Preventing Slips, Trips, and Falls | AU2-417-443 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Road Rage | PAU2-417-467 | 2/22/2001 |
| VVP Finance Corporation | Industrial Training Video-Safety Checklist | PAU2-417-442 | 2/22/2001 |
| **UNREGISTERED COPYRIGHTS** | | | |
| VVP Finance Corporation | Web Address:  VVP-ACI.COM | | |

# EXHIBIT I

## ASSIGNMENT OF DOMAIN NAMES

Exhibit I-1

**EXHIBIT I**

# DOMAIN NAME ASSIGNMENT

This DOMAIN NAME ASSIGNMENT (this "Assignment") is made as of June [_], 2011, by and among Vitro America, LLC ("Vitro America"), a Delaware limited liability company and those affiliates of Vitro America that are signatories hereto (together with Vitro America, "Assignors"), and American Glass Enterprises, LLC, a Delaware limited liability company ("Assignee").

**WHEREAS,** Assignors and Assignee have entered into an Asset Purchase Agreement dated as of June 8, 2011 (as the same may be amended, modified or supplemented from time to time, the "Asset Purchase Agreement");

**WHEREAS,** capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement;

**WHEREAS,** pursuant to the Asset Purchase Agreement, Assignors have agreed to sell, transfer, assign, convey, and deliver the Purchased Assets to Assignee, and Assignee has agreed to purchase or be assigned and assume, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title and interest of Assignors in, to or under the Purchased Assets upon the terms and subject to the conditions of the Asset Purchase Agreement; and

**WHEREAS,** pursuant to the Asset Purchase Agreement, Assignors wish to sell, transfer, assign, convey and deliver to Assignee, and Assignee wishes to purchase and acquire from Assignors, free and clear of all Encumbrances (other than Permitted Encumbrances), all of assignors' right, title and interest in, to or under all Domain Names owned, leased, licensed, used or held for use in, or relating to, the Business, including but not limited to the Domain Names set forth on Schedule A attached hereto (the "Assigned Domain Names").

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

Assignors do hereby assign to Assignee their entire right, title and interest in, to and under the Assigned Domain Names.

Assignors agree to cooperate with Assignee to transfer the Assigned Domain Names electronically from each Assignor's account to Assignee's account as quickly as reasonably practicable (such that Assignee will be listed as the registrant of the Assigned Domain Name in the WHOIS database).  Assignors further agree: (i) to complete, execute, notarize (as necessary) and deliver at any future date any additional documents that are reasonably necessary to perfect Assignee's ownership of the Assigned Domain Names including, but not limited to, any transfer documents required by a domain name registrar; and (ii) to generally provide all further cooperation, including taking such further action and executing such additional documents, which Assignee, or its successors, assigns or other legal representatives reasonably request to secure, obtain or enforce proper protection for the Assigned Domain Names and all associated rights in the United States or any other country or jurisdiction.

Section 2.6 of the Asset Purchase Agreement is hereby incorporated herein by reference. In the event of a conflict between the terms and conditions of the Asset Purchase Agreement and the terms and conditions of this Assignment, the terms and conditions of the Asset Purchase Agreement shall control.

Assignors authorize and request Network Solutions, LLC and/or any other applicable registration authority to transfer the Assigned Domain Name from Assignors to Assignee.

*    *    *    *    *

**IN WITNESS WHEREOF**, Assignors and Assignee have caused this Assignment to be executed by their duly authorized representatives effective as of the Closing Date.

ASSIGNEE:

AMERICAN GLASS ENTERPRISES, LLC

By: _____

Name: _____

Title: _____

ASSIGNORS:

VVP HOLDINGS, LLC

By: _____

Name: _____

Title: _____

VITRO AMERICA, LLC

By: _____

Name: _____

Title: _____

SUPER SKY INTERNATIONAL, INC.

By: _____

Name: _____

Title: _____

**[Signature Page to Domain Names Assignment]**

SUPER SKY PRODUCTS, INC.


By: _____

Name: _____

Title: _____


VVP FUNDING CORPORATION


By: _____

Name: _____

Title: _____


VVP FINANCE CORPORATION


By: _____

Name: _____

Title: _____


**[Signature Page to Domain Names Assignment]**

STATE OF                             )
                                       ) SS.
COUNTY OF                          )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Assignee.

_____
Notary Public

STATE OF                             )
                                       ) SS.
COUNTY OF                          )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of VVP Holdings, LLC.

_____
Notary Public

STATE OF                             )
                                       ) SS.
COUNTY OF                          )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Vitro America, LLC.

_____
Notary Public

**[Domain Names Assignment]**

STATE OF _____ )
                          ) SS.
COUNTY OF _____ )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Super Sky International, Inc.

                                        _____
                                        Notary Public



STATE OF _____ )
                          ) SS.
COUNTY OF _____ )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of Super Sky Products, Inc.

                                        _____
                                        Notary Public



STATE OF _____ )
                          ) SS.
COUNTY OF _____ )

On this _____ day of _____, there appeared before me _____,
personally known to me, who acknowledged that he signed the foregoing Assignment as his
voluntary act and deed on behalf and with full authority of VVP Funding Corporation.

                                        _____
                                        Notary Public

**[Domain Names Assignment]**

STATE OF                     )
                                  ) SS.
COUNTY OF                )

On this _____ day of _____, there appeared before me _____, personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of VVP Finance Corporation.

_____
Notary Public

## SCHEDULE A

## DOMAIN NAMES

| DOMAIN NAMES | | | |
|---|---|---|---|
| **Holder** | **Description** | **Date** | **Country** |
| Vitro America, LLC | www.acidistribution.asia | 08/27/2009 | Asia |
| Vitro America, LLC | www.acidistribution.cn | 08/27/2009 | Asia |
| Vitro America, LLC | www.acidistribution.com.cn | 08/27/2009 | Asia |
| Vitro America, LLC | vitroamerica.cn | 01/15/2010 | China |
| Vitro America, LLC | vitromarica.com.cn | 01/15/2010 | China |
| Vitro America, LLC | vitroamerica.net.cn | 01/15/2010 | China |
| Vitro America, LLC | vitroamerica.org.cn | 01/15/2010 | China |
| Vitro America, LLC | vitroamerica.asia | 12/18/2009 | Asia |
| Vitro America, LLC | vitroamerica.hk | 12/18/2009 | Hong Kong |
| Vitro America, LLC | vitroamerica.tw | 12/18/2009 | Taiwan |
| Vitro America, LLC | vabsc.com | 04/11/2011 | USA |
| Vitro America, LLC | vitroap.com | 01/10/2011 | USA |
| Vitro America, LLC | vitroap.net | 01/10/2011 | USA |
| Vitro America, LLC | vitroenvision.com | 01/10/2011 | USA |
| Vitro America, Inc. | vitroglasscentral.com | 12/27/2007 | USA |
| Vitro America, Inc. | vitroamerica.com | 05/24/2002 | USA |
| Vitro America, Inc. | vitroamerica.info | 03/17/2003 | USA |
| Vitro America, Inc. | vitroamericacorporate.com | 12/13/2007 | USA |
| Vitro America, Inc. | binswangerglass.com | 07/29/1997 | USA |

# EXHIBIT J

## PRICE ADJUSTMENT ESCROW AGREEMENT

# PRICE ADJUSTMENT ESCROW AGREEMENT

THIS PRICE ADJUSTMENT ESCROW AGREEMENT (as the same may be amended or modified from time to time pursuant hereto, this ("Agreement") is made and entered into as of June [_], 2011, by and among American Glass Enterprises, LLC, a Delaware limited liability company ("Buyer"), and Vitro America LLC, a Delaware limited liability company, ("Seller", and together with Buyer, sometimes referred to individually as "Party" or collectively as the "Parties"), and JPMorgan Chase Bank, National Association (the "Escrow Agent").

**WHEREAS**, in connection with Sections 3.2 and 3.3 of that certain Underlying Agreement (defined below), the Parties have agreed to deposit in escrow certain funds and wish such deposit to be subject to the terms and conditions set forth herein.

**NOW THEREFORE**, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.      **Appointment.**  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2.      **Fund.**  Buyer agrees to deposit with the Escrow Agent the sum of $ _____ (the "Escrow Deposit"). The Escrow Agent shall hold the Escrow Deposit and, subject to the terms and conditions hereof, shall invest and reinvest the Escrow Deposit and the proceeds thereof (the "Fund") as directed in Section 3.

3.      **Investment of Fund.**  During the term of this Agreement, the Fund shall be invested in a JPMorgan Money Market Deposit Account ("MMDA") or a successor or similar investment offered by the Escrow Agent, unless otherwise instructed in writing by the Parties and as shall be acceptable to the Escrow Agent.  MMDA have rates of compensation that may vary from time to time based upon market conditions.  Instructions to make any other investment ("Alternative Investment") must be in writing and shall specify the type and identity of the investments to be purchased and/or sold.  The Escrow Agent is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity.  The Escrow Agent or any of its affiliates may receive compensation with respect to any Alternative Investment directed hereunder including without limitation charging any applicable agency fee in connection with each transaction.  The Parties recognize and agree that the Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of moneys held in the Fund or the purchase, sale, retention or other disposition of any investment described herein. The Escrow Agent shall not have any liability for any loss sustained as a result of any investment in an investment made pursuant to the terms of this Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Parties to give the Escrow Agent instructions to invest or reinvest the Fund.  The Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Agreement.

Market values, exchange rates and other valuation information (including without limitation, market value, current value or notional value) of any Alternative Investment furnished in any report or statement may be obtained from third party sources and is furnished for the exclusive use of the Parties.  Escrow Agent has no responsibility whatsoever to determine the market or other value of any Alternative Investment and makes no representation or warranty, express or implied, as to the accuracy of any such valuations or that any values necessarily reflect the proceeds that may be received on the sale of an Alternative Investment.

4.      **Disposition and Termination.**  The Escrow Agent shall hold the Fund until the Escrow Agent receives (i) joint written instructions from both the Buyer and the Seller instructing the Escrow Agent with respect to the disbursement of the Fund in accordance with Section 3.3(b) of the Underlying Agreement (defined below) ("Written Direction") or (ii) a final written order of the United States Bankruptcy Court for the Northern District of Texas or other court of competent jurisdiction indicating the manner in which the funds are to be disbursed among the Buyer and Seller (a "Final Order"), accompanied by a written opinion of counsel attesting to the finality of the Final Order, in which case the Escrow Agent shall disburse the Fund in accordance with the Written Direction or Final Order.

The Escrow Agent will disburse the Fund only in accordance with this Section 4.   Upon delivery of the Fund by the Escrow Agent, this Agreement shall terminate, subject to the provisions of Section 8(b).

5.        **Escrow Agent**. (a)   The Escrow Agent shall have only those duties as are specifically and expressly provided herein and no other duties shall be implied.   The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, including without limitation the Asset Purchase Agreement, dated as of June 8, 2011, among Seller and Buyer and the other parties thereto (the "Underlying Agreement")**,** nor shall the Escrow Agent be required to determine if any person or entity has complied with any Underlying Agreement, nor shall any additional obligations of the Escrow Agent be inferred from the terms of any Underlying Agreement, even though reference thereto may be made in this Agreement.  In the event of any conflict between the terms and provisions of this Agreement, those of the Underlying Agreement**,** any schedule or exhibit attached to this Agreement, or any other agreement among the Parties, the terms and conditions of this Agreement shall control.   The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any written notice, document, instruction or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper Party or Parties without inquiry and without requiring substantiating evidence of any kind.   The Escrow Agent shall not be liable to any Party, any beneficiary or other person for refraining from acting upon any instruction setting forth, claiming, containing, objecting to, or related to the transfer or distribution of the Fund, or any portion thereof, unless such instruction shall have been delivered to the Escrow Agent in accordance with Section 11 below and the Escrow Agent has been able to satisfy any applicable security procedures as may be required thereunder. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request.   The Escrow Agent shall have no duty to solicit any payments which may be due it or the Fund, including, without limitation, the Escrow Deposit nor shall the Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder.

(b)  The Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that a final adjudication of a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss to either Party.  The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents.  The Escrow Agent may consult with counsel, accountants and other skilled persons to be selected and retained by it.  The Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in accordance with, or in reliance upon, the advice or opinion of any such counsel, accountants or other skilled persons.  In the event that the Escrow Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be given a direction in writing by the Parties which eliminates such ambiguity or uncertainty to the satisfaction of Escrow Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction.   The Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same.  Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

6.        **Succession.** (a)   The Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving thirty (30) days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect.  If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the Parties hereto.  Escrow Agent's sole responsibility after such thirty (30) day notice period expires shall be to hold the Fund (without any obligation to reinvest the same) and to deliver the same to a designated substitute escrow agent, if any, or in accordance with the directions of a final order or judgment of a court of competent jurisdiction, at which time of delivery Escrow Agent's obligations hereunder shall cease and terminate, subject to the provisions of Section 8(b).  In accordance with Section 8(b) below, the Escrow Agent shall have the right to withhold an amount equal to any amount due and owing to the Escrow Agent, plus any costs and expenses the Escrow Agent shall reasonably believe may be incurred by the Escrow Agent in connection with the termination of this Agreement.

2

(b)      Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business may be transferred, shall be the Escrow Agent under this Agreement without further act.

7.      **Compensation and Reimbursement.**  The Parties agree that expenses shall be borne equally by Seller and Buyer (a) to pay the Escrow Agent upon execution of this Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder, which unless otherwise agreed in writing shall be as described in Schedule 2 attached hereto, and (b) to pay or reimburse the Escrow Agent upon request for all expenses, disbursements and advances, including, without limitation reasonable attorney's fees and expenses, incurred or made by it in connection with the performance, modification and termination of this Agreement.  The obligations set forth in this Section 7 shall survive the resignation, replacement or removal of the Escrow Agent or the termination of this Agreement.

8.      **Indemnity.**  (a) The Parties shall jointly and severally indemnify, defend and save harmless the Escrow Agent and its affiliates and their respective successors, assigns, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, costs or expenses (including, without limitation, the fees and expenses of outside counsel and experts and their staffs and all expense of document location, duplication and shipment)(collectively "Losses"), arising out of or in connection with (i) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except in the case of any Indemnitee to the extent that such Losses are finally adjudicated by a court of competent jurisdiction to have been primarily caused by the gross negligence or willful misconduct of such Indemnitee, or (ii) its following any instructions or other directions, whether joint or singular, from the Parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof.  The indemnity obligations set forth in this Section 8(a) shall survive the resignation, replacement or removal of the Escrow Agent or the termination of this Agreement.

(b) The Parties hereby grant the Escrow Agent a lien on, right of set-off against and security interest in, the Fund for the payment of any claim for indemnification, fees, expenses and amounts due to the Escrow Agent or an Indemnitee.  In furtherance of the foregoing, the Escrow Agent is expressly authorized and directed, but shall not be obligated, to charge against and withdraw from the Fund for its own account or for the account of an Indemnitee any amounts due to the Escrow Agent or to an Indemnitee under either Sections 6(a), 7 or 8(a) of this Agreement.

9.      **Patriot Act Disclosure/Taxpayer Identification Numbers/Tax Reporting.**

(a) **Patriot Act Disclosure.**  Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, the Parties acknowledge that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm the Parties identity including without limitation name, address and organizational documents ("identifying information"). The Parties agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

(b) **Certification and Tax Reporting.**  The Parties have provided the Escrow Agent with their respective fully executed Internal Revenue Service ("IRS") Form W-8, or W-9 and/or other required documentation.  All interest or other income earned under this Agreement shall be allocated to the Seller and reported, as and to the extent required by law, by the Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income earned from the Escrow by the Seller whether or not said income has been distributed during such year.  Escrow Agent shall withhold any taxes it deems appropriate in the absence of proper tax documentation or as required by law, and shall remit such taxes to the appropriate authorities. The Parties hereby represent and warrant to the Escrow Agent that such underlying transaction does not constitute an installment sale requiring any tax reporting or withholding of imputed interest or original issue discount to the IRS or other taxing authority; provided, further, if the transaction is entitled to installment sale treatment pursuant to the applicable laws, the Seller hereby covenants to elect to cause the transaction not to be treated as an installment sale.

3

10.     **Notices.**  All communications hereunder shall be in writing and except for communications from the Parties setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of funds, including but not limited to funds transfer instructions (all of which shall be specifically governed by Section 11 below), shall be deemed to be duly given after it has been received if it is sent or served:

> (a) by facsimile;

> (b) by overnight courier; or

> (c) by prepaid registered mail, return receipt requested;

to the appropriate notice address set forth below or at such other address as any party hereto may have furnished to the other parties in writing.

| | |
|---|---|
| If to Buyer | American Glass Enterprises, LLC<br>c/o Sun Capital Partners, Inc.<br>5200 Town Center Circle, Suite 600<br>Boca Raton, FL 33486<br>Tel.: (561) 394-0550<br>Fax: (561) 394-0540<br>Attn: Jason Neimark, Aaron Wolfe and C. Deryl Couch |

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Tel. : (312) 862-2000
Fax: (312) 862-2200
Attn: Douglas C. Gessner, P.C., Patrick J. Nash, Jr., and Jeremy S. Liss

| | |
|---|---|
| If to Seller | 965 Ridge Lake Boulevard, Suite 300<br>Memphis, TN  38120<br>Attn: Arturo Carrillo<br>Tel.: (901) 767-7111<br>Fax: (901) 682-3062 |

| | |
|---|---|
| If to the Escrow Agent | JPMorgan Chase Bank, N.A.<br>712 Main Street, 5th Floor South<br>Houston, Texas  77002<br>Attn: Lori Knight, Escrow Services<br>Fax No.: 713-216-6927 |

Notwithstanding the above, in the case of communications delivered to the Escrow Agent, such communications shall be deemed to have been given on the date received by an officer of the Escrow Agent or any employee of the Escrow Agent who reports directly to any such officer at the above-referenced office.  In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.  For purposes of this Agreement, "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which the Escrow Agent located at the notice address set forth above is authorized or required by law or executive order to remain closed.

11.     **Security Procedures.**  Notwithstanding anything to the contrary as set forth in Section 10, any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of funds, including but not limited to any such funds transfer instructions that may otherwise be set forth in a written instruction permitted pursuant to Section 4 of this Agreement, may be given to the Escrow Agent only by confirmed

facsimile and no instruction for or related to the transfer or distribution of the Fund, or any portion thereof, shall be deemed delivered and effective unless the Escrow Agent actually shall have received such instruction by facsimile at the number provided to the Parties by the Escrow Agent in accordance with Section 10 and as further evidenced by a confirmed transmittal to that number.

(a) In the event funds transfer instructions are received by the Escrow Agent by facsimile, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule 1 hereto, and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated. The persons and telephone numbers for call-backs may be changed only in a writing actually received and acknowledged by the Escrow Agent. If the Escrow Agent is unable to contact any of the authorized representatives identified in Schedule 1, the Escrow Agent is hereby authorized both to receive written instructions from and seek confirmation of such instructions by telephone call-back to any one or more of Seller's or Buyer's executive officers, ("Executive Officers"), as the case may be, which shall include the titles of Vice President, as the Escrow Agent may select. Such "Executive Officer" shall deliver to the Escrow Agent a fully executed incumbency certificate, and the Escrow Agent may rely upon the confirmation of anyone purporting to be any such officer. The Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Seller or Buyer to identify (i) the beneficiary, (ii) the beneficiary's bank, or (iii) an intermediary bank. The Escrow Agent may apply any of the Fund for any payment order it executes using any such identifying number, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated.

(b) Seller acknowledges that the Escrow Agent is authorized to use the following funds transfer instructions to disburse any funds due to Seller under this Agreement without a verifying call-back as set forth in Section 11(a) above:

Seller's Bank account information:                Bank name:
                                                Bank Address:
                                               ABA number:
                                               Account name:
                                             Account number:

Buyer acknowledges that the Escrow Agent is authorized to use the following funds transfer instructions to disburse any funds due to Buyer under this Agreement without a verifying call-back as set forth in Section 11(a) above:

Buyer's Bank account information:               Bank name:
                                                 Bank Address:
                                             ABA number:
                                              Account name:
                                             Account number:

(c) The Parties acknowledge that the security procedures set forth in this Section 11 are commercially reasonable.

12.     **Compliance with Court Orders.** In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, entity, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

13.     **Miscellaneous.** Except for change to funds transfer instructions as provided in Section 11, the provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by the Escrow Agent and the Parties. Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by the Escrow Agent or any Party, except as provided in Section 6, without the prior consent of the Escrow Agent and the other parties. This Agreement shall be governed by and construed under the laws of the State

of New York. Each Party and the Escrow Agent irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of New York. To the extent that in any jurisdiction either Party may now or hereafter be entitled to claim for itself or its assets, immunity from suit, execution attachment (before or after judgment), or other legal process, such Party shall not claim, and it hereby irrevocably waives, such immunity. Each Party and the Escrow Agent further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement. No party to this Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Agreement may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. A person who is not a party to this Agreement shall have no right to enforce any term of this Agreement. The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written. Except as expressly provided in Section 8 above, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

**BUYER**

By:_____

Name:_____

Title: _____

**SELLER**

By:_____

Name:_____

Title: _____

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**

**as Escrow Agent**

By:_____

Name:_____

Title: _____

**SCHEDULE 1**

**Telephone Number(s) and authorized signature(s) for**
**Person(s) Designated to give Funds Transfer Instructions**

If from Buyer:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |

If from Seller:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |

**Telephone Number(s) for Call-Backs and**
**Person(s) Designated to Confirm Funds Transfer Instructions**

If from Buyer:

| | Name | Telephone Number |
|---|---|---|
| 1. | _____ | _____ |
| 2. | _____ | _____ |
| 3. | _____ | _____ |

If from Seller:

| | Name | Telephone Number |
|---|---|---|
| . | _____ | _____ |
| 2. | _____ | _____ |
| 3. | _____ | _____ |

SCHEDULE 2

# J.P.Morgan

## Schedule of Fees for Escrow Agent Services

Based upon our current understanding of your proposed transaction, our fee proposal is as follows:

**Account Acceptance Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . …...**$ Waived**
Encompassing review, negotiation and execution of governing documentation, opening of the account, and completion of all due diligence documentation.  Payable upon closing.

**Annual Administration Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **$ 2,500.00**
The Administration Fee covers our usual and customary ministerial duties, including record keeping, distributions, document compliance and such other duties and responsibilities expressly set forth in the governing documents for each transaction. Payable upon closing and annually in advance thereafter, without pro-ration for partial years.

### Extraordinary Services and Out-of Pocket Expenses
Any additional services beyond our standard services as specified above, and all reasonable out-of-pocket expenses including attorney's or accountant's fees and expenses will be considered extraordinary services for which related costs, transaction charges, and additional fees will be billed at the Bank's then standard rate.  Disbursements, receipts, investments or tax reporting exceeding 25 items per year may be treated as extraordinary services thereby incurring additional charges. The Escrow Agent may impose, charge, pass-through and modify fees and/or charges for any account established and services provided by the Escrow Agent, including but not limited to, transaction, maintenance, balance-deficiency, and service fees and other charges, including those levied by any governmental authority.

### Disclosure & Assumptions
- Please note that the fees quoted are based on a review of the transaction documents provided and an internal due diligence review. JPMorgan reserves the right to revise, modify, change and supplement the fees quoted herein if the assumptions underlying the activity in the account, level of balances, market volatility or conditions or other factors change from those used to set our fees.

- The escrow deposit shall be continuously invested in a JPMorgan Chase Bank money market deposit account ("MMDA") or a JPMorgan Chase Bank Cash Compensation account. MMDA and Cash Compensation Accounts have rates of compensation that may vary from time to time based upon market conditions.  The Annual Administration Fee would include a supplemental charge up to 25 basis points on the escrow deposit amount if another investment option were to be chosen.

- The Parties acknowledge and agree that they are permitted by U.S. law to make up to six (6) pre-authorized withdrawals or telephonic transfers from an MMDA per calendar month or statement cycle or similar period.  If the MMDA can be accessed by checks, drafts, bills of exchange, notes and other financial instruments ("Items"), then no more than three (3) of these six (6) transfers may be made by an Item.  The Escrow Agent is required by U.S. law to reserve the right to require at least seven (7) days notice prior to a withdrawal from a money market deposit account.

- Payment of the invoice is due upon receipt.

### Compliance
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account.  We may ask for information that will enable us to meet the requirements of the Act.

**EXHIBIT K**

**GENERAL RELEASE**

**EXHIBIT K**

## <u>GENERAL RELEASE OF CLAIMS AGREEMENT</u>

This GENERAL RELEASE OF CLAIMS AGREEMENT (the "<u>Release</u>") is executed as of June [_], 2011, by Vitro, S.A.B. de C.V. ("Parent"), [Insert any other appropriate entity that deals with Vitro America and its subsidiaries] (each a "<u>Parent Subsidiary</u>" and collectively, "<u>Parent Subsidiaries</u>"), in favor of American Glass Enterprises, LLC, a Delaware limited liability company ("<u>Buyer</u>").

### W I T N E S S E T H

**WHEREAS,** Parent and Parent Subsidiaries want to induce Buyer to enter into that certain Asset Purchase Agreement dated as of June 8, 2011 (as the same may be amended, modified or supplemented from time to time, the "<u>Asset Purchase Agreement</u>"), pursuant to which Buyer has agreed to purchase substantially all of the assets and assume certain specified liabilities of the Business, and certain subsidiaries of Parent that are a party thereto have agreed to sell to Buyer substantially all of the assets and certain specified liabilities of the Business, in each case subject to the terms and conditions of the Asset Purchase Agreement;

**WHEREAS,** pursuant to Sections 4.4(a) and 9.2(i) of the Asset Purchase Agreement, the execution and delivery by each Seller of this Release is a condition precedent to the consummation of the transactions contemplated by the Asset Purchase Agreement;

**WHEREAS,** the Sellers have guaranteed certain obligations of Parent and Parent Subsidiaries;

**WHEREAS,** Parent and each Parent Subsidiary has made an independent and informed decision that the transactions contemplated by this Release are in its best interests; and

**WHEREAS,** capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants between the parties, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned agrees as follows:

1. **<u>Release.</u>**  In order to induce Buyer to enter into the Asset Purchase Agreement and to consummate the transactions contemplated thereby, effective as of the Closing Date, Parent and each of the Parent Subsidiaries hereby remises, releases and forever discharges, and by these presents do for their respective subsidiaries (direct or indirect), and for themselves and their respective predecessors, successors, affiliates and assigns (each, a "<u>Releasor</u>"), remise, release and forever discharge, Buyer and each of its respective predecessors, Affiliates, subsidiaries (direct or indirect), successors, assigns, participants, officers, managers, directors, shareholders, members, partners, employees or agents (each, a "<u>Released Party</u>"), of and from all manner of claims or actions at law or equity, all causes of action for damages, costs, debts, sums of money, accounts, bills, rights of indemnity, breach of contract, provision of labor or materials, loss of use, loss of services, expenses, compensation, consequential or punitive damages, equitable subordination, avoidance of preferential or fraudulent transfers, or any other liability or

thing whatever, whether or not now known, claimed or suspected, which any Releasor ever had or now has against any of the Released Parties and which may have arisen prior to the Closing Date or by virtue of actions taken, actions omitted to be taken or the occurrence of any other event prior to the Closing Date (collectively, "Causes of Action").

2.   **No Assignment of Claims.**  Each Releasor hereby represents to the Released Parties that such Releasor (a) has not assigned any Causes of Action or possible Causes of Action against any Released Party, (b) fully intends to release all Causes of Action against the Released Parties including, without limitation, unknown and contingent Causes of Action, and (c) has consulted with respect to the execution and delivery of this Release and has been fully apprised of the consequences hereof.

3.   **Covenant Not to Sue.**  Each Releasor covenants and agrees not to institute any litigation, lawsuit, claim or action against any of the Released Parties with respect to the released Causes of Action.

4.   **Adequacy of Information.**  Each Releasor hereby represents and warrants that he has access to adequate information regarding the terms of the Asset Purchase Agreement and the scope and effect of the general release set forth herein, and all other matters encompassed by this Release, to make an informed and knowledgeable decision with regard to entering into this Release.

5.   **Sufficiency of Consideration.**  Each Releasor acknowledges and agrees that the obligations of the Released Parties pursuant to the Asset Purchase Agreement and the Transition Services Agreement and the covenants contained therein provide good and sufficient consideration for every promise, duty, release, obligation, agreement and right contained in this Release.

6.   **Law Governing; Dispute Resolution.**  This Release, and all claims and disputes arising in connection with this Release, or the negotiation, breach, termination, performance or validity hereof or the transactions contemplated hereby, shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of law rules of such State.

7.   **Interpretation.**  Each party has been represented by counsel in connection with this Release and each provision of this Release shall be interpreted and construed as if it were equally and jointly drafted by the parties hereto.

8.   **Entire Agreement.**  This Release contains the entire understanding and agreement between and among the parties with respect to the subject matter hereof.  No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any party with respect to the subject matter of this Release.  All prior or contemporaneous conversations, negotiations, proposed agreements and agreements, or representations, covenants and warranties with respect to the subject matter hereof are merged herein, waived, superseded and replaced in total by this Release.

IN WITNESS WHEREOF, each of the undersigned have caused this Release to be duly executed by the signature of its duly authorized officer as of the date first written above.

**RELEASORS:**

**VITRO, S.A.B. DE C.V.**

By: _____

Name: _____

Title: _____


**[●]**

By: _____

Name: _____

Title: _____

**[●]**

By: _____

Name: _____

Title: _____

**[●]**

By: _____

Name: _____

Title: _____

[Signature Page to the Release]

# EXHIBIT L

# DEPOSIT ESCROW AGREEMENT

Exhibit L-1

## DEPOSIT ESCROW AGREEMENT

THIS DEPOSIT ESCROW AGREEMENT (as the same may be amended or modified from time to time pursuant hereto, this ("Agreement") is made and entered into as of May 19, 2011, by and among American Glass Enterprises, LLC, a Delaware corporation ("Buyer"), and Vitro America LLC, a Delaware limited liability company, ( "Seller", and together with Buyer, sometimes referred to individually as "Party" or collectively as the "Parties"), and JPMorgan Chase Bank, National Association (the "Escrow Agent").

**WHEREAS,** the Parties have agreed to deposit in escrow certain funds and wish such deposit to be subject to the terms and conditions set forth herein.

**NOW THEREFORE,** in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.      **Appointment.**  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2.      **Fund.**  Buyer agrees to deposit with the Escrow Agent the sum of $2,000,000 (the "Escrow Deposit"). The Escrow Agent shall hold the Escrow Deposit and, subject to the terms and conditions hereof, shall invest and reinvest the Escrow Deposit and the proceeds thereof (the "Fund") as directed in Section 3; provided, however, that any amount over $2,000,000 shall accrue for the benefit of Buyer.

3.      **Investment of Fund.**  During the term of this Agreement, the Fund shall be invested in a JPMorgan Money Market Deposit Account ("MMDA") or a successor or similar investment offered by the Escrow Agent, unless otherwise instructed in writing by the Parties and as shall be acceptable to the Escrow Agent. MMDA have rates of compensation that may vary from time to time based upon market conditions. Instructions to make any other investment ("Alternative Investment") must be in writing and shall specify the type and identity of the investments to be purchased and/or sold. The Escrow Agent is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. The Escrow Agent or any of its affiliates may receive compensation with respect to any Alternative Investment directed hereunder including without limitation charging any applicable agency fee in connection with each transaction. The Parties recognize and agree that the Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of moneys held in the Fund or the purchase, sale, retention or other disposition of any investment described herein. The Escrow Agent shall not have any liability for any loss sustained as a result of any investment in an investment made pursuant to the terms of this Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Parties to give the Escrow Agent instructions to invest or reinvest the Fund. The Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Agreement.

Market values, exchange rates and other valuation information (including without limitation, market value, current value or notional value) of any Alternative Investment furnished in any report or statement may be obtained from third party sources and is furnished for the exclusive use of the Parties. Escrow Agent has no responsibility whatsoever to determine the market or other value of any Alternative Investment and makes no representation or warranty, express or implied, as to the accuracy of any such valuations or that any values necessarily reflect the proceeds that may be received on the sale of an Alternative Investment.

4.      **Disposition and Termination.**  The Escrow Agent shall hold the Fund until the Escrow Agent receives (i) joint written instructions from both the Buyer and the Seller instructing the Escrow Agent with respect to the disbursement of the Fund ("Written Direction") or (ii) a final written order of the United States Bankruptcy Court for the Northern District of Texas or other court of competent jurisdiction indicating the manner in which the funds are to be disbursed among the Buyer and Seller (a "Final Order"), accompanied by a written opinion of counsel attesting to the finality of the Final Order, in which case the Escrow Agent shall disburse the Fund in accordance with the Written Direction or Final Order. The Escrow Agent will disburse the Fund only in accordance with this Section 4.    Upon delivery of the Fund by the Escrow Agent, this Agreement shall terminate, subject to the

provisions of Section 8(b). The Buyer and Seller agree to give Written Direction to the Escrow Agent to release any amount over $2,000,000 to the Buyer in accordance with Buyer's instructions.

5.      **Escrow Agent**. (a)  The Escrow Agent shall have only those duties as are specifically and expressly provided herein and no other duties shall be implied.  The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, including without limitation the proposed Asset Purchase Agreement, to be dated on or about June 1, 2011, among Seller and Buyer and the other parties thereto (the "Underlying Agreement"), nor shall the Escrow Agent be required to determine if any person or entity has complied with any Underlying Agreement or any other agreement or order, nor shall any additional obligations of the Escrow Agent be inferred from the terms of any Underlying Agreement or any other agreement or order, even though reference thereto may be made in this Agreement.  In the event of any conflict between the terms and provisions of this Agreement, those of the Underlying Agreement, any schedule or exhibit attached to this Agreement, or any other agreement among the Parties, the terms and conditions of this Agreement shall control.  The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any written notice, document, instruction or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper Party or Parties without inquiry and without requiring substantiating evidence of any kind.  The Escrow Agent shall not be liable to any Party, any beneficiary or other person for refraining from acting upon any instruction setting forth, claiming, containing, objecting to, or related to the transfer or distribution of the Fund, or any portion thereof, unless such instruction shall have been delivered to the Escrow Agent in accordance with Section 11 below and the Escrow Agent has been able to satisfy any applicable security procedures as may be required thereunder. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request.  The Escrow Agent shall have no duty to solicit any payments which may be due it or the Fund, including, without limitation, the Escrow Deposit nor shall the Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder.

(b) The Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that a final adjudication of a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss to either Party.  The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents.  The Escrow Agent may consult with counsel, accountants and other skilled persons to be selected and retained by it.  The Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in accordance with, or in reliance upon, the advice or opinion of any such counsel, accountants or other skilled persons.  In the event that the Escrow Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be given a direction in writing by the Parties which eliminates such ambiguity or uncertainty to the satisfaction of Escrow Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction.  The Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same.  Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

6.     **Succession.** (a) The Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving thirty (30) days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect. If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the Parties hereto. Escrow Agent's sole responsibility after such thirty (30) day notice period expires shall be to hold the Fund (without any obligation to reinvest the same) and to deliver the same to a designated substitute escrow agent, if any, or in accordance with the directions of a final order or judgment of a court of competent jurisdiction, at which time of delivery Escrow Agent's obligations hereunder shall cease and terminate, subject to the provisions of Section 8(b). In accordance with Section 8(b) below, the Escrow Agent shall have the right to withhold an amount equal to any amount due and owing to the Escrow Agent, plus any costs and expenses the Escrow Agent shall reasonably believe may be incurred by the Escrow Agent in connection with the termination of this Agreement.

(b)     Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business may be transferred, shall be the Escrow Agent under this Agreement without further act.

7.     **Compensation and Reimbursement.** The Parties agree that expenses shall be borne equally by Seller and Buyer (a) to pay the Escrow Agent upon execution of this Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder, which unless otherwise agreed in writing shall be as described in Schedule 2 attached hereto, and (b) to pay or reimburse the Escrow Agent upon request for all expenses, disbursements and advances, including, without limitation reasonable attorney's fees and expenses, incurred or made by it in connection with the performance, modification and termination of this Agreement. The obligations set forth in this Section 7 shall survive the resignation, replacement or removal of the Escrow Agent or the termination of this Agreement.

8.     **Indemnity.** (a) The Parties shall jointly and severally indemnify, defend and save harmless the Escrow Agent and its affiliates and their respective successors, assigns, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, costs or expenses (including, without limitation, the fees and expenses of outside counsel and experts and their staffs and all expense of document location, duplication and shipment)(collectively "Losses"), arising out of or in connection with (i) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except in the case of any Indemnitee to the extent that such Losses are finally adjudicated by a court of competent jurisdiction to have been primarily caused by the gross negligence or willful misconduct of such Indemnitee, or (ii) its following any instructions or other directions, whether joint or singular, from the Parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. The indemnity obligations set forth in this Section 8(a) shall survive the resignation, replacement or removal of the Escrow Agent or the termination of this Agreement.

(b) The Parties hereby grant the Escrow Agent a lien on, right of set-off against and security interest in, the Fund for the payment of any claim for indemnification, fees, expenses and amounts due to the Escrow Agent or an Indemnitee. In furtherance of the foregoing, the Escrow Agent is expressly authorized and directed, but shall not be obligated, to charge against and withdraw from the Fund for its own account or for the account of an Indemnitee any amounts due to the Escrow Agent or to an Indemnitee under either Sections 6(a), 7 or 8(a) of this Agreement.

9.     **Patriot Act Disclosure/Taxpayer Identification Numbers/Tax Reporting.**

(a) **Patriot Act Disclosure.** Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, the Parties acknowledge that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm the Parties identity including without limitation name, address and organizational documents ("identifying information"). The Parties agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

3

(b) **Certification and Tax Reporting.** The Parties have provided the Escrow Agent with their respective fully executed Internal Revenue Service ("IRS") Form W-8, or W-9 and/or other required documentation. All interest or other income earned under this Agreement shall be allocated to the Buyer and reported, as and to the extent required by law, by the Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income earned from the Escrow by the Buyer whether or not said income has been distributed during such year. Escrow Agent shall withhold any taxes it deems appropriate in the absence of proper tax documentation or as required by law, and shall remit such taxes to the appropriate authorities. The Parties hereby represent and warrant to the Escrow Agent that such underlying transaction does not constitute an installment sale requiring any tax reporting or withholding of imputed interest or original issue discount to the IRS or other taxing authority; provided, further, if the transaction is entitled to installment sale treatment pursuant to the applicable laws, the Seller hereby covenants to elect to cause the transaction not to be treated as an installment sale.

10.      **Notices.** All communications hereunder shall be in writing and except for communications from the Parties setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of funds, including but not limited to funds transfer instructions (all of which shall be specifically governed by Section 11 below), shall be deemed to be duly given after it has been received if it is sent or served:

(a) by facsimile;

(b) by overnight courier; or

(c) by prepaid registered mail, return receipt requested;

to the appropriate notice address set forth below or at such other address as any party hereto may have furnished to the other parties in writing.

If to Buyer

American Glass Enterprises, LLC
c/o Sun Capital Partners, Inc.
5200 Town Center Circle, Suite 600
Boca Raton, FL 33486
Tel.: (561) 394-0550
Fax: (561) 394-0540
Attn: Jason Neimark, Aaron Wolfe and C. Deryl Couch

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Tel. : (312) 862-2000
Fax: (312) 862-2200
Attn: Douglas C. Gessner, P.C., Patrick J. Nash, Jr., and Jeremy S. Liss

If to Seller

965 Ridge Lake Boulevard, Suite 300
Memphis, TN 38120
Attn: Arturo Carrillo
Tel.: (901) 767-7111
Fax: (901) 682-3062

If to the Escrow Agent

JPMorgan Chase Bank, N.A.
712 Main Street, 5th Floor South
Houston, Texas 77002
Attn: Lori Knight, Escrow Services
Fax No.: 713-216-6927

Notwithstanding the above, in the case of communications delivered to the Escrow Agent, such communications shall be deemed to have been given on the date received by an officer of the Escrow Agent or any employee of the Escrow Agent who reports directly to any such officer at the above-referenced office. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate. For purposes of this Agreement, "Business Day" shall

mean any day other than a Saturday, Sunday or any other day on which the Escrow Agent located at the notice address set forth above is authorized or required by law or executive order to remain closed.

11.  **Security Procedures.** Notwithstanding anything to the contrary as set forth in Section 10, any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of funds, including but not limited to any such funds transfer instructions that may otherwise be set forth in a written instruction permitted pursuant to Section 4 of this Agreement, may be given to the Escrow Agent only by confirmed facsimile and no instruction for or related to the transfer or distribution of the Fund, or any portion thereof, shall be deemed delivered and effective unless the Escrow Agent actually shall have received such instruction by facsimile at the number provided to the Parties by the Escrow Agent in accordance with Section 10 and as further evidenced by a confirmed transmittal to that number.

(a) In the event funds transfer instructions are received by the Escrow Agent by facsimile, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule 1 hereto, and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated. The persons and telephone numbers for call-backs may be changed only in a writing actually received and acknowledged by the Escrow Agent. If the Escrow Agent is unable to contact any of the authorized representatives identified in Schedule 1, the Escrow Agent is hereby authorized both to receive written instructions from and seek confirmation of such instructions by telephone call-back to any one or more of Seller's or Buyer's executive officers, ("Executive Officers"), as the case may be, which shall include the titles of Vice President, as the Escrow Agent may select. Such "Executive Officer" shall deliver to the Escrow Agent a fully executed incumbency certificate, and the Escrow Agent may rely upon the confirmation of anyone purporting to be any such officer. The Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Seller or Buyer to identify (i) the beneficiary, (ii) the beneficiary's bank, or (iii) an intermediary bank. The Escrow Agent may apply any of the Fund for any payment order it executes using any such identifying number, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated.

(b) Seller acknowledges that the Escrow Agent is authorized to use the following funds transfer instructions to disburse any funds due to Seller under this Agreement without a verifying call-back as set forth in Section 11(a) above:

> Seller's Bank account information:
>
> | | |
> |---|---|
> | Bank name: | Bank of America, N.A. |
> | Bank Address: | 100 N. Tryon Street, Charlotte, NC 28202 |
> | Fed Wire ABA number: | 02009593 |
> | ACH ABA number: | 061000052 |
> | SWIFT number: | BOFAUS3N |
> | Account name: | Vitro America LLC |
> | Account number: | 003253918694 |

Buyer acknowledges that the Escrow Agent is authorized to use the following funds transfer instructions to disburse any funds due to Buyer under this Agreement without a verifying call-back as set forth in Section 11(a) above:

> Buyer's Bank account information:
>
> | | |
> |---|---|
> | Bank name: | Wachovia Bank, N.A., a division of Wells Fargo Bank, N.A. |
> | Bank Address: | Boca Raton, FL 33486 |
> | ABA number: | 063-000-021 |
> | SWIFT number: | PNBPUS33 |
> | Account name: | Sun Capital Partners V, L.P. |
> | Account number: | 2000035180414 |

(c) The Parties acknowledge that the security procedures set forth in this Section 11 are commercially reasonable.

12.  **Compliance with Court Orders.** In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all

writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, entity, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

13.    **Miscellaneous.** Except for change to funds transfer instructions as provided in Section 11, the provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by the Escrow Agent and the Parties. Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by the Escrow Agent or any Party, except as provided in Section 6, without the prior consent of the Escrow Agent and the other parties. This Agreement shall be governed by and construed under the laws of the State of New York. Each Party and the Escrow Agent irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of New York. To the extent that in any jurisdiction either Party may now or hereafter be entitled to claim for itself or its assets, immunity from suit, execution attachment (before or after judgment), or other legal process, such Party shall not claim, and it hereby irrevocably waives, such immunity. Each Party and the Escrow Agent further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement. No party to this Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Agreement may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. A person who is not a party to this Agreement shall have no right to enforce any term of this Agreement. The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written. Except as expressly provided in Section 8 above, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date set forth above.

**BUYER**

By:_____

Name: Aaron P. Wolfe

Title: Vice President and Assistant Secretary of American Glass Enterprises, LLC

**SELLER**

By:_____

Name: _____

Title: _____

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**

**as Escrow Agent**

By:_____

Name:_____

Title: _____

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

**BUYER**

By:_____

Name: Aaron P. Wolfe

Title: Vice President and Assistant Secretary of American Glass Enterprises, LLC

**SELLER**

By:_____

Name: *Ricardo J Mais*

Title: *Vice President - Finance*

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**

**as Escrow Agent**

By:_____

Name:_____

Title: _____

7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

**BUYER**

By:_____

Name: Aaron P. Wolfe

Title: Vice President and Assistant Secretary of American Glass Enterprises, LLC

**SELLER**

By:_____

Name: _____

Title: _____

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**

as Escrow Agent

By:_____

Name:_____
         MAY NG

Title: _____
         Vice President

7

**SCHEDULE 1**

**Telephone Number(s) and authorized signature(s) for
Person(s) Designated to give Funds Transfer Instructions**

If from Buyer:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Aaron P. Wolfe | (561) 394-0550 | ~~~~~~ |
| 2. | Jason H. Neimark | (561) 394-0550 | _____ |

If from Seller:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |

**Telephone Number(s) for Call-Backs and
Person(s) Designated to Confirm Funds Transfer Instructions**

If from Buyer:

| | Name | Telephone Number |
|---|---|---|
| 1. | Aaron P. Wolfe | (561) 394-0550 |
| 2. | Jason H. Neimark | (561) 394-0550 |

If from Seller:

| | Name | Telephone Number |
|---|---|---|
| 1. | _____ | _____ |
| 2. | _____ | _____ |
| 3. | _____ | _____ |

**SCHEDULE 1**

**Telephone Number(s) and authorized signature(s) for**
**Person(s) Designated to give Funds Transfer Instructions**

If from Buyer:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Aaron P. Wolfe | (561) 394-0550 | |
| 2. | Jason H. Neimark | (561) 394-0550 | |

If from Seller:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |

**Telephone Number(s) for Call-Backs and**
**Person(s) Designated to Confirm Funds Transfer Instructions**

If from Buyer:

| | Name | Telephone Number |
|---|---|---|
| 1. | Aaron P. Wolfe | (561) 394-0550 |
| 2. | Jason H. Neimark | (561) 394-0550 |

If from Seller:

| | Name | Telephone Number |
|---|---|---|
| 1. | _____ | _____ |
| 2. | _____ | _____ |
| 3. | _____ | _____ |

## SCHEDULE 1

**Telephone Number(s) and authorized signature(s) for
Person(s) Designated to give Funds Transfer Instructions**

If from Buyer:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Aaron P. Wolfe | (561) 394-0550 | _____ |
| 2. | Jason H. Neimark | (561) 394-0550 | _____ |

If from Seller:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Arturo Carrillo | (901) 537-8422 | |
| 2. | Ricardo Maiz | (901) 537-8465 | |
| 3. | _____ | _____ | _____ |

**Telephone Number(s) for Call-Backs and
Person(s) Designated to Confirm Funds Transfer Instructions**

If from Buyer:

| | Name | Telephone Number |
|---|---|---|
| 1. | Aaron P. Wolfe | (561) 394-0550 |
| 2. | Jason H. Neimark | (561) 394-0550 |

If from Seller:

| | Name | Telephone Number |
|---|---|---|
| 1. | Arturo Carrillo | (901) 537-8422 |
| 2. | Ricardo Maiz | (901) 537-8465 |
| 3. | _____ | _____ |

8

SCHEDULE 2

# J.P.Morgan

**Schedule of Fees for Escrow Agent Services**

Based upon our current understanding of your proposed transaction, our fee proposal is as follows:

**Account Acceptance Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$ Waived**
Encompassing review, negotiation and execution of governing documentation, opening of the account, and completion of all due diligence documentation. Payable upon closing.

**Annual Administration Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$ 2,500.00**
The Administration Fee covers our usual and customary ministerial duties, including record keeping, distributions, document compliance and such other duties and responsibilities expressly set forth in the governing documents for each transaction. Payable upon closing and annually in advance thereafter, without pro-ration for partial years.

## Extraordinary Services and Out-of Pocket Expenses

Any additional services beyond our standard services as specified above, and all reasonable out-of-pocket expenses including attorney's or accountant's fees and expenses will be considered extraordinary services for which related costs, transaction charges, and additional fees will be billed at the Bank's then standard rate. Disbursements, receipts, investments or tax reporting exceeding 25 items per year may be treated as extraordinary services thereby incurring additional charges. The Escrow Agent may impose, charge, pass-through and modify fees and/or charges for any account established and services provided by the Escrow Agent, including but not limited to, transaction, maintenance, balance-deficiency, and service fees and other charges, including those levied by any governmental authority.

## Disclosure & Assumptions

- Please note that the fees quoted are based on a review of the transaction documents provided and an internal due diligence review. JPMorgan reserves the right to revise, modify, change and supplement the fees quoted herein if the assumptions underlying the activity in the account, level of balances, market volatility or conditions or other factors change from those used to set our fees.

- The escrow deposit shall be continuously invested in a JPMorgan Chase Bank money market deposit account ("MMDA") or a JPMorgan Chase Bank Cash Compensation account. MMDA and Cash Compensation Accounts have rates of compensation that may vary from time to time based upon market conditions. The Annual Administration Fee would include a supplemental charge up to 25 basis points on the escrow deposit amount if another investment option were to be chosen.

- The Parties acknowledge and agree that they are permitted by U.S. law to make up to six (6) pre-authorized withdrawals or telephonic transfers from an MMDA per calendar month or statement cycle or similar period. If the MMDA can be accessed by checks, drafts, bills of exchange, notes and other financial instruments ("Items"), then no more than three (3) of these six (6) transfers may be made by an Item. The Escrow Agent is required by U.S. law to reserve the right to require at least seven (7) days notice prior to a withdrawal from a money market deposit account.

- Payment of the invoice is due upon receipt.

## Compliance

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account. We may ask for information that will enable us to meet the requirements of the Act.

9

## FIRST AMENDMENT TO ESCROW AGREEMENT

THIS FIRST AMENDMENT TO THE ESCROW AGREEMENT (this "Amendment") is entered into to be effective as of June **[10]**, 2011 and amends that certain Deposit Escrow Agreement dated May 19, 2011 (the "Agreement"), by and among American Glass Enterprises, LLC, a Delaware corporation ("Buyer"), and Vitro America LLC, a Delaware limited liability company ("Seller," and together with Buyer, sometimes referred to individually as "Party" or collectively as the "Parties"), and JPMorgan Chase Bank, National Association, (the "Escrow Agent"). Capitalized terms used herein, but not otherwise defined, shall have the meaning ascribed to such terms in the Agreement.

**WHEREAS**, Buyer previously deposited $2,000,000 with the Escrow Agent subject to the terms and conditions of the Agreement;

**WHEREAS**, the Parties have agreed to increase the Escrow Deposit to $10,000,000 and, in connection with such agreement and this Amendment, Buyer is depositing an additional $8,000,000 with the Escrow Agent;

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein and in the Agreement and this Amendment, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.     <u>**Amendments to the Agreement.**</u>

Section 2 of the Agreement shall be amended and restated in its entirety as follows:

"2.     **Fund**. Buyer agrees to deposit with the Escrow Agent the sum of $10,000,000 (the "Escrow Deposit"). The Escrow Agent shall hold the Escrow Deposit and, subject to the terms and conditions hereof, shall invest and reinvest the Escrow Deposit and the proceeds thereof (the "Fund") as directed in Section 3; provided, however, that any amount over $10,000,000 shall accrue for the benefit of Buyer."

Section 4 of the Agreement shall be amended and restated in its entirety as follows:

"4.     **Disposition and Termination.** The Escrow Agent shall hold the Fund until the Escrow Agent receives (i) joint written instructions from both the Buyer and the Seller instructing the Escrow Agent with respect to the disbursement of the Fund ("Written Direction") or (ii) a final written order of the United States Bankruptcy Court for the Northern District of Texas or other court of competent jurisdiction indicating the manner in which the funds are to be disbursed among the Buyer and Seller (a "Final Order"), accompanied by a written opinion of counsel attesting to the finality of the Final Order, in which case the Escrow Agent shall disburse the Fund in accordance with the Written Direction or Final Order. The Escrow Agent will disburse the Fund only in accordance with this Section 4. Upon delivery of the Fund by the Escrow Agent, this Agreement shall

terminate, subject to the provisions of Section 8(b).  The Buyer and Seller agree to give Written Direction to the Escrow Agent to release any amount over $10,000,000 to the Buyer in accordance with Buyer's instructions.

2.      <u>Effect on Agreement</u>. Except as set forth in this Amendment, the Agreement and this Amendment shall remain in full force and effect in accordance with its original terms.

3.      <u>Governing Law</u>.  This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns and shall be governed by, construed, interpreted, and applied in accordance with the laws of New York, excluding any choice of law rules which would refer the matter to the laws of another jurisdiction.

4.      <u>Headings</u>.  Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purpose.

5.      <u>Counterparts, Facsimile Signatures</u>.  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which constitute but one agreement.  Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature hereto.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, this Amendment has been duly executed and delivered by each of the parties as of the date first above written.

**BUYER**

By:_____

Name: _____

Title: _____

**SELLER**

By:_____

Name: _____

Title: _____

**JPMORGAN CHASE BANK, N.A.**

By:_____

Name:_____

Title: _____